**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| BARCO, INC. and BARCO NV, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 2:23-CV-00521-JRG-RSP |
| | ) |
| v. | ) |
| | ) |
| YEALINK (USA) NETWORK | ) |
| TECHNOLOGY CO., LTD., and | ) |
| YEALINK NETWORK | ) |
| TECHNOLOGY CO., LTD. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.     Introduction ............................................................................................................. 1

II.    Legal Standards ....................................................................................................... 2

       A.     Necessity Of Claim Construction ................................................................ 2

       B.     Indefiniteness .............................................................................................. 3

       C.     Antecedent Basis ......................................................................................... 3

III.   Overview of the Technology ................................................................................... 4

IV.    Construction of Terms ............................................................................................ 7

       A.     Terms of the '002 Patent ............................................................................. 7

              1.     "means for audio communication" ................................................... 7

              2.     "means for data communication" ..................................................... 15

       B.     Terms of the '676 Patent ............................................................................. 16

              1.     "means for communication" ............................................................. 16

       C.     Terms of the '103 Patent ............................................................................. 17

              1.     "the at least one peripheral device" ................................................. 17

       D.     Terms of the '237 Patent ............................................................................. 20

              1.     "the audio device" ............................................................................ 20

V.     Conclusion .............................................................................................................. 22

## I.    INTRODUCTION

Plaintiffs Barco, Inc. and Barco NV ("Barco") asserts six patents in this case, each protecting inventive aspects of Barco's revolutionary wireless presentation and conferencing ClickShare® Products:  U.S. Patent Nos. 10,762,002 (the "'002 Patent") (Ex. A); 10,795,832 (the "'832 Patent") (Ex. B); 10,904,103 (the "'103 Patent") (Ex. C); 11,258,676 (the "'676 Patent") (Ex. D); 11,403,237 (the "'237 Patent") (Ex. E); and 11,422,951 (the "'951 Patent") (Ex. F) (collectively "the Asserted Patents").  ECF 1, ¶¶1, 21 (www.barco.com/en/products/clickshare-conferencing-collaboration/wireless-presentation).

Defendants Yealink (USA) Network Technology Co., Ltd., and Yealink Network Technology Co., Ltd. (collectively "Defendants") ***admit*** they infringe at least one claim from each asserted patent, including claim 11 of the '002 Patent, claim 1 of the '832 Patent, claim 1 of the '103 Patent, claim 1 of the '676 Patent, claim 1 of the '237 Patent, and claim 1 of the '951 Patent, and do not assert any counterclaims in this case, including no counterclaims of invalidity. ECF 47 (Yealink's Second Amended Answer) at ¶¶ 41, 51, 61, 71, 81, 91.

For claim construction, Defendants identify only five terms for construction, and do not propose any actual construction, instead alleging the following terms are indefinite:

- means for audio communication;
- means for data communication;
- means for communication;
- the at least one peripheral device; and
- the audio device.

The first three of the five terms addressed below, are "means plus function" terms that Defendants *admit* have support for structure and function in the specification.  Ex. L (Deposition Tr. of Defendants' expert, Dr. Almeroth) at 44:2-5 ("Q: Do you offer the opinion that there isn't hardware described? A: I don't think I have addressed that question.").   Indeed, the same

1

limitations appear uncontested in claims 11 of the '002 Patent and 1 of the '676 Patent that Defendants *admit* they infringe. *See* ECF 1, ¶¶41, 71; and ECF 47, ¶¶41, 71 (admitting infringement). Defendants, thus, had no difficulties understanding the scope of these three claim terms to admit its Accused Products meets those claimed limitations, and as a result, these terms are in no way indefinite.

The last two terms are clear, and Defendants only raise trivial antecedent basis based-invalidity theories. A POSITA, however, would readily understand the scope of the claims. Defendants' antecedent basis arguments are regularly rejected by this Court as insufficient to meet the clear and convincing standard necessary to find patent claims invalid. Indeed, a POSITA would readily understand these terms when viewed through the intrinsic record.

Defendants cannot meet their clear and convincing burden to establish that any claim term is indefinite, their arguments should be rejected, and the Court should adopt Barco's proposed construction. For the means-plus-function terms, the terms should be interpreted consistent with the specification's structure and function. For the non-means-plus-function terms, the terms are not indefinite and, consistent with this Court's precedent, interpreted in accordance with the specification to have their respective ordinary and customary meaning.

## II. LEGAL STANDARDS

### A. Necessity Of Claim Construction

"[T]he claims of a patent define the invention to which the patentee is entitle the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim construction "is a matter of resolution of disputed meanings and technical scope to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *02 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d 1351, 1362

(Fed. Cir. 2008) (citation omitted). "[C]laims are construed…only to the extent necessary to resolve the controversy." *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction "is not an obligatory exercise in redundancy").

### B.    Indefiniteness

A claim is definite if "viewed in light of the specification and prosecution history, inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* To be found indefinite, a means-plus-function term must have insufficient disclosure of structure in the specification to be understood by one skilled in the art as able to perform the recited functions. *Intel Corp. v. VIA Technologies, Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### C.    Antecedent Basis

"When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). "[T]he failure to provide explicit antecedent basis for terms does not always render a claim indefinite." *Id*. (citation omitted). Courts may also look to the prosecution history as "[a]nother tool to supply proper context for claim construction…." *Home Diagnostics, Inc. v. LifeScan, Inc.* 381 F.3d 1352, 1356 (Fed. Cir. 2004)

### III.    OVERVIEW OF THE TECHNOLOGY

The Asserted Patents improve upon the prior art by providing "a method and a system for connecting a processing device such as a laptop, smartphone, PDA, computer, tablet and suchlike to a communications network, the processing device having a memory, a display and an operating system with pre-installed generic drivers providing a generic communications protocol for communication between processing device and a standard class of peripheral devices." Ex. A at 29:66–30:6.

In 2011 (the priority date of the Asserted Patents), there were many problems for holding a face-to-face meeting. Ex. A at 4:37-38. For example, there was complexity of the networking infrastructure; high demands on technical expertise of users in systems that are supposed to be designed to support everyday use by the non-expert user; barriers to the use of complicated technology in meetings; great variety of possible collaborative software solutions—none of which seems to solve the fundamental problems of holding successful meetings; lack of standards for audio; need to install proprietary drivers for audio; large number of different, non-standardized sound cards. *Id.* at 4:39-60.

The inventors of the Asserted Patents developed a remedy to the prior art problems by "advantageously us[ing] the availability of a plug and play interface such as a USB interface. A USB device is connected to a suitable port on the processing device. For example, on every PC-like platform, there is standard built-in support for a USB audio device. Thus, there is a standard generic audio driver available. Using this audio interface is thus possible without special driver installation." *Id.* at 30:36-43. The Asserted Patents explain that "instead of 'scraping' the audio like e.g. prior art products do, embodiments of the present invention provide a channel, as described above, which is adapted to capture the audio on the peripheral device using only standard

drivers and not requiring any software installation in or on the processing device." *Id.* at 31:20-25; *see also id.* at 31:57-58 ("The generic drivers installed on the processing device make the audio available at the port 8 to the peripheral device 32.").

The Asserted Patents further teach that "[w]ith reference to the audio data on the processing device 31 such as a client PC, the audio is sent over a port using generic drivers such as over a USB port 8 using the standard built-in generic audio driver such as UAC driver 7.  On the peripheral device 32, the audio packets are read from the generic port, e.g. USB port 11 by a dedicated audio device 14.  These packets are then processed by any of a mixer a rate converter, an echo canceller, noise canceller or similar.  Any of the mixing, rate conversion, echo cancelling, noise cancelling can be executed using an ALSA driver 18." *Id.* at 32:57-66.

Thus, the Asserted Patents are directed to various aspects of using the pre-installed generic audio driver (or pre-installed generic driver) of the operating system to set up audio communication and routing the audio data via the connector/connection and the audio communication in a specific way.   Independent Claim 1 of the '002 Patent  specifically requires "setting up, by means of a first pre-installed generic audio driver of the operating system, a means for audio communication between the peripheral device and the processing device and by means of a second pre-installed generic driver of the operating system, a means for data communication between the peripheral device and the processing device" and "routing audio data from the processing device to the wireless transceiver via the connector of the peripheral device and the means for audio communication and routing the audio data from the wireless transceiver of the peripheral device to a base node over the communications network, wherein the first pre-installed generic audio driver is used for transferring the audio data between the processing device and the peripheral device." *Id.* at 33:52-58, 33:62-34:3.

A side-by-side comparison of Yealink's admittedly infringing product (left) and one embodiment of Barco's revolutionary ClickShare® patented device (right) is shown below:



ECF 1, ¶28.

## IV.    CONSTRUCTION OF TERMS

### A.    Terms of the '002 Patent

#### 1.    "means for audio communication"

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Not indefinite | Indefinite |
| **Alternatively:** | **Alternatively:** |
| Function: Provide audio communication between the peripheral device and the processing device. | Function: Provide audio communication between the peripheral device and the processing device. |
| Structure: an interface using a generic communications protocol. | Structure: an interface using a generic communications protocol. |
| '002 Patent (Ex. A) at 14:32-46; 18:19-28; 18:29-40; 18:60-61; 18:64-67; 19:10-35; 19:50-20:12; 23:26-24:20; 29:50-51; 30:15-19; 30:20-30; 30:36-31:42; 31:57-58; 32:11-42; 32:57-33:16; Figs. 1a, 3-5, 7-11. | '002 Patent (Ex. A), 19:50-20:12 |

The parties do not dispute that the term "means for audio communication" is governed by 35 U.S.C. 112 ¶6.  The parties do not dispute the function of this term.  *See above.*  The parties do not dispute the disclosed structure of this term.  *See above*; *see also* Ex. L at 44:2-5 (Dr. Almeroth confirming he did not opine that there is a lack of structure disclosed in the '002 Patent's specification).  The sole dispute is Defendants' assertion that the claim is indefinite.

Claim 1 of the '002 Patent requires, in part "a ***means for audio communication*** between the peripheral device and the processing device" and "routing audio data from the processing device to the wireless transceiver via the connector of the peripheral device and the ***means for audio communication***[.]" Ex. A at Claim 1.  Claim construction for the "means for audio communication" is unnecessary because Defendants admit infringement of claim 11 of the '002 Patent which contains the exact same term:  means for audio communication.  *See* ECF 1, ¶41, Ex.

A at Claim 11 (reciting "means for audio communications"); ECF 47, ¶41 (admitting infringement).   Nevertheless, to the extent claim construction is necessary, the parties' interpretation of the "means for audio communication" is not in dispute.

Despite admitting they infringe claims using this term, Defendants allege that the "means for audio communication" is indefinite.  The parties, however, each identify structure that performs the claimed function, found in the '002 Patent.  This confirms the term is not indefinite.

        a)   <u>Claim construction is unnecessary because Defendants have admitted infringement of a claim with this term in the '002 Patent.</u>

Defendants admit infringement of independent Claim 11 of the '002 Patent.  ECF 47, ¶41.  Claim 11 expressly recites the term "a means for audio communication."  Ex. A at Claim 11.  Defendants had no issues understanding the metes and bounds of this element when concluding that the Accused Products practiced Claim 11 of the '002 Patent.

As Defendants admitted to infringement of a claim containing the same term, the scope of the same means term in other claims is clear.  Accordingly, claim construction of this term is not necessary.  *See 02 Micro Intern.,* 521 F.3d at 1362 (Claim construction "is a matter of resolution of ***disputed meanings*** and technical scope...") (citation omitted).

        b)   <u>The '002 Patent provides sufficient structure under 35 U.S.C. §112 ¶6.</u>

To the extent the Court wishes to construe this term, the specification of the '002 Patent includes exemplary structure for the "means for audio communications" that the parties agree is the structure performing the claimed function.

Construing means-plus-function limitations requires first determining the function of the limitation and second, determining the corresponding structure described in the specification and equivalents thereof.  *Medtronic, Inc. v. Advanced Cardiovascular Systems*, *Inc.* 248 F.3d 1303, 1311 (Fed. Cir. 2001).

Neither the structure nor function of the "means for audio communication" are in dispute. The parties agree that the structure "means for audio communication" is an interface using a generic communications protocol.  ECF 65, Ex. B, 1.  Likewise, the parties agree that the function provide audio (or data) "communication between the peripheral device and the processing device." ECF 65, Ex. B, 1; Ex. I (Brogioli Declaration) at ¶39; *see also*, Ex. K (Almeroth Declaration) at ¶45.  Despite admitting the term "means for audio communication" is clear when conceding infringement of Claim 11, Defendants assert that the same "means for audio communication" is indefinite when it appears in Claim 1.

A claim is definite if "viewed in light of the specification and prosecution history, inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc.,* 572 U.S. at 910.  Conversely, a "patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 901. To be found indefinite, a means-plus-function term must have insufficient disclosure of structure in the specification to be understood by one skilled in the art as able to perform the recited functions. *Intel Corp.*, 319 F.3d at 1366.  "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co.* 844 F.3d at 1377.

"[I]f a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim, a means-plus-function clause is indefinite." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015). Both experts agree that there is structure in the specification.  However here, the parties have both identified structure in the specification that corresponds to the claimed function, such that the term

is definite.  Indeed, the specification of the '002 Patent provides sufficient structure to be understood by a POSITA as able to perform the recited function.

A "means for audio communication" is an interface which uses a generic communications protocol (such as USB).  Ex. I at ¶39.  Pre-installed generic drivers (such as a USB Driver) are identified as "providing a generic communications protocol for communication between processing device and a standard class of peripheral devices."  Ex. A at 30:4-6.  A pre-installed generic driver is "a driver which is installed on a processing device such as a computer as a standard driver, e.g., is installed with the installation of the operating system."  *Id*. at 14:32-46. Pre-installed generic drivers "can drive a standard class of peripheral devices coupled to or connected to the processing device" and do not require "installation of a specific driver[.]"  *Id*. at 14:35-39.  Pre-installed generic drivers include human interface drivers (HID), mass storage device drivers, and other which are used to drive, for example, to drive CD-ROMs, keyboards, USB memory sticks, flash memories, external hard drives, and more.  *Id.* at 14:39-46.

Hand-in-hand with the software driver is the corresponding discussion of pre-installed generic drivers and the associated ports.  For example, a connection unit may communicate to a processing device using a generic communications protocol provided by the pre-installed generic driver.  *Id*. at 19:61-65.  A connection unit is understood to be "a physical device in the form of an external peripheral device (shown in the drawings as a 'dongle' D)."  *Id*. at 23:35-44.  Fig. 4 depicts the external peripheral devices or "dongle" which also includes a plug and play interface (a USB interface, for example):



Fig. 4

*Id*. at Fig. 4; 23:40-53. The '002 Patent identifies the advantageous use of plug and play interfaces (like USB) with pre-installed generic drivers to provide communication of data between the processing device and peripheral device. *Id*. at 30:36-42.

An example connection unit (e.g., peripheral device) depicted in Fig. 10 also includes a USB device interface and a flexible connection over which data (including audio data) is communicated:



*Id*. at Fig. 10. "Preferably the connection units 47 … are physical plug-and-play devices." *Id*., 17:67-18:2. The connection unit is connected to the user processing device via the plug-and-play port, or the USB port in this example. *Id*. at 20:23-56 ("A first user action connects the client

processing device 31 to the base node 36, e.g., by inserting a connection unit 47 into the relevant interface connector on the processing device 31 e.g., a USB interface.")  "The generic driver is used in connection with the connection unit 47 (optionally 49) operating as a peripheral device… using a generic communication protocol provided by the pre-installed generic driver." (*Id*. at 19:61-65).  USB drivers are examples of pre-installed drivers.  *Id*. at 19:64-66.

Plug and play refers to "computer bus or device specification, which facilitates the discovery of a hardware component in a system, without the need for physical device configuration, or user intervention in resolving resource conflicts." *Id*. at 11:64-12:1; Ex. L (Dep. Tr. of Dr. Almeroth) at 32:22-33:1 ("UPnP is another technology.  Some of which is codified within a standard to essentially do what that describes:  The ability to be able to plug in different types of devices and be able to use them, to play them, with the goal being minimal configuration by user."). Computing systems are "automatically configured to make the newly added device work, both from *[a] hardware and from software perspective*." Ex. A at 12:4-6.  Example plug and play interfaces include "Firewire (IEEE-1394), PCI, Mini PCI, PCI Express, Mini PCI Express, PCMCIA, PC Card, Universal Serial Bus (USB), [and] SDIO Cards."  *Id*. at 12:9-11.

Example "hot swamping and hot plugging" interfaces are also disclosed in the specification.  A POSITA would understand these terms (e.g., USB, eSATA, PCLe, FireWire) are used with pre-installed generic drivers as a means for audio/data communications.  *Id*. at 12:35-36 ("A well-known example of this functionality is the Universal Serial Bus (USB) that allows users to add or remove peripheral components such as a mouse, keyboard, or printer.  Other examples are eSATA, PCIe, FireWire, for example.").

While other generic drivers and ports are supported in the specification as noted above, the

'002 Patent specifically identifies USB drivers and ports as the means for audio/data

communications.[1]  For example:

> In these embodiments, one of the pre-installed generic drivers of the operating
> system on the relevant computer device **31, 36** is exploited for setting up
> communication from the computer device **31, 36** to the network **50** via the
> connection unit **47,** (optionally **49**).  The generic driver is used in connection with
> the connection unit **47,** (optionally **49**) operating as a peripheral device but the use
> can go beyond that of the standard class of peripheral devices for which the generic
> driver is intended.  In some embodiments the connection unit **47,** (optionally **49**)
> operated as a peripheral device communicates with the relevant processing device
> **31**, **36** by using a generic communication protocol provided by the pre-installed
> generic driver. Pre-installed USB drivers are examples.

Ex. A, 19:53-65.

Indeed, "[a]n advantage of embodiments of the present invention is to provide data transfer

to the peripheral device via a peripheral interface such as a USB interface on any processing device

such as a computer in a manner that is largely operating system independent without leaving a

footprint (Zero-Footprint)." *Id*., 24:4-11.  Rather "[i]nstallation of drivers and/or applications onto

such a processing device as a computer is not necessary whether pre-installed generic drivers are

present" and "[t]o avoid the need for administrative rights, this embodiment uses other peripheral

device pre-installed drivers such as USB class drivers supported without any extra installation."

*Id*., 26:5-8, 26:9-12.

Further, USB is a known method to communicate data, including audio data.  Ex. L at

48:14-17 ("If I understand the scenario correctly, USB can be used to send data regardless of the

time of data that it is.  And so that data could, for example, be audio data."); Ex. J at 21:21-23:5

---

[1] USB is utilized by Yealink's WPP30 to connect the WPP30 to a user processing device.
Ex. N (WPP30 Data Sheet) at 2.

(describing using audio drivers to communicate audio information), 20:2-20 (describing using audio drivers to communicate audio information), 17:12-19:5 (describing drivers and USB communicating audio).  Indeed, "on every PC-like platform, there is  standard built-in support for a USB audio device.  Thus, there is a standard generic audio driver available."  Ex. A at 30:38-42.

A POSITA would understand that the plug and play interfaces beyond USB disclosed in the specification can be used with pre-installed generic drivers to provide a similar means of communication.  *Id*. at 12:7-10.  Indeed, these standards, and the corresponding structure associated with those standards, are well known to a POSITA to enable communications of data generally, in addition to audio data.  Ex. L, 25:19-26:6, 27:10-29:17, 34:1-24.

The preinstalled generic driver and ports of the peripheral device enable communication of data from the host processing device to the base node through one or more channels.  Ex. A at 29:30-37.  As noted in the specification, these channels may include (1) a scraped image stream; (2) GPU commands; (3) mouse pointing coordinates; (4) mouse pointer icons; (5) image data files; (6) multimedia data files or streams; (7) audio data files or streams; (8) text or document data files; and (9) transmission of a priority value.  *Id*. at 29:40-55.

Based on the description provided in the specification of the '002 Patent, the meaning of the "means for audio communication" is clear.  Ex. I at ¶39.  Further, while Defendants' Expert alleges that a POSITA would not reasonably be apprised of the scope of the claim with regard to the "means for [audio/data] communication" (Ex. K at ¶¶44, 62, 80), he also opines unambiguously regarding the scope of this term as applied to the prior art in a parallel IPR proceeding regarding the '002 Patent, confirming the clarity of the claims.  Ex. M (Almeroth Decl. in IPR2024-1436) at ¶¶103-118.  Accordingly, the term should be interpreted consistent with its usage in the specification.

### 2. "means for data communication"

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Not indefinite | Indefinite |
| **Alternatively:** | **Alternatively:** |
| Function: Provide data communication between the peripheral device and the processing device. | Function: Provide data communication between the peripheral device and the processing device. |
| Structure: an interface using a generic communications protocol. | Structure: an interface using a generic communications protocol. |
| '002 Patent (Ex. A) at 14:32-46; 18:19-28; 18:29-40; 18:60-61; 18:64-67; 19:10-35; 19:50-20:12; 23:26-24:20; 29:50-51; 30:15-19; 30:20-30; 30:36-31:42; 31:57-58; 32:11-42; 32:57-33:16; Figs. 1a, 3-5, 7-11. | '002 Patent (Ex. A), 19:50-20:12 |

> a) Claim construction is unnecessary because Defendants have admitted infringement of a claim with this term in the '002 Patent.

Defendants admit infringement of Claim 11 of the '002 Patent, which contains the exact same term "means for data communication." *See* ECF 1, ¶41, Ex. A at Claim 1 (reciting "means for data communications"); ECF 47, ¶41 (admitting infringement). Given Defendants' admission to infringement of a claim containing the same term, the scope of what is claimed by the term is clear. Accordingly, claim construction of this term is not necessary. *See 02 Micro Intern.,* 521 F.3d at 1362.

> b) The '002 Patent provides sufficient structure under 35 U.S.C. §112 ¶6.

Plaintiffs provided an identical position regarding the construction of "means for data communication" as submitted for "means for audio communication[.]" ECF 65, Ex. B. Audio, as is used in the prior claim term, is a subset of "data" and for the same reasons outlined above regarding "means for audio communication," the term "means for data communication" is

similarly not indefinite and should be interpreted consistent with its use in the specification.  Ex. J

(Deposition Tr. of M. Brogioli) at 51:4-53:2.

**B.    Terms of the '676 Patent**

**1.  "means for communication"**

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Not indefinite | Indefinite |
| **Alternatively:** | **Alternatively:** |
| Function: Provide communication between the peripheral device and the processing device. | Function: Provide communication between the peripheral device and the processing device. |
| Structure: an interface using a generic communications protocol. | Structure: an interface using a generic communications protocol. |
| '002 Patent (Ex. A) at 14:32-46; 18:19-28; 18:29-40; 18:60-61; 18:64-67; 19:10-35; 19:50-20:12; 23:26-24:20; 29:50-51; 30:15-19; 30:20-30; 30:36-31:42; 31:57-58; 32:11-42; 32:57-33:16; Figs. 1a, 3-5, 7-11. | '002 Patent (Ex. A), 19:50-20:12 |

a)    Claim construction is unnecessary because Defendants have admitted infringement of a claim with this term in the '676 Patent.

Defendants admit infringement of Claim 1 of the '676 Patent, which contains the exact

same term.  *See* ECF 1, ¶71, Ex. A at Claim 1 (reciting "means for communications"); ECF 47,

¶71 (admitting infringement).  Given Defendants' admission of infringement of a claim containing

the same term, the scope of the term is clear.  Accordingly, claim construction of this term is not

necessary.  *See 02 Micro Intern.,* 521 F.3d at 1362.

b)    The '676 Patent provides sufficient structure under 35 U.S.C. §112 ¶6.

Plaintiffs provided an identical position regarding the construction of "means for

communication" as submitted for "means for audio communication[.]"  ECF 65, Ex. B.  This term

does not specify what is communicated and therefore encompasses both the audio and data of claim 1 of the '002 Patent. Ex. J (Deposition Tr. of M. Brogioli) at 51:4-53:2. For the same reasons outlined above regarding "means for audio communication," the term "means for communication" is similarly not indefinite and should be interpreted consistent with its use in the specification.

### C.    Terms of the '103 Patent

#### 1.    "the at least one peripheral device"

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Plain and ordinary meaning, no construction is necessary | Indefinite |

Claim 1 of the '103 Patent requires, in part "*A computer peripheral device* comprising… wherein the visual indicator is configured in a way such that the user action by actuating the physical actuator indicates to the user whether or not the arbitrary media content is being sent from *the at least one peripheral device* to the communications network." Ex. C at Claim 1. Claim 16 depends from Claim 1. *Id*. at Claim 16. The term "the at least one peripheral device" is not recited earlier in Claim 1. *Id*. at Claim 1. Defendants do not propose any express construction for this term, only advancing a theory that the claim is invalid as indefinite. Defendants cannot carry their clear and convincing burden to establish this claim is invalid.

Claim construction for "the at least one peripheral device" is unnecessary because Defendants have admitted infringement of Claim 1 of the '103 Patent which contains this term. *See* ECF 1, ¶61, Ex. C at Claim 1); ECF 47, ¶61 (admitting infringement). However, to the extent claim construction is necessary, Defendants' position that "the at least one peripheral device" is indefinite, or otherwise unclear, should be rejected, as a POSITA would readily understand the meaning of the term.

a) Claim construction is unnecessary because Defendants have admitted infringement of a claim with this term in the '103 Patent.

Defendants admit infringement of Claim 1 of the '103 Patent, which recites this term. ECF 47, ¶61. Given the admission, the scope of what is claimed by the term is clear. Accordingly, claim construction of this term is not necessary.

b) The meaning of "the at least one peripheral device" is clear.

Defendants' contention that the term is indefinite should be rejected. "When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" *Energizer Holdings, Inc.*, 435 F.3d at 1370. "Another tool to supply proper context for claim construction is the prosecution history." *Home Diagnostics, Inc.*, 381 F.3d at 1356 . Upon review of the '103 Patent file history, the term is clear. Ex. G (the '103 File History).

Claim 1[2] was initially provided as Claim 29. Ex. G at 2303. On September 10, 2018, the USPTO rejected claims 23-49 under pre-AIA 35 USC §103(a) as being unpatentable over the prior art. *Id.* at 1338. In response, applicant amended then-existing Claim 23, which already included a limitation claiming "at least one peripheral device" to recite "wherein the visual indicator is configured in a way such that the user action by actuating the actuator indicates to the user whether or not the arbitrary media content is being sent from ***the at least one peripheral device*** to the communications network." *Id.* at 1603-04. Claim 29 was similarly amended "to recite similar features as recited in amended claim 23." *Id.* at 1606, 1613. When amending Claim 29, Applicant

---

[2] Claim 16 depends from Claim 1. Ex. C at Claim 16. Defendants have not identified any reasons Claim 16 is indefinite beyond the arguments provided for Claim 1. Ex. K at ¶¶95-100. As Claim 1 is not indefinite, neither is Claim 16.

merely copied the identical text added to Claim 23 despite Claim 29 reciting "[a] computer peripheral device" instead of "at least one peripheral device" as recited in (then-existing) Claim 23. Claims 23-28 were later cancelled and Claim 29 issued as Claim 1 including "the at least one peripheral device" language. *Id.* at 2033, 2046, 2051.

However, upon review, it is clear that the claimed "the at least one peripheral device" refers to the earlier introduced "a computer peripheral device." In addition to the clarity provided by the prosecution history, a POSITA would know that "a" means "one or more." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 365 F.3d 1299, 1305-06 (Fed. Cir. 2004) ("the article 'a' or 'an'…mean[s] one or more"); *ABS Global, Inc. v. Cytonome/ST, LLC*, 84 F.4th 1034, 1040-1041 (Fed. Cir. 2023). When the claim first introduced the noun "peripheral device" it is introduced as "a" "computer" "peripheral device." The "a" confirms that the claim encompasses "one or more" or said otherwise "at least one" peripheral device. *WAPP Tech Ltd. P'ship v. JPMorgan Chase Bank, N.A.*, No. 4:23-CV-1137, 2024 WL 4828080, at *12 (E.D. Tex. Nov. 19, 2024) (citing *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("Because the initial indefinite article ('a') carries either a singular or plural meaning, any later reference to that same claim element merely reflects the same potential plurality.")). Similarly, when the noun "peripheral device" is first introduced, it is accompanied by the adjective "computer" describing the claimed one or more peripheral device. As the POSITA continues to read the remainder of the claim, the POSITA would understand that the subsequently mentioned "peripheral device" refers to the previously mentioned "peripheral device," despite the subsequently mentioned "peripheral device" not including the same "computer" adjective.

When the subsequently mentioned "the…peripheral device" appears, a POSITA would understand it to refer to the previously mentioned "a…peripheral device," despite the subsequently

mentioned "the…peripheral device" expressly including the implied "one or more" of the article "a." *Id.* at *13 ("To whatever extent this antecedent basis is deemed to be not explicit, this antecedent basis relationship is implicit because [a peripheral device] encompasses both the singular and the plural.") (citing *Baldwin*, 512 F.3d at 1342 (quoted above); *see also Energizer Holdings, Inc.*, 435 F.3d at 1371 (holding that "an anode gel comprised of zinc as the active anode component" provided implicit antecedent basis for "said zinc anode"); *see also Ex Parte Porter*, 25 U.S.P.Q. 2d (BNA) 1144, 1145 (B.P.A.I. 1992) ("The term 'the controlled fluid' ... finds reasonable antecedent basis in the previously recited 'controlled stream of fluid ....' "); *Fisher-Price, Inc. v. Graco Children's Prods.*, No. 05-1258, 154 F. App'x 903, 909 (Fed. Cir. Nov. 4, 2005) ("[a] claim is not invalid for indefiniteness if its antecedent basis is present by implication") (citations omitted).)

Indeed, as noted by Dr. Brogioli, a POSITA would be informed, with reasonable certainty, as to the scope of Claim 1 of the '103 Patent. Ex. I at ¶¶46-51.

Accordingly, it would be readily apparent to a POSITA that the "peripheral device" and "a computer peripheral device" refer to the same element, and that no further claim construction is necessary. Ex. I at ¶¶47-49.

### D.    Terms of the '237 Patent

#### 1.    "the audio device"

| Plaintiffs' Position | Defendants' Position |
|---|---|
| Plain and ordinary meaning, no construction is necessary | Indefinite |

Claim 2 of the '237 Patent recites "The method of claim 1**,** wherein the ***audio device*** comprises an audio output adapter device which is configured as a virtual audio device to transfer the audio data from the processing device to the base node via the communications network."  Ex.

20

E at Claim 2.  Defendants' position that "the audio device" is indefinite should be rejected. Defendants do not propose any express construction for this term, only advancing a theory that the claim is invalid as indefinite.  Defendants cannot carry their clear and convincing burden to establish this claim is invalid.

a)    <u>"the audio device" is not indefinite.</u>

Like the prior term, by looking to the prosecution history the meaning of Claim 2 is clear. Claim 2 was originally filed as Claim 83.  Ex. H (the '237 Patent File History) at 923.  As-filed Claim 83 provided the identical limitations to issued Claim 2.  *Id*. at 91; Ex. E at Claim 2.  When filed, Claim 82 (which issued as Claim 1) contained the limitation "reading the audio data from the port using an audio device on the external peripheral device[.]"  Ex. H at 923.  During prosecution this limitation was removed.  *Id*. at 664.  However, Claim 83 was not amended to change the antecedent basis of "the audio device[,]" *Id*.  It is clear that Claim 2 of the '237 Patent's use of "the audio device" should be "an audio device," as no other audio device has been introduced.  *WAPP Tech Ltd. P'ship*, 2024 WL 4828080, at *16 (finding a claim reciting "the mobile device" without introducing "a mobile device" to be "reasonably clear as referring to the mobile device that the user is using.").  Similarly, the introduction of "the audio device" is clear, referring to an audio device in the claimed system.  Indeed, where such an interpretation "is apparent on the face of the claim," such a claim is not indefinite.

There is no requirement a term have an explicit antecedent basis—an antecedent basis may be present by implication.  *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1319 (Fed. Cir. 2005); *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001) ("The failure to provide explicit antecedent basis for terms does not always render a claim indefinite. If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.").

21

Finally, as noted by Dr. Brogioli, a POSITA would be informed, with reasonable certainty, as to the scope of Claim 2 of the '237 Patent.  (Ex. I at ¶¶52-58).  Accordingly, no claim construction is necessary.

## V.    CONCLUSION

Defendants cannot meet their clear and convincing evidence burden to establish that any terms of the Asserted Patents are invalid (their sole claim construction theories), and as a result the plain and ordinary meaning of the terms should govern.

Dated: January 28, 2025

*/s/ Erik J. Halverson*
Erik J. Halverson (Bar No. 333492CA)
erik.halverson@klgates.com
**K&L GATES LLP**
Four Embarcadero Ctr.,
Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8238

Melissa Smith (Texas Bar No. 24001351)
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: +1 903 934 8450
Facsimile: +1 903 934 9257
melissa@gillamsmithlaw.com

Christopher Centurelli (pro hac vice)
christopher.centurelli@klgates.com
Anna E. L'Hommedieu (pro hac vice)
Anna.lhommedieu@klgates.com
Joshua N. Andrews (pro hac vice)
Joshua.Andrews@klgates.com
**K&L GATES LLP**
1 Congress Street, Suite 2900
Boston, MA 02114-2023
Telephone: (617) 261-3100

*Attorneys for Plaintiffs*
*Barco, Inc. and Barco N.V.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2025, all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3).

*/s/ Erik J. Halverson*
Erik J. Halverson

23