|  |  |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE EASTERN DISTRICT OF TEXAS |
| 3 | MARSHALL DIVISION |
| 4 | BARCO, INC., ET AL.,            )( |
| 5 | PLAINTIFFS,            )(   CIVIL ACTION NO. |
| 6 | )(   2:23-CV-521-JRG-RSP |
| 7 | VS.            )(   MARSHALL, TEXAS |
| 8 | YEALINK (USA) NETWORK            )( |
| 9 | TECHNOLOGY CO., LTD., ET AL., )(   MARCH 11, 2025 |
| 10 | DEFENDANTS.            )(   3:03 P.M. |

11    CLAIM CONSTRUCTION AND MOTION TO COMPEL HEARING

12    BEFORE THE HONORABLE ROY S. PAYNE

13    UNITED STATES MAGISTRATE JUDGE

14

15    FOR THE PLAINTIFFS:    Mr. Erik J. Halverson
                             K&L Gates LLP
16                           4 Embarcadero Center
                             Suite 1200
17                           San Francisco, CA 94111

18                           Mr. Joshua N. Andrews
                             Mr. Christopher Centurelli
19                           K&L Gates LLP
                             1 Congress St.
20                           Suite 2900
                             Boston, MA 02114

21

22                           Mr. Tom Gorham
                             Gillam & Smith LLP
                             102 N. College
23                           Suite 800
                             Tyler, TX 75702

24

25

```
 1   FOR THE DEFENDANTS:        Mr. Stephen Yang
                                Dentons US LLP
 2                              1221 Avenue of the Americas
                                New York, NY 10020
 3
                                Mr. Forrest Gothia
 4                              Mr. Victor C. Johnson
                                Dentons US LLP
 5                              100 Crescent Court
                                Suite 900
 6                              Dallas, TX 75201

 7
     COURT REPORTER:            Ms. Shelly Holmes, CSR, TCRR
 8                              Official Court Reporter
                                Honorable Robert W. Schroeder III
 9                              United States District Judge
                                Eastern District of Texas
10                              Texarkana Division
                                500 North State Line Avenue
11                              Texarkana, TX 75501
                                shelly_holmes@txed.uscourts.gov
12
     (Proceedings recorded by mechanical stenography, transcript
13   produced on a CAT system.)

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 03:03:46 | 1 | COURT SECURITY OFFICER:  All rise. |
| 03:03:47 | 2 | THE COURT:  Good afternoon.  Please be seated. |
| 03:04:26 | 3 | For the record, we're here for the claim |
| 03:04:39 | 4 | construction hearing, as well as a motion hearing, in |
| 03:04:43 | 5 | Barco, Inc. versus Yealink Network, et al., which is Case |
| 03:04:49 | 6 | No. 2:23-521 on our docket. |
| 03:04:53 | 7 | Would counsel state their appearances for the |
| 03:04:55 | 8 | record? |
| 03:04:55 | 9 | MR. GORHAM:  Good afternoon, Your Honor.  Tom |
| 03:04:59 | 10 | Gorham on behalf of the Plaintiffs.  With me here today is |
| 03:05:02 | 11 | Erik Halverson, Josh Andrews, and Chris Centurelli. |
| 03:05:08 | 12 | Plaintiffs are ready to proceed, Your Honor. |
| 03:05:09 | 13 | THE COURT:  Thank you, Mr. Gorham. |
| 03:05:11 | 14 | MR. GOTHIA:  Good afternoon, Your Honor.  Forrest |
| 03:05:13 | 15 | Gothia with Dentons US, here for the Yealink Defendants. |
| 03:05:16 | 16 | With me is my colleague, Stephen Yang, also with Dentons. |
| 03:05:21 | 17 | THE COURT:  All right. |
| 03:05:21 | 18 | MR. GOTHIA:  We are ready to proceed, Your Honor. |
| 03:05:22 | 19 | THE COURT:  Thank you, Mr. Gothia. |
| 03:05:26 | 20 | MR. GOTHIA:  Thank you. |
| 03:05:27 | 21 | THE COURT:  Earlier this afternoon, we distributed |
| 03:05:31 | 22 | to counsel for both sides a set of preliminary |
| 03:05:34 | 23 | constructions of the disputed terms. |
| 03:05:39 | 24 | I want to emphasize that the intent of issuing |
| 03:05:43 | 25 | those preliminary constructions was not to prevent either |

| | | |
|---|---|---|
| 03:05:50 | 1 | side from taking whatever position they believe is |
| 03:05:52 | 2 | appropriate on these terms.  Rather, the intent is to allow |
| 03:06:01 | 3 | counsel to know where the Court is after the initial review |
| 03:06:03 | 4 | of the briefing and the record so that you can focus your |
| 03:06:08 | 5 | arguments most where you think the Court may have missed |
| 03:06:11 | 6 | the mark. |
| 03:06:11 | 7 | I do reserve the right to amend these preliminary |
| 03:06:15 | 8 | constructions and not uncommonly do amend them based on the |
| 03:06:27 | 9 | arguments in this hearing.  So I hope they'll be taken in |
| 03:06:30 | 10 | that spirit. |
| 03:06:31 | 11 | Having said that, I will turn it over first to |
| 03:06:34 | 12 | counsel for Plaintiff. |
| 03:06:35 | 13 | MR. HALVERSON:  Good afternoon, Your Honor.  Erik |
| 03:06:51 | 14 | Halverson on behalf of Barco. |
| 03:06:52 | 15 | THE COURT:  Good afternoon. |
| 03:06:52 | 16 | MR. HALVERSON:  I'm going to handle the |
| 03:06:55 | 17 | "means-plus-function" terms, and then my associate, |
| 03:06:57 | 18 | Mr. Andrews, is going to handle the "peripheral device" |
| 03:07:03 | 19 | term, and we can dive on in. |
| 03:07:06 | 20 | So I believe you have in front of you, Your Honor, |
| 03:07:08 | 21 | our preliminary constructions -- excuse me, our slides for |
| 03:07:13 | 22 | today -- |
| 03:07:13 | 23 | THE COURT:  I do. |
| 03:07:14 | 24 | MR. HALVERSON:  -- in a binder, and so I'll do my |
| 03:07:17 | 25 | best to reference the slide that we're on for the record as |

03:07:19    1    we proceed.

03:07:19    2    So there are six patents at issue in this case.

03:07:25    3    They're directed towards presentation dongles and the

03:07:28    4    communication of information from one device to another

03:07:31    5    device through these dongles.

03:07:33    6    And I have here today what Barco's dongles are.

03:07:37    7    It's a little box with a button on it that the user uses

03:07:42    8    once they've attached the dongle to their laptop.  And then

03:07:45    9    this device communicates with a base station up at the

03:07:48    10   front of the room, takes information from the laptop,

03:07:51    11   transmits it to a large display screen up at the front.

03:07:55    12   And when you've got multiple people in the room, one person

03:07:58    13   pushes the button to take control.  When they're done

03:08:01    14   presenting, somebody else pushes the button to take

03:08:05    15   control.

03:08:05    16   And so it's through these dongles, you can have a

03:08:08    17   group presentation on a network within an office building,

03:08:12    18   a government building, or some other facility where you may

03:08:15    19   not want to necessarily grant access to the visitors to

03:08:21    20   access the local network or the Internet in that office.

03:08:24    21   So this has a lot of bearing at places like law

03:08:29    22   firms or government buildings where the employees who work

03:08:30    23   in that building may have access to secure files, but when

03:08:31    24   people come in and need to make a presentation, the IT

03:08:34    25   department of that building may not want to let the

03:08:36  1  visitors have access to the Internet.  And so, instead,

03:08:44  2  what they use is these kinds of dongles.

03:08:47  3      So there are a few different ways that these

03:08:49  4  dongles could work.  You could have software on them that

03:08:54  5  is installed on your laptop when you insert them.  You

03:08:57  6  could have existing drivers on the machine, and those

03:09:02  7  existing drivers you can use to help facilitate the

03:09:06  8  transfer of information from one spot to another.

03:09:08  9      And so the claims that we're talking about today

03:09:10  10 as it relates to the "means-plus-function" terms are claims

03:09:14  11 where you're transferring information using existing

03:09:17  12 drivers, generic drivers such as USB, HDMI, VGA, display

03:09:23  13 ports, content that's already sitting on the user's laptop.

03:09:26  14 So you're not installing software from the dongle onto the

03:09:31  15 laptop, you're just using what the laptop already has.

03:09:35  16     And so before we dive into the claim construction

03:09:41  17 itself, I think it's important to kind of reorient where we

03:09:44  18 are in the case.

03:09:45  19     So Barco filed its initial complaint alleging

03:09:48  20 infringement of a number of claims.  Yealink answered in

03:09:52  21 its answer.  In its answer, it denied infringement.  It

03:09:56  22 raised a number of affirmative defenses, and it raised a

03:10:00  23 number of counterclaims.

03:10:02  24     Yealink then filed an amended answer.  In that

03:10:06  25 amended answer, they dropped their counterclaims, they

03:10:08   1   reduced the number of affirmative defenses, and they

03:10:10   2   admitted infringement of a number of claims.  You see in

03:10:13   3   the middle column up on the screen -- or the second to

03:10:15   4   the -- from the right the claims that they have admitted to

03:10:18   5   infringe.

03:10:18   6           Now, why does this matter?  Well, one of these

03:10:21   7   claims that they've admitted to infringe, Claim 1 of the

03:10:26   8   '676 patent, they're now arguing is indefinite.  They have

03:10:28   9   no counterclaims.  They've already admitted to the cause of

03:10:33   10  action.  All that remains on the '676 patent is whether or

03:10:37   11  not -- or the amount of the damages that should be awarded,

03:10:40   12  the reasonable royalty -- at least the reasonable royalty

03:10:43   13  that Barco is entitled to.  And our position is that

03:10:46   14  they've waived all right to any of their defenses because

03:10:50   15  they've admitted to that cause of action on the '676.

03:10:52   16          So we'll dive into the disputed terms today.

03:11:00   17  There are three "means for" terms, and there's one -- at

03:11:05   18  least one peripheral device.  And depending on what counsel

03:11:09   19  for Yealink does, there might be one more term.  We've

03:11:16   20  received an email saying that they were withdrawing the

03:11:19   21  "audio device" term from argument, and so we'll see what

03:11:21   22  happens when they get up.

03:11:23   23          So we're going to begin with the means for

03:11:26   24  function -- or the means for claims.  And there are two

03:11:29   25  claims at issue for the means-plus-function claims in this

| | | |
|---|---|---|
| 03:11:32 | 1 | case, Claim 1 of the '002 patent and Claim 1 of the '676 |
| 03:11:36 | 2 | patent. |
| 03:11:39 | 3 | Now, what is not at issue here?  There is no |
| 03:11:43 | 4 | dispute about what the structure for these |
| 03:11:46 | 5 | means-plus-function claims is.  There's no dispute that |
| 03:11:50 | 6 | means-plus-function governs, that these claims should be |
| 03:11:54 | 7 | construed in accordances with 112(f) or 112(6). |
| 03:11:57 | 8 | There's no dispute as to what the claim function |
| 03:11:59 | 9 | is. |
| 03:11:59 | 10 | There's also no dispute that exemplary disclosure |
| 03:12:02 | 11 | exists for what that structure is. |
| 03:12:06 | 12 | And so what is that dispute?  Why are we here |
| 03:12:08 | 13 | today? |
| 03:12:09 | 14 | Well, we're here because Yealink contends that for |
| 03:12:13 | 15 | structure, where there is no generic processor identified, |
| 03:12:17 | 16 | that for some reason there needs to be an algorithm |
| 03:12:19 | 17 | identified. |
| 03:12:21 | 18 | And so we disagree that that's the case.  But even |
| 03:12:24 | 19 | to the extent it is the case and there is a need for an |
| 03:12:27 | 20 | algorithm to be disclosed, there is a disclosure of a |
| 03:12:30 | 21 | sufficient algorithm in the specification. |
| 03:12:32 | 22 | And so as this Court has held, when there is |
| 03:12:38 | 23 | special-purpose hardware and it is disclosed in the |
| 03:12:43 | 24 | specification, there is no algorithm required.  And so |
| 03:12:45 | 25 | don't forget, we see the structure -- we don't see the |

03:12:50    1    structure because the clicker doesn't work -- but in the

03:12:53    2    green box, we see what that structure is.  It's

03:12:56    3    special-purpose structure.  We see in Yealink's proposal

03:12:59    4    that they agree that there is disclosure for that

03:13:02    5    structure.

03:13:02    6        And so what do we have in the specification that

03:13:05    7    is that structure?  We have a picture of the product.  We

03:13:08    8    have exactly what this is.  This is the interface that is

03:13:13    9    the structure that the parties do not dispute performs the

03:13:16    10   function that the parties do not dispute, and this is

03:13:19    11   exactly what Figure 11 -- or, excuse me, Figure 10 of the

03:13:24    12   two patents depicts.

03:13:25    13       And so to the extent there is an algorithm

03:13:31    14   required -- and, again, we don't think that there is --

03:13:34    15   when there is some disclosure of an arguable algorithm,

03:13:38    16   what we have to look at is, is that disclosure in the

03:13:43    17   specification enough in the eyes of a person of skill in

03:13:46    18   the art to identify the sufficiency of it?

03:13:48    19       And so we contend that it is.

03:13:55    20       Dr. Almeroth, Yealink's expert in this case,

03:13:59    21   offers the opinion solely that there is no disclosure of

03:14:02    22   any algorithm, no disclosure of any structure or no

03:14:06    23   disclosure of even definitions as to what the generic

03:14:10    24   communication protocol provided by the preinstalled generic

03:14:14    25   driver is.  And that's not quite what the test is.

10

03:14:17    1          The test is, is there an algorithm that performs

03:14:20    2    the function?  The function is the audio communication

03:14:25    3    between the peripheral device, which is the laptop, and the

03:14:29    4    processing device -- excuse me, the peripheral device,

03:14:31    5    which is the dongle, the back of the dongle, the box part,

03:14:34    6    and the processing device which is a laptop.

03:14:38    7          Now, how do we provide for audio communication

03:14:41    8    from one device to the other?  Through this interface,

03:14:45    9    through this wire, into this box.  This box over here is

03:14:49    10    the peripheral device.  The laptop that it plugs into is

03:14:53    11    the processing device.

03:14:54    12          Dr. Almeroth says there's no disclosure of any

03:14:59    13    algorithm.  And so when we're talking about the sufficiency

03:15:02    14    of any disclosure in the specification, Dr. Almeroth offers

03:15:06    15    no opinion on whether or not what is in the specification

03:15:09    16    is sufficient.  His sole opinion is that there is no

03:15:13    17    disclosure.

03:15:14    18          Now, Dr. Brogioli, Barco's expert in this matter,

03:15:20    19    evaluated the specification.  He went through, and he found

03:15:23    20    what we contended to be an example flow in the figure --

03:15:27    21    and we'll put the figure up in just a second -- but an

03:15:30    22    example flow of how it is that this audio information or

03:15:35    23    data information or just general data is communicated from

03:15:38    24    the laptop to the dongle.

03:15:39    25          What he said is:  Look, this disclosure in the

11

03:15:43    1    '002 tells the reader, it's simple.  It's just the USB

03:15:46    2    interface, or it's generic, or it's the equivalent of that

03:15:49    3    USB interface.  But that is what this claim is disclosing

03:15:52    4    as that process.

03:15:53    5         And so how does that do that?  We've got a series

03:15:57    6    of drivers that are depicted in the figure and described in

03:16:01    7    the specification that communicate information through the

03:16:03    8    USB port of the laptop, through this USB receiver, through

03:16:10    9    this wire, and then into the dongle.  And that's exactly

03:16:13    10   what we see in this flowchart of Figure 11.

03:16:17    11        And on this screen, we see a few examples of where

03:16:21    12   this USB driver and where this USB interface is depicted in

03:16:26    13   the specification.

03:16:27    14        Now, I want to draw your attention to the one on

03:16:29    15   the right where we see a first user action connects the

03:16:34    16   client processing device to the base node by inserting a

03:16:36    17   connection unit 47 into the relevant interface connector on

03:16:42    18   the processing device 31, e.g., the USB interface of the

03:16:47    19   dongle that's depicted in Figure 10.

03:16:49    20        We see some more exemplary disclosure of exactly

03:16:52    21   the same USB interface.  In the '002 patent, Column 24,

03:16:59    22   Lines 4 to 11; Column 30, Lines 36 to 43; Column 31, Lines

03:17:07    23   29 to 42; and Column 32, Lines 22 to 26.

03:17:16    24        And the reason why this USB port or USB interface

03:17:19    25   is particularly at issue is this is the accused product.

03:17:23    1    This is the exact same USB interface, exact same flexible

03:17:28    2    cord, goes into their box.

03:17:30    3        So this claim construction exercise about

03:17:33    4    indefiniteness is all centered on whether or not the image

03:17:37    5    depicting this -- Barco's product is of sufficient

03:17:41    6    disclosure for Yealink's identically structured structure

03:17:45    7    that performs the same algorithm in its project -- product,

03:17:49    8    excuse me.

03:17:49    9        With that, Your Honor, I have nothing else unless

03:17:51    10    you have any questions on the "means for" limitations.

03:17:55    11        THE COURT:  Not at this time, Mr. Halverson.

03:17:57    12    Thank you.

03:17:58    13        MR. HALVERSON:  Mr. Andrews is going to handle

03:18:01    14    "the at least one peripheral" part of today's argument.

03:18:05    15        THE COURT:  Although I would like to hear the

03:18:06    16    response first.

03:18:07    17        MR. HALVERSON:  Okay.

03:18:08    18        THE COURT:  Thank you.

03:18:19    19        MR. YANG:  Good afternoon, Your Honor.  Stephen

03:18:21    20    Yang on behalf of the Yealink Defendants.

03:18:24    21        THE COURT:  Good afternoon, Mr. Yang.

03:18:30    22        MR. YANG:  Your Honor, we do have some

03:18:30    23    demonstratives we prepared for today's hearing.  If the

03:18:32    24    Court would like to see them, I can approach and hand them

03:18:33    25    up.

| | | |
|---|---|---|
| 03:18:33 | 1 | THE COURT:  All right.  That's fine. |
| 03:18:55 | 2 | MR. YANG:  Thank you, Your Honor. |
| 03:18:57 | 3 | I have seen the Court's preliminary construction, |
| 03:19:00 | 4 | so instead of going through the entire argument, is there a |
| 03:19:04 | 5 | particular point the Court would like me -- would like me |
| 03:19:07 | 6 | to focus on and just explain better? |
| 03:19:09 | 7 | THE COURT:  You know, I understand that the |
| 03:19:11 | 8 | dispute really has to do about whether an algorithm is |
| 03:19:15 | 9 | required. |
| 03:19:15 | 10 | MR. YANG:  Yes, Your Honor. |
| 03:19:17 | 11 | THE COURT:  It's my view of the case law that an |
| 03:19:22 | 12 | algorithm is not required if the structure is not a general |
| 03:19:26 | 13 | purpose computer or a processor.  And I don't see anything |
| 03:19:33 | 14 | here that indicates that that's the case. |
| 03:19:38 | 15 | So to the extent you have a different view of it, |
| 03:19:42 | 16 | I'd like to hear it. |
| 03:19:43 | 17 | MR. YANG:  Of course, Your Honor. |
| 03:19:44 | 18 | I think here, the structure, as my colleague, |
| 03:19:50 | 19 | Mr. Halverson, has pointed out, refers to this generic |
| 03:19:57 | 20 | communications protocol.  It's an interface that uses a |
| 03:20:00 | 21 | generic communications protocol. |
| 03:20:02 | 22 | But according to the patents, there's a little bit |
| 03:20:05 | 23 | more to that, because a protocol is something that uses the |
| 03:20:12 | 24 | preinstalled generic drivers.  Preinstalled generic drivers |
| 03:20:18 | 25 | provide this protocol, and what the protocol does is |

03:20:22    1    communication between the processing device, which is a

03:20:25    2    computer, and a standard class of the peripheral devices,

03:20:29    3    including the dongle we have just seen.

03:20:31    4        Drivers, Your Honor, are software.  Drivers are

03:20:36    5    not hardware.  So here we do have a situation -- even

03:20:40    6    though the claims refer to this interface, this interface

03:20:44    7    has to use a generic communication protocol that is

03:20:49    8    provided by a generic -- a preinstalled generic driver.

03:20:54    9    That is what is claimed through this "means for" claim.

03:20:59    10        And because of that, Your Honor, it is our

03:21:02    11    position that there has to be a little bit more.  Here you

03:21:07    12    do have a computer or processing device that is being

03:21:12    13    programmed to provide this function, the function of

03:21:15    14    communicating between processing device and the peripheral

03:21:19    15    device.

03:21:20    16        THE COURT:  Would you contend that that's a

03:21:22    17    general purpose processor?

03:21:24    18        MR. YANG:  I think the computer, before it had

03:21:28    19    this driver on it, before it was programmed to do this

03:21:31    20    function, yes, that is a general purpose computer.  It

03:21:36    21    could be anybody's personal laptop.  It could be a computer

03:21:40    22    running Mac.  It could be running Android operating system.

03:21:44    23        But once it has --

03:21:45    24        THE COURT:  That's what it's communicating with,

03:21:48    25    but that's not part of the structure of this particular

03:21:56    1    means, is it?

03:21:56    2        MR. YANG:  Well, Your Honor, again, the means, as

03:22:01    3    defined in the claims, is a means for audio communication

03:22:04    4    that is an interface which uses a generic communications

03:22:08    5    protocol.  So it's a little bit more than just hardware.

03:22:13    6        And Claim 1 of the '002 patent also talks about

03:22:19    7    just generic communication protocol.  It also talks about

03:22:22    8    preinstalled generic drivers without using the "means for"

03:22:26    9    claiming, without using -- without triggering

03:22:31   10    Paragraph 112 -- Section 112(6).

03:22:33   11        And, Your Honor, in those instances, we do not

03:22:37   12    contend those are indefinite.  But because here we do have

03:22:39   13    a 112(6) claim, we have a "means for" claim, our contention

03:22:45   14    is it has to do a little bit more than that because at the

03:22:48   15    end -- at the end of the day, it is in reality referring to

03:22:52   16    the piece of software.  It is referring to this

03:22:56   17    preinstalled generic driver that does the function.

03:22:59   18        And because of that, there has to be an algorithm

03:23:04   19    or some kind of algorithm -- sufficient algorithm disclosed

03:23:07   20    for this preinstalled generic driver.

03:23:11   21        THE COURT:  And what is your best case in support

03:23:15   22    of this particular term "requiring an algorithm"?

03:23:22   23        MR. YANG:  Your Honor, I think we -- the best

03:23:24   24    case -- I guess the most analogous case, Your Honor, we

03:23:28   25    referred to Noah Systems from the Federal Circuit.  And

| | | |
|---|---|---|
| 03:23:32 | 1 | there in Noah Systems, the Federal Circuit actually |
| 03:23:34 | 2 | rejected similar arguments made by Barco in this case. |
| 03:23:39 | 3 | But it's this principle that when you have -- when |
| 03:23:45 | 4 | the specification discloses a special purpose computer -- |
| 03:23:49 | 5 | and by the way, special purpose computer, as explained in |
| 03:23:53 | 6 | Aristocrat, it's really a computer microprocessor |
| 03:23:57 | 7 | programmed to carry out an algorithm.  In that case, there |
| 03:24:02 | 8 | has to be some algorithm disclosed. |
| 03:24:06 | 9 | And, Your Honor, if I may go back to Slide No. 9, |
| 03:24:12 | 10 | here, we do have that, a means for audio communication, |
| 03:24:17 | 11 | this interface that uses -- uses a generic communications |
| 03:24:24 | 12 | protocol.  And, again, according to the patent -- the '002 |
| 03:24:28 | 13 | patent's disclosure, that generic communication protocol is |
| 03:24:32 | 14 | provided by the preinstalled generic drivers. |
| 03:24:37 | 15 | So a POSA looking at this patent -- or a POSA |
| 03:24:42 | 16 | questioning what these generic drivers are, what the |
| 03:24:47 | 17 | algorithm is for the generic drivers, there's no disclosure |
| 03:24:52 | 18 | in the '002 patent. |
| 03:24:57 | 19 | THE COURT:  All right.  I understand your |
| 03:24:59 | 20 | argument. |
| 03:25:00 | 21 | MR. YANG:  Thank you, Your Honor. |
| 03:25:01 | 22 | If I may respond to Barco's argument that there is |
| 03:25:11 | 23 | algorithm disclosed regardless in the '002 patent, and they |
| 03:25:14 | 24 | point to Figure 11 of the '002 patent.  Your Honor, this |
| 03:25:31 | 25 | Figure 11 in the '002 patent is not actually an algorithm. |

03:25:39    1    According to Barco's own expert who looked at this,

03:25:42    2    Dr. Brogioli, this figure, all it does is it shows a

03:25:48    3    high-level diagram that shows a flow of blocks within the

03:25:51    4    exemplary system.

03:25:55    5         So the question is what is the algorithm for the

03:26:00    6    means for audio communication?  What is the algorithm for

03:26:05    7    the preinstalled generic driver?  This Figure 11 is

03:26:10    8    actually not it.  It does not do any -- it does not

03:26:14    9    disclose the algorithm.  All it does is it shows how

03:26:19   10    information flows, what it's supposed to do.  It's a

03:26:22   11    block -- it's a figure of just components.  It does not

03:26:26   12    provide any algorithm.

03:26:27   13         In fact, when Dr. Brogioli looked at this figure,

03:26:36   14    he testified he was actually not sure exactly what it

03:26:39   15    discloses.  He was speculating during his deposition.  You

03:26:46   16    know, he said:  Maybe that part, as well.  It's not clear.

03:26:48   17         So to him, this is actually not clear.

03:26:51   18         One more thing, too.  Dr. Brogioli, when he looked

03:26:54   19    at the '002 patent, when he looked at these claims, he

03:26:57   20    actually did not apply Section 112(6).  He did not have

03:27:04   21    an opinion whether these are means-plus-function claims.

03:27:10   22    He testified that he just looked for some structure, and

03:27:13   23    then he found some structure.  That's all he was asked to

03:27:16   24    do.

03:27:16   25         In addition to that, Your Honor, if I may, at the

03:27:26    1    end of the day, if there's any structure -- sorry, if

03:27:29    2    there's any algorithm, what is clear is that a POSA has to

03:27:33    3    look outside the patent.  The POSA has to go find what that

03:27:43    4    algorithm is.

03:27:43    5         And, Your Honor, if I might go back to Slide No.

03:27:46    6    15 of our demonstratives.

03:27:47    7         Again, these are testimony from Dr. Brogioli.

03:27:50    8    When asked, are there any APIs, are there any algorithm

03:27:55    9    identified in the patent, Dr. Brogioli testified:  Well,

03:27:59   10    the reader knows this is USB.  So he has to -- he or she

03:28:08   11    has to go look to see how to do that, how to implement

03:28:12   12    that.  The user has to look online.  The user has to go

03:28:15   13    find the right documentation.

03:28:17   14         And, finally, I want to add.  We've heard many

03:28:22   15    times about this USB.  This is just USB.  It is simple.

03:28:26   16         But even within USB, Dr. Brogioli testified that

03:28:30   17    there are different versions of a USB.  Each version is

03:28:35   18    different.  In other words, even if a POSA knows this is

03:28:39   19    USB, he or she has to go online to figure out which version

03:28:43   20    of the USB that is, and then figure out what the driver

03:28:51   21    is -- what the appropriate drivers are for the USB, what

03:28:52   22    the appropriate algorithm is.

03:28:54   23         On top of that, even though we hear about USB, the

03:28:59   24    '002 patent, the disclosure regarding the means for audio

03:29:04   25    communications, means for data communication is much

03:29:05   1  broader than USB.  It claims many more different

03:29:10   2  interfaces, many more different USBs -- well, structures

03:29:15   3  similar to USB.  And there is no disclosure whatsoever in

03:29:20   4  the specification for those other aspects.

03:29:22   5        In light of all this, Your Honor, it is our

03:29:28   6  argument that there has to be some algorithm disclosed in

03:29:33   7  the specification.  Otherwise, what we're looking at is

03:29:36   8  just a black box.  We know the '002 patent improved upon

03:29:41   9  the prior art by providing this function of communication,

03:29:46  10  but what is not clear from the specification is how.  It is

03:29:52  11  not clear exactly what it's doing this function -- exactly

03:29:58  12  what the algorithm -- the algorithm is.

03:30:02  13        So, Your Honor, I'll end there.

03:30:04  14        THE COURT:  All right.  Thank you, Mr. Yang.

03:30:07  15        MR. YANG:  Thank you, Your Honor.

03:30:08  16        THE COURT:  Mr. Andrews, do you want to address

03:30:25  17  the next term?

03:30:27  18        MR. ANDREWS:  Yes.  Thank you, Your Honor.

03:30:28  19        Good afternoon, Your Honor.

03:30:40  20        So the term I will be arguing is "the at least one

03:30:44  21  peripheral device."  And just to orient your -- on this

03:30:49  22  issue, Yealink has not proposed any construction on this

03:30:52  23  term.  They have just proposed that this term is

03:30:56  24  indefinite.  And we are proposing that the claim should be

03:30:59  25  construed with its plain and ordinary meaning.

03:31:01   1          So on Slide 20, you will see that the claim --

03:31:09   2   Claim 1 of the '103 patent is listed.  On Claim 1, you will

03:31:13   3   read at the end of the claim in yellow highlight "the at

03:31:16   4   least one peripheral device."

03:31:18   5          Claim 1 of the '103 patent is directed towards a

03:31:21   6   computer peripheral device, and "the at least one

03:31:25   7   peripheral device" is referencing the previously mentioned

03:31:29   8   computer peripheral device.

03:31:30   9          So while the claim language is not the exact same,

03:31:34   10  it would still be clear to a person of skill in the art

03:31:38   11  what is being referenced by "the at least one peripheral

03:31:41   12  device."  For example, in patent law, it's well-understood

03:31:45   13  that "a" refers to one or more in the same way that "the at

03:31:49   14  least one" would refer to one or more of the said element.

03:31:54   15         Additionally, while "computer" is in the preamble

03:31:58   16  and other references to the computer peripheral device, it

03:32:01   17  would still be clear to a person of skill that "the at

03:32:06   18  least one peripheral device" references a computer

03:32:08   19  peripheral device as there is no other mention of an

03:32:12   20  alternative peripheral device in Claim 1.

03:32:15   21         Additionally, this interpretation is supported by

03:32:19   22  the prosecution history of the '103 patent.  For example,

03:32:26   23  Claim 23 of the pending application on March 7th, 2019 was

03:32:33   24  amended in response to this Office Action to add the

03:32:37   25  limitation shown at the bottom of the screen in blue, which

03:32:44    1    added a reference to "the at least one peripheral device."

03:32:46    2    And in this context, reference to "the at least one

03:32:48    3    peripheral device" makes sense in that Claim 23 had an

03:32:52    4    earlier limitation that referenced "at least one peripheral

03:32:54    5    device."

03:32:55    6        And when making this amendment in the same Office

03:33:01    7    Action Response, the prosecuting attorney added the same

03:33:05    8    limitations shown in blue highlight to the then pending

03:33:09    9    Claim 29, which eventually issues as Claim 1 in the '103

03:33:15    10   patent.

03:33:15    11       And in making this amendment, the prosecuting

03:33:21    12   counsel did not adjust the language to -- of "the at least

03:33:26    13   one peripheral device" to match the preamble of Claim 29.

03:33:29    14   However, it would still be clear to a person of skill in

03:33:32    15   the art that this limitation is meant to reference the

03:33:34    16   earlier stated "a computer peripheral device."  And,

03:33:39    17   therefore, based on both the plain reading of the claim

03:33:42    18   limitations and also the prosecution history, it would be

03:33:44    19   clear to a person of skill what is being claimed by "the at

03:33:48    20   least one peripheral device."

03:33:49    21       If you don't have any questions, I will...

03:33:57    22       THE COURT:  All right.  Not at the moment,

03:33:59    23   Mr. Andrews.  Thank you.

03:34:00    24       MR. ANDREWS:  Okay.  And additionally, it was our

03:34:01    25   understanding that "the audio device" would not be argued

03:34:05    1    by opposing counsel today, but to the extent that that

03:34:08    2    issue is raised, we are prepared to discuss that, as well.

03:34:11    3    Thank you.

03:34:11    4            THE COURT:  All right.

03:34:24    5            MR. YANG:  Your Honor, on the "peripheral device"

03:34:26    6    term, again, I've seen the Court's preliminary

03:34:30    7    construction.  And to make this hearing more efficient, is

03:34:32    8    there any particular question the Court -- or issue the

03:34:37    9    Court would like me to focus on?

03:34:38    10            THE COURT:  Well, obviously, I've indicated in the

03:34:41    11    preliminary what I think the construction of that term

03:34:48    12    should be.  If you have argument that you want to offer

03:34:54    13    against that, I'm happy to consider it, but I have reviewed

03:35:01    14    your brief in arriving at this preliminary construction.

03:35:03    15            MR. YANG:  I understand, Your Honor.

03:35:05    16            I think just to -- just real quick, I don't think

03:35:09    17    there's any dispute that as this claim in the '103 patent

03:35:13    18    is drafted right now, there is confusion as to the term

03:35:18    19    "peripheral device."  It's not clear whether it's referring

03:35:21    20    to the same peripheral device in Claim 1, or is it

03:35:23    21    referring to other peripheral devices outside of the device

03:35:28    22    in Claim 1?

03:35:29    23            I don't think --

03:35:30    24            THE COURT:  That would be an unusual construction

03:35:35    25    to say that that term is referring to otherwise

03:35:41  1    unidentified devices.

03:35:44  2         MR. YANG:  Well, Your Honor, the way Claim 1 of

03:35:47  3    the '0 -- '103 patent is drafted, it's talking about this

03:35:51  4    peripheral device like the one we've seen earlier from

03:35:55  5    Mr. Halverson.  This peripheral device has a light, a

03:35:58  6    visual indicator.  And what it does is it lights up -- it

03:36:03  7    sends indication to the user when there's content

03:36:08  8    transmitted from the laptop to which the peripheral

03:36:12  9    device -- the dongle is connected.  It's telling the user

03:36:17  10   you are now transmitting.

03:36:17  11        But Claim 1 does talk about this meeting room

03:36:23  12   system, like the one we've seen in Figure 1A up here on

03:36:30  13   Slide No. 35.  And in that Slide No. 35, we've actually

03:36:34  14   annotated Figure 1A.  The orange pieces, Your Honor, are

03:36:39  15   these peripheral devices.

03:36:40  16        And I think the confusion it comes down to, if

03:36:44  17   it's not clear that the peripheral device at the end of

03:36:48  18   Claim 1 is referring to the same peripheral device of Claim

03:36:52  19   1, it is possible to have a scenario where when somebody

03:36:58  20   else's peripheral device is transmitting content to the

03:37:03  21   communications network, then the user's peripheral device

03:37:07  22   is sending a visual indication and it's lighting up.

03:37:11  23        And that's what Dr. Almeroth opined to in his

03:37:15  24   declaration.

03:37:17  25        THE COURT:  Does that really make any sense?

03:37:20    1          MR. YANG:  I agree it's unusual, Your Honor.  No,

03:37:23    2    I think it does make sense because, again, if it's not

03:37:27    3    clear that the visual indicator of the peripheral device,

03:37:34    4    again, at the end of Claim 1, it's not clear what that

03:37:38    5    peripheral device is referring to, it is possible to have a

03:37:41    6    scenario where the user's peripheral device is lighting up

03:37:46    7    when somebody else is transmitting onto the network.

03:37:49    8          And, again, this is a meeting room setup.  There

03:37:52    9    could be many users looking at the same screen.  And, of

03:37:57   10    course, one user is sharing content.

03:37:59   11          THE COURT:  How would it even be helpful to the

03:38:02   12    user for the light to come on when some other device is

03:38:09   13    transmitting?

03:38:10   14          MR. YANG:  Well, I think, Your Honor, that -- I

03:38:15   15    would hate to speculate on behalf of any user, but I do see

03:38:19   16    some using that, indicating to the user that somebody

03:38:25   17    else's content is being shared.  Again, it's a meeting room

03:38:31   18    setup.  It could be many users in the same room.  It could

03:38:34   19    be users from elsewhere joining remotely.

03:38:37   20          But, Your Honor, I could see some function.  I

03:38:39   21    agree it's perhaps a little unusual, but I think there is

03:38:44   22    support in the specification that there could be a scenario

03:38:46   23    where you have a visual indication that either the user or

03:38:52   24    somebody else is sharing content.  It could be a situation

03:38:58   25    where a user who is not the meeting host is sharing content

03:39:01    1    and there has to be some indication to let another user

03:39:05    2    know.  And, of course, when a user him or herself is

03:39:09    3    sharing content, then there's a visual indication.

03:39:13    4        I guess in that sense, Your Honor, it makes as

03:39:15    5    much sense to let the user know that he or she is sharing

03:39:20    6    content herself because presumably, they would know.

03:39:23    7        But, again, the way the claim is drafted, there's

03:39:26    8    a visual indication, but what is not clear is when that

03:39:33    9    visual indication is active.

03:39:41    10        THE COURT:  All right.

03:39:42    11        MR. YANG:  Okay.  Again, that -- those two

03:39:44    12    possible scenarios -- Yealink's expert, Dr. Almeroth,

03:39:49    13    explained that those are two possible scenarios.  And, of

03:39:52    14    course, because of that, there's an issue as to when

03:39:55    15    infringement occurs.

03:39:57    16        We have heard from Barco that this is at the end

03:40:01    17    of the day a mistake.  A POSA would know that's a mistake.

03:40:05    18        Your Honor, it's not so clear that it is.  One,

03:40:10    19    Dr. Almeroth looked at the claims, he looked at the patent

03:40:13    20    prosecution, and he opined that there still could be two

03:40:18    21    scenarios.

03:40:18    22        Barco's expert, Dr. Brogioli, did not, in his

03:40:22    23    opinion, analyze the prosecution history.  In his opinion,

03:40:27    24    Dr. Brogioli's -- in his declaration, Dr. Brogioli's

03:40:31    25    opinions are rather conclusory.  He said:  Well, I looked

03:40:32  1  at the claims, along with the specification.  It is clear

03:40:38  2  to me that it's referring to the computer peripheral

03:40:40  3  device, but there is no analysis.

03:40:42  4      What Barco is asking this Court to do, realizing

03:40:46  5  there is an issue with the claim, is to rewrite the claim

03:40:51  6  for Barco.  This Court, of course, has the authority to do

03:40:55  7  that, but the Court can correct the patent only if the

03:41:04  8  correction is not subject to reasonable debate and the

03:41:06  9  prosecution history does not suggest a different

03:41:08  10  interpretation.

03:41:09  11      And, Your Honor, we submit this standard is not

03:41:12  12  being met here because there is reasonable debate.  Two

03:41:18  13  POSA looked at -- two POSAs looked at the claims.  One of

03:41:21  14  them looked at the prosecution history, and there is

03:41:23  15  debate whether this is indefinite, whether the claim is not

03:41:27  16  clear.

03:41:28  17      And, two, if we looked at the prosecution history

03:41:31  18  itself, Your Honor, if we looked at -- Barco wants us to

03:41:34  19  look at original Claim 23, which was later canceled, and,

03:41:42  20  Your Honor, Claim 29, which became granted Claim No. 1.

03:41:46  21      And I'm on Slides 39 and 40.

03:41:49  22      But if we do look at these two claims, Your Honor,

03:41:55  23  we see there is a difference in scope.  Claim 23, which was

03:42:00  24  later canceled, is directed to this electronic meeting tool

03:42:04  25  that recites a communication network.  It talks about

03:42:08   1   multiple peripheral devices.

03:42:12   2       So, Your Honor, in that sense, it is possible that

03:42:16   3   Claim 23 at the time did intend to have multiple peripheral

03:42:21   4   devices and it did intend to distinguish other people's

03:42:27   5   peripheral devices from the user's peripheral device.

03:42:30   6       Claim 29, on the other hand, which did become

03:42:34   7   Claim 1, is really just about the computer peripheral

03:42:42   8   device itself for the user.

03:42:45   9       Now, I do not disagree that we see the limitations

03:42:49   10  being added in the same Office Action, but standing here

03:42:55   11  today we do not know why they were added.  And it's not

03:43:01   12  clear that it was added -- this just was all a mistake.

03:43:07   13      And, Your Honor, we submit that in a situation

03:43:12   14  like this, instead of having the Court correct the patent

03:43:15   15  on Barco's behalf, what should be done -- what should --

03:43:19   16  what is more -- or more appropriate is for Barco -- is for

03:43:24   17  the patentee to go to the Patent Office.  The Patent Office

03:43:29   18  can correct the patent through a certification of

03:43:32   19  correction.  That hasn't been done.  But the Patent Office

03:43:35   20  can look at the claim -- can look at the prosecution

03:43:38   21  history and make the judgment whether there should be a

03:43:43   22  correction, whether there was just an obvious mistake.

03:43:46   23      And, Your Honor, if I may go back to your earlier

03:43:51   24  question, how does it make sense that the light is shown

03:43:57   25  that somebody else is sharing?  Another explanation is if

03:44:01    1    somebody else is sharing content and the light is on, it is

03:44:06    2    telling the user maybe do not override, maybe do not try to

03:44:11    3    share at the same time.

03:44:12    4         Again, these are all just possible scenarios.  I'm

03:44:14    5    not an expert in the field, but the way the claims are

03:44:18    6    drafted, that is a possibility.  Dr. Almeroth looked at

03:44:23    7    this.  He opined those are all possibilities, and that's

03:44:27    8    what leads to this indefiniteness issue.

03:44:32    9         THE COURT:  All right.

03:44:33   10         MR. YANG:  And, Your Honor, if I may just address

03:44:36   11    "the audio device" term.

03:44:40   12         Earlier this morning, in attempt to streamline the

03:44:45   13    hearing, Yealink did inform Barco that it no longer intends

03:44:48   14    to argue this term at the hearing.  So for that term, Your

03:44:53   15    Honor, we would just like to submit our position on the

03:44:56   16    papers.

03:44:57   17         THE COURT:  All right.  Thank you, Mr. Yang.

03:44:59   18         MR. YANG:  Thank you, Your Honor.

03:44:59   19         MR. HALVERSON:  May I respond to that briefly?

03:45:03   20         THE COURT:  Yes.

03:45:03   21         MR. HALVERSON:  So the email from Mr. Yang this

03:45:07   22    morning doesn't say that they're going to rest on their

03:45:11   23    papers.  It says -- pardon me one second -- it says, and I

03:45:25   24    quote, Yealink will no longer ask the Court to construe

03:45:29   25    "the audio device" term from Claim 2 of the '237 patent and

03:45:33  1  will propose that the Court accord this term its plain and

03:45:37  2  ordinary meaning.  We will inform the Court at the start of

03:45:40  3  the hearing.

03:45:42  4       We're happy to argue the term this morning -- or

03:45:45  5  this afternoon, but that representation from Yealink is

03:45:47  6  pretty clear is what they intended to do.

03:45:52  7       THE COURT:  Mr. Yang, do you have a different

03:45:55  8  understanding of what you agreed to this morning?

03:46:01  9       MR. YANG:  No, Your Honor.  That's -- that's what

03:46:03  10 we offered.  Again, we're trying to just streamline the

03:46:08  11 hearing, but we're -- Your Honor, at the end of the day,

03:46:11  12 the reason we did that is we're looking at "the audio

03:46:15  13 device" in a dependent claim of the '237 patent.

03:46:20  14      THE COURT:  I understand --

03:46:21  15      MR. YANG:  We're fine -- we're fine with just

03:46:23  16 going with plain and ordinary meaning.  That was our

03:46:26  17 intention to streamline the process, Your Honor.

03:46:27  18      THE COURT:  All right.  Well, I give you credit

03:46:31  19 for standing by your agreement.

03:46:33  20      MR. YANG:  That was our intention, Your Honor.  So

03:46:36  21 I did not mean to make this more complicated.  But if the

03:46:41  22 Court has already reached a construction, that was my

03:46:45  23 intention.  But we're fine with just going with plain and

03:46:48  24 ordinary meaning.

03:46:48  25      THE COURT:  All right.  I will note that agreement

03:46:49    1    for the record.

03:46:52    2            MR. HALVERSON:  Thank you, Your Honor.

03:46:52    3            THE COURT:  And I would tell you, Mr. Halverson,

03:46:56    4    that it would be preferable if you would notify the Court

03:47:00    5    when you reach agreements withdrawing terms.  You might

03:47:04    6    avoid issues like this.

03:47:06    7            MR. HALVERSON:  Understood, Your Honor.

03:47:07    8            THE COURT:  All right.  We also have the motion to

03:47:17    9    compel.  And I guess I need the Plaintiff to tell me what

03:47:23   10    is still at issue on that motion.

03:47:25   11            MR. HALVERSON:  So, Your Honor, we moved for a

03:47:46   12    motion to compel -- or an order to compel on six different

03:47:49   13    topics, technical documents on design and development, U.S.

03:47:54   14    sales data, license agreements, market research, source

03:47:58   15    code, and interrogatories on non-infringement.

03:48:03   16            Yealink has represented that they will be

03:48:05   17    providing the sales data, although there has not been a --

03:48:10   18    in a tabular summary form that has not come yet.  They did

03:48:16   19    say that it was coming today.

03:48:19   20            They have represented, as well, that they have

03:48:22   21    produced the entirety of the license agreement, the HDMI

03:48:25   22    agreement.  And so based on those two representations, I

03:48:28   23    don't know that we need to argue either one of those.

03:48:32   24    However, I do think that the remaining four topics are

03:48:37   25    still ripe for discussion today.

03:48:51  1        THE COURT:  Go ahead and address the first topic

03:48:53  2   then.

03:48:54  3        MR. HALVERSON:  So the technical documents on

03:48:57  4   design and development of the accused products, we were

03:48:59  5   here last November before Your Honor discussing the exact

03:49:02  6   same subject matter.  Yealink was ordered to provide

03:49:07  7   documents describing how the products came to be developed

03:49:10  8   and how they operate.  All we've gotten has been a

03:49:14  9   collection of testing documents from third-party testers.

03:49:18  10  We've gotten no documents describing the development

03:49:21  11  process, no documents describing the operation.

03:49:27  12       And so at this late stage in discovery, it's

03:49:30  13  becoming a little bit troubling that we're still not

03:49:33  14  getting access to how it is that these products came to be

03:49:36  15  or how it is that they operate.

03:49:37  16       And I think this topic goes hand-in-hand with the

03:49:41  17  source code topic which has been part of our infringement

03:49:46  18  contentions since March of last year and still has not been

03:49:51  19  provided.

03:49:51  20       THE COURT:  As I understand it, one of the primary

03:49:55  21  arguments that the Defendants are relying upon has to do

03:50:00  22  with a stipulation of infringement.

03:50:05  23       What is the relevance of these technical documents

03:50:12  24  in view of that stipulation?

03:50:14  25       MR. HALVERSON:  Well, so thus far, there is no

03:50:17  1  stipulation.  And so I think the first point there is as we

03:50:21  2  sit here today, the scope of the case doesn't have that

03:50:23  3  kind of a stipulation in it.

03:50:25  4       And so even if a stipulation to that effect were

03:50:28  5  to be reached between the parties, how the devices came to

03:50:33  6  be designed when we know based on Yealink's interrogatory

03:50:37  7  responses that Yealink was aware of Barco's Clickshare

03:50:42  8  product, when they were designing the accused products,

03:50:46  9  which, again, have same interfaces, same flexible dongles,

03:50:52  10  same back -- or the flexible connectors, same back ends

03:50:57  11  with buttons that light up.  In view of the admission that

03:51:00  12  they were aware of those products while they were designing

03:51:02  13  those, that information is still relevant to at least the

03:51:05  14  damages case under Georgia-Pacific 9 and I think it's 11,

03:51:10  15  as well as to the willfulness case as it relates to

03:51:16  16  Yealink's copying of our product.

03:51:17  17       THE COURT:  So tell me the relevance to the

03:51:20  18  damages case.

03:51:21  19       MR. HALVERSON:  So as I recall, Georgia-Pacific

03:51:27  20  Factor 9 refers to how the accused product is an

03:51:32  21  advancement over the then existing state of the art.

03:51:35  22       And then Georgia-Pacific Factor No. 11 relates

03:51:38  23  to -- and this is a rough paraphrase, but effectively any

03:51:44  24  evidence of copying of a patented product would go into

03:51:48  25  that Georgia-Pacific factor.

03:51:50   1          And so to the extent we get access to these

03:51:53   2   documents and they explain that the way that Yealink

03:51:55   3   arrived at this was they took this and they reverse

03:52:00   4   engineered it, that's wildly relevant to the damages that

03:52:03   5   should be afforded Barco for Yealink's infringement.

03:52:09   6          THE COURT:  The first Georgia-Pacific factor you

03:52:14   7   referred to may have been 9.  That would be about the

03:52:17   8   claimed invention, not the accused device, wouldn't it?

03:52:21   9          MR. HALVERSON:  Pardon me, Your Honor.

03:52:23  10          THE COURT:  All right.

03:52:23  11          MR. HALVERSON:  The utility and advantages of the

03:52:55  12   patent property over the old modes and devices.  And so

03:52:59  13   traditionally, yes, I would agree that it would be how does

03:53:02  14   the claim separate itself from what else is there.

03:53:04  15          But to the extent they copied, I would argue that

03:53:10  16   the patent property would encompass the identicality of

03:53:17  17   functionality between the copied product and the patented

03:53:23  18   product.

03:53:23  19          THE COURT:  And do you have indications that there

03:53:25  20   was actual copying by Yealink?

03:53:27  21          MR. HALVERSON:  We have an interrogatory response

03:53:29  22   that confirms that Yealink -- Yealink, excuse me, was aware

03:53:33  23   of the Clickshare while they were developing their product.

03:53:37  24   We have evidence that Yealink was part of Barco's technical

03:53:45  25   alliance program, which means they had access to Barco's

03:53:51  1  products, and whether or not -- or, excuse me, the fact

03:53:54  2  that we don't have additional documents that support the

03:53:56  3  copying is exactly why we're here today.  We need those

03:53:59  4  documents to figure out whether or not that's there.

03:54:08  5       THE COURT:  All right.  And can you be -- well,

03:54:16  6  maybe you can't be more specific about it.  You're just

03:54:20  7  asking for an order that they produce documents regarding

03:54:26  8  development and operation of the accused products?

03:54:29  9       MR. HALVERSON:  That's what the portion of A is in

03:54:39  10 our brief.  And I think as a subset of that, it would also

03:54:43  11 include documents that reference Barco and the Clickshare

03:54:48  12 product that were part of Yealink at that time.

03:54:51  13      Now, Yealink has represented to Barco that they

03:54:54  14 don't have any of those documents, but they have also

03:54:57  15 represented to Barco that they were aware of Barco's

03:55:01  16 Clickshare product.  And so what we're struggling with is

03:55:04  17 how do we reconcile their statements that, yes, while we

03:55:07  18 were developing our product, we knew exactly what you were

03:55:10  19 doing, Barco, but we have nothing that refers to Barco in

03:55:14  20 any of our documents.

03:55:17  21      THE COURT:  Whether they knew exactly what you

03:55:21  22 were doing or whether they were aware of you are two

03:55:24  23 somewhat different things.

03:55:25  24      MR. HALVERSON:  Yes, Your Honor.

03:55:27  25      THE COURT:  All right.  Well, let me hear the

03:55:30   1    response on these technical documents, and then we'll move

03:55:32   2    on to the other portions of the motion.

03:55:42   3         MR. YANG:  Your Honor, on the technical documents,

03:55:53   4    Barco -- by the way, this was not made clear to us until

03:55:58   5    the meet and confer after the motion has been filed on

03:56:01   6    February 20th.

03:56:02   7         Barco seems to believe that Yealink has just

03:56:05   8    copied its products, copied everything.  And this

03:56:10   9    interrogatory that Mr. Halverson keeps referring to, Your

03:56:14   10   Honor, Interrogatory No. 8, it asks whether -- specifically

03:56:18   11   whether Yealink was aware of Barco's Clickshare products,

03:56:21   12   which is a whole family of products, during development.

03:56:26   13        The answer is yes, Yealink was aware of it.  Barco

03:56:30   14   is a big company.  Yealink is a big company.  Yealink is

03:56:30   15   aware of these products.  It's aware of a lot of products.

03:56:36   16   All we did, Your Honor, was say that Yealink was aware of

03:56:38   17   it.

03:56:39   18        There is a big logical jump from that to Yealink

03:56:44   19   has copied its products.

03:56:46   20        We've also heard that these documents are relevant

03:56:50   21   to willful infringement.  Your Honor, Yealink developed its

03:56:55   22   dongle product WPP20 in 2017, 2018, years before the

03:57:01   23   patents came around, and I think five or six years before

03:57:06   24   Barco has even marked its products with the patents.

03:57:12   25        On top of that, Your Honor, this issue of whether

03:57:15   1   Yealink has documents referencing Barco, Barco's patents,

03:57:19   2   Barco's patent applications, the answer is we've already

03:57:24   3   told Barco this.  The answer is no.  Yealink conducted a

03:57:28   4   search.  It does not have these documents.

03:57:30   5        Your Honor, I personally was at Yealink last week.

03:57:35   6   I sat down with the relevant people at Yealink.  I looked

03:57:39   7   at their documents.  And, Your Honor, we did not find any

03:57:46   8   documents that talk about Barco, talk about copying Barco,

03:57:53   9   documents that talk about patent numbers, Barco's patent

03:57:54   10  application numbers.  It just -- it is not -- it's just --

03:57:58   11  there is no basis to insist that Yealink somehow copied

03:58:02   12  Barco's products, and there must be evidence that Yealink

03:58:07   13  copied Barco's products.

03:58:08   14       THE COURT:  Well, that -- they are seeking

03:58:11   15  evidence on the development of Yealink's products, which

03:58:18   16  would be the kind of evidence you're talking about.

03:58:21   17       MR. YANG:  Right, Your Honor.  That's my next

03:58:23   18  point.

03:58:24   19       On the development, we were here before Your Honor

03:58:28   20  on November 15th.  This Court issued an order to produce

03:58:32   21  some development documents.  Your Honor, we did.  We

03:58:35   22  produced -- there were third-party testing documents.  We

03:58:42   23  also produced documents that describe the time log of

03:58:44   24  Yealink's developments.

03:58:45   25       Now, on November 15th, this Court has also

03:58:49  1   informed us, look, produce the documents, produce

03:58:54  2   documents -- what we believe to be sufficient.  If Barco

03:58:56  3   has an issue, if Barco finds any deficiencies, we can work

03:59:03  4   it out.

03:59:03  5           THE COURT:  That was primarily on the operation

03:59:05  6   side of things, sufficient to show the operation, yes?

03:59:10  7           MR. YANG:  Your Honor, my point is for two months

03:59:13  8   before Barco brought this motion, we have not heard

03:59:16  9   anything about any deficiency.  And when we received a

03:59:18  10  letter on January 29th, Yealink was away on break.  And we

03:59:24  11  told Barco this.

03:59:26  12          But we got Yealink's people to come back to the

03:59:28  13  office, and we tried to look for some of the documents that

03:59:31  14  Barco is asking for.  We asked Barco to be more specific,

03:59:36  15  to tell us what they're looking for.  And, Your Honor, the

03:59:41  16  Court mentioned this agreement, this stipulation.  This was

03:59:45  17  in our briefing, as well.  We thought we had reached an

03:59:49  18  agreement with Barco on further claims to which had

03:59:56  19  admitted infringement that would effectively end most of

03:59:59  20  technical discovery, including the issues that we now see

04:00:02  21  in Barco's motion.  We thought that we had reached that

04:00:05  22  agreement, and then we were surprised to see a motion to

04:00:09  23  compel.

04:00:09  24          But regardless, we did produce development

04:00:12  25  documents.  And if there are more that Barco insists are

04:00:17   1   missing and that they need, we're happy to look and try to

04:00:20   2   get those documents to Barco.  That has never been an

04:00:23   3   issue.

04:00:23   4          THE COURT:  Two things, Mr. Yang.

04:00:24   5          MR. YANG:  Yes.

04:00:25   6          THE COURT:  First off, have you stipulated to

04:00:28   7   infringement as you discuss in your briefing?

04:00:32   8          MR. YANG:  So we reached an agreement -- now, it's

04:00:36   9   a stipulation that is with Barco.  We sent our agreement to

04:00:42   10  Barco.

04:00:44   11         Your Honor, just a little more background.  The

04:00:45   12  agreement was Yealink will admit to infringement of one

04:00:49   13  dependent claim from four of the patents so long as those

04:00:52   14  dependent claims were not challenged.  The parties have

04:00:56   15  been discussing this for a period of time starting in

04:01:00   16  December through January.  And on February 11th, Your

04:01:03   17  Honor, I thought we had reached an agreement.

04:01:06   18         We sent the agreement to Barco.  Again, we are

04:01:10   19  happy to provide copies of the emails to Your Honor.  But

04:01:14   20  the point is Barco has now come back.  They sent us

04:01:17   21  additional terms.  They want us to admit to copying Barco's

04:01:23   22  products.  They want Yealink to agree to treble damages.

04:01:28   23  They want Yealink to admit to disjoin, Your Honor, evidence

04:01:32   24  of Yealink's copying.

04:01:36   25         THE COURT:  So there is no stipulation is what I'm

04:01:38    1    hearing; is that right?

04:01:39    2            MR. YANG:  One more thing, Your Honor.  Two days

04:01:41    3    ago, we sent a proposed third amended answer to Barco.

04:01:49    4            Now, last time we were before this Court, we made

04:01:51    5    it clear that Yealink tried to streamline this case.  It's

04:01:55    6    already withdrawn the dongle product from the U.S. market.

04:01:57    7    It wishes to proceed the damages case because it does not

04:02:01    8    really see the point of engaging in additional fact

04:02:05    9    discovery when it's not necessary.

04:02:06    10           Two days ago, Your Honor, we sent a draft answer

04:02:09    11   to Barco -- third amended answer.  And in this answer, Your

04:02:14    12   Honor, Yealink is agreeing to admit to infringement of all

04:02:18    13   asserted claims and agreeing to admit to the infringement

04:02:23    14   as contended by Barco, including all the accused products,

04:02:28    15   again, as contended by Barco.

04:02:29    16           We're waiting for Barco to get back to us on

04:02:32    17   whether they have any objections, knowing that Yealink

04:02:37    18   needs to move for leave to amend its answer.  But Yealink

04:02:41    19   is prepared to do that.

04:02:42    20           We have copies of this third amended answer

04:02:46    21   available if the Court wishes to see, and we're happy to

04:02:49    22   file this, if there is leave, as soon as today.

04:02:54    23           But, Your Honor, we tried to reach a stipulation.

04:02:57    24   It has become clear that Barco is asking Yealink to agree

04:03:01    25   to terms it just cannot.  At the same time, Yealink is

04:03:04   1   willing to admit to infringement and just put the issue of

04:03:09   2   liability in the rearview mirror and move on.

04:03:12   3          THE COURT:  All right.  I will hear from them in a

04:03:14   4   moment on that.

04:03:15   5          Tell me what you have produced in the way of

04:03:22   6   development documents.  You've talked about documents

04:03:24   7   showing the timeline.

04:03:25   8          MR. YANG:  Your Honor, I believe there are some

04:03:27   9   documents for the accused products about the timeline and

04:03:36  10   stages of development, and it makes references to what was

04:03:40  11   done, what was studied at each stage.

04:03:43  12          Now, I admit it has been some time ago, but it is

04:03:46  13   my belief we have produced those documents.

04:03:49  14          THE COURT:  And do you contend that those

04:03:51  15   documents show development of your products before the

04:03:56  16   asserted patents were issued?

04:03:57  17          MR. YANG:  I want to be accurate on that, Your

04:04:01  18   Honor, but the WPP20 dongle product, and I believe that is

04:04:08  19   a product whose development Barco is after, Your Honor,

04:04:12  20   yes, that product had been developed in 2017.  It was

04:04:15  21   marketed in the U.S. in 2018.

04:04:18  22          The asserted -- the asserted patents were not

04:04:20  23   issued until 2020 and then on.  And, again, they were not

04:04:25  24   marked until 2023.

04:04:32  25          THE COURT:  All right.

04:04:33    1          MR. YANG:  I want to be accurate.  I think there

04:04:35    2    are some other products that are not dongles.  I do not

04:04:39    3    recall exactly what the dates are, but we did provide the

04:04:41    4    development dates in our interrogatory responses.

04:04:48    5          THE COURT:  All right.  Thank you, Mr. Yang.

04:04:50    6          MR. YANG:  Thank you, Your Honor.

04:04:51    7          THE COURT:  Mr. Halverson, are you intending to

04:04:59    8    accept the offer that's been made to admit infringement of

04:05:07    9    all asserted claims by all accused products?

04:05:11   10          MR. HALVERSON:  So we have not yet had the chance

04:05:14   11    to confer with Barco, who is a European company.  We have

04:05:18   12    sent the proposal to them and have not heard back yet on

04:05:22   13    that request.

04:05:23   14          We have no opposition to the filing of a motion

04:05:25   15    for leave to enter that amended answer.  But to the extent

04:05:33   16    there becomes an opposition to the motion -- or to the

04:05:37   17    answer itself later, we would reserve our right to oppose

04:05:40   18    that motion for leave.

04:05:41   19          But as of right now, no, Barco has no opposition

04:05:44   20    to Yealink filing its third amended answer with a motion

04:05:49   21    for leave to amend its answer.

04:05:51   22          THE COURT:  I think that they're offering that

04:05:53   23    with the understanding that it will take care of the burden

04:06:01   24    of producing these technical documents.

04:06:10   25          And what do you say to the argument that they

04:06:15  1  could not have copied your patented technology if the

04:06:23  2  product was developed before the patents?

04:06:26  3      MR. HALVERSON:  So there are, I think, two points

04:06:29  4  to that question, Your Honor.

04:06:30  5      The first is as far as whether or not that would

04:06:36  6  obviate the need for this discovery, it might -- it might

04:06:41  7  not.  Part of the problem is we got this on Saturday night

04:06:44  8  from Yealink, and today is Tuesday afternoon.  So there

04:06:47  9  hasn't been a lot of time to process what that is.

04:06:51  10  Had they wanted to do this, it could have been

04:06:53  11  done back in November when we were here last time.

04:06:56  12  Here we are in March still fighting about the

04:06:59  13  exact same things with Yealink still saying we're happy to

04:07:02  14  do this, we're happy to do that, we're happy to do this,

04:07:05  15  but it just doesn't happen.

04:07:07  16  Forgive me, Your Honor, I forgot the second half

04:07:15  17  of the question.

04:07:17  18  THE COURT:  Well, you heard the description by

04:07:23  19  Mr. Yang as to the production of development documents and

04:07:27  20  the development timeline.

04:07:29  21  Do you dispute that?

04:07:31  22  MR. HALVERSON:  So what I believe Mr. Yang is

04:07:34  23  referring to as far as the timeline is there is an

04:07:38  24  interrogatory response, not documents, that says the year

04:07:42  25  in which Yealink began developing each of its products, the

04:07:46    1  types of documents that they have produced -- can I turn

04:08:05    2  this -- on the other hand...

04:08:05    3      THE COURT:  It's very sensitive to movement.  As

04:08:08    4  soon as you get it placed, it'll be fine.

04:08:11    5      MR. HALVERSON:  It's something like this.  It's a

04:08:13    6  test report from a third-party agency describing the types

04:08:16    7  of tests that were run on a product.  It has nothing to do

04:08:20    8  with what Yealink did.  Nothing in this document describes

04:08:24    9  a Yealink engineer, how somebody at Yealink decided to

04:08:29   10  arrive at this design when they were aware of this product,

04:08:39   11  what it is that they did as far as figuring out the

04:08:42   12  functionality of what this thing needed to do when they

04:08:45   13  were aware of this product.

04:08:47   14      What it does do, it simply lists a bunch of things

04:08:55   15  that are not available, and it's pages and pages and pages

04:09:03   16  of that.

04:09:04   17      And so to the extent this is what Yealink does to

04:09:08   18  develop its products, I'm not sure what else we can do to

04:09:12   19  try to get this information from them.  But in the years

04:09:15   20  that I've been litigating, this is not a developmental

04:09:18   21  document.  This isn't a Yealink document.  It's a

04:09:21   22  third-party document.

04:09:22   23      And so I -- I disagree with the contention on both

04:09:26   24  fronts, Your Honor, about whether or not the timeline or

04:09:29   25  the development documents have been produced.

04:09:37  1          And to the extent an agreement can be reached, you

04:09:43  2  know, as far as its implications on the rest of the case,

04:09:47  3  I've never seen somebody so afraid of providing development

04:09:52  4  discovery as I have in this case.  I've never had somebody

04:09:55  5  else admit to infringement of every asserted claim in an

04:09:59  6  effort to avoid providing basic development documents or

04:10:02  7  source code access.

04:10:03  8          And so it's this constant fighting over the course

04:10:06  9  of the last seven months that leads us to think that

04:10:09  10  there's something there.  Where that smoke is, there's

04:10:12  11  probably fire.

04:10:16  12          THE COURT:  And I assume your argument is the same

04:10:20  13  for the source code issue?

04:10:22  14          MR. HALVERSON:  For the source code issue, yes,

04:10:27  15  Your Honor.

04:10:27  16          THE COURT:  What about the market research?

04:10:30  17          MR. HALVERSON:  So that has bearing on damages as

04:10:36  18  far as what Yealink's expected position in the market is

04:10:40  19  for itself, Yealink's awareness of what Barco's position in

04:10:45  20  the market is, how it arrives at its pricing for its

04:10:49  21  products, things like that.  I don't know that that would

04:10:52  22  be obviated by an amended answer, as Mr. Yang has been

04:10:57  23  discussing.  I think that would still be relevant to what

04:11:00  24  needs to be -- or what needs to occur in the case.

04:11:05  25          I do think that the interrogatories on

04:11:10   1  non-infringement we can probably remove, to the extent that

04:11:12   2  kind of an arrangement is reached or that kind of answer is

04:11:16   3  entered, but I do think that the documents that could

04:11:20   4  support a copying finding -- I remember what the second

04:11:25   5  part of the question was -- but the documents that could

04:11:27   6  support a copying finding, as well as the documents

04:11:30   7  pertinent to damages, would still be relevant.

04:11:32   8         The second question was whether or not a -- the

04:11:36   9  timing of the development of the accused products happening

04:11:41  10  before Barco's patents issued would somehow remove the need

04:11:47  11  for this information.  To the extent when Yealink developed

04:11:49  12  this, they were looking at this, and they were trying to

04:11:52  13  figure out exactly how to do this so that they could sell

04:11:56  14  this, regardless of when that happened, it's still evidence

04:12:00  15  that is relevant for a jury to consider when they're

04:12:03  16  evaluating damages and copying.

04:12:04  17         THE COURT:  The copying of your unpatented product

04:12:16  18  is not evidence of willfulness, is it?

04:12:21  19         MR. HALVERSON:  Copying of a patent practicing

04:12:24  20  product I think is evidence of willfulness.

04:12:29  21         THE COURT:  Well, before the patent issues?

04:12:31  22         MR. HALVERSON:  Well, there's certainly no willful

04:12:33  23  infringement that can occur before that, but to the extent

04:12:35  24  that design stemmed out of copying, yes, I do think that

04:12:39  25  that supports a finding of willfulness.

04:12:45    1          THE COURT:  How is your product a patent

04:12:47    2    practicing product before the patent issues?

04:12:50    3          MR. HALVERSON:  Well, of the patents in the case,

04:12:55    4    it's not.  Of other patents in Barco's portfolio, it is.

04:13:01    5    And the willfulness inquiry is all about Yealink's state of

04:13:06    6    mind throughout that process.  Part of that is did Yealink

04:13:10    7    intentionally infringe, but part of that also accounts for

04:13:16    8    whether or not Yealink was a -- I don't want to say bad

04:13:21    9    actor, but the development process of that was below board.

04:13:30    10          THE COURT:  All right.  Are there other issues on

04:13:33    11    your motion to compel?

04:13:35    12          MR. HALVERSON:  Oh, the final is the redacted

04:13:42    13    sales information.  So we've received 1,700 pages of

04:13:47    14    invoices, many of which are partially redacted.  There's no

04:13:52    15    privilege claim for those invoices.  There can't be.

04:13:57    16    They're from a third party sent to Yealink.  The basis for

04:13:59    17    the redactions that we heard back was relevance, and

04:14:03    18    relevance is not a basis for redaction.

04:14:09    19          THE COURT:  All right.  And you indicated that the

04:14:12    20    Defendant had agreed to provide the sales data that is

04:14:19    21    addressed in the motion.  Is this a different issue?

04:14:21    22          MR. HALVERSON:  So there are two prongs to the

04:14:23    23    sales part of the motion.  One is does Yealink have useable

04:14:29    24    sales data?  What we got was the 1,700 pages of invoices

04:14:34    25    which would have to be tabulated.  And there's no way of

04:14:37  1  verifying whether or not those 1,700 pages are the full

04:14:40  2  scope of what has -- what infringement has occurred.

04:14:43  3         The other is a spreadsheet or computer-generated

04:14:49  4  accounting-type software printout.  Yealink has agreed to

04:14:53  5  provide the accounting printout.  And I think that that

04:14:58  6  aspect of the motion to compel can be withdrawn if that is

04:15:01  7  produced.  It still has not been produced, but we got a

04:15:04  8  representation that it was going to be produced.

04:15:06  9         But the redaction of the sales invoices, I don't

04:15:10  10  think, is obviated by the chart presentation -- or the

04:15:15  11  chart production, excuse me, because the content below

04:15:17  12  those boxes would allow Barco to verify what's in that

04:15:24  13  chart.  And so we have no idea what's behind those black

04:15:27  14  boxes.  For all we know it's 12 more WPP30s.

04:15:33  15         And so if what this sales spreadsheet is going to

04:15:36  16  be is simply Yealink's tabulation of the non-redacted

04:15:40  17  numbers, and then the redacted numbers are additional

04:15:43  18  accused products, we would have no way of knowing that.

04:15:47  19         So the invoices should be produced in an

04:15:51  20  unredacted form, and then the table should be produced so

04:15:54  21  that we can verify the table or verify what has already

04:15:57  22  been produced using that table.

04:16:02  23         THE COURT:  All right.  Thank you, Mr. Halverson.

04:16:10  24         MR. YANG:  Your Honor, if it's okay with the

04:16:15  25  Court, may I address this redact the sales information

| | | |
|---|---|---|
| 04:16:19 | 1 | issue first? |
| 04:16:19 | 2 | THE COURT:  Yes. |
| 04:16:20 | 3 | MR. YANG:  Your Honor, Yealink makes a lot of |
| 04:16:22 | 4 | products.  The majority of its products are related to |
| 04:16:25 | 5 | phones, IP phones.  Those are the information in the |
| 04:16:29 | 6 | redacted sales invoices.  We have made this very clear to |
| 04:16:35 | 7 | Barco. |
| 04:16:36 | 8 | And, Your Honor, I do not agree with Barco that a |
| 04:16:40 | 9 | party cannot redact wholly irrelevant information.  This |
| 04:16:46 | 10 | idea that Barco has to verify, has to tabulate the |
| 04:16:49 | 11 | numbers -- now, during the parties' meet and confer on |
| 04:16:53 | 12 | February 20th, after the motion has been filed, we heard |
| 04:16:56 | 13 | for the first time that Barco wanted Yealink to produce |
| 04:17:01 | 14 | accounting information for its products. |
| 04:17:05 | 15 | The reason, Your Honor, we were told is Barco does |
| 04:17:08 | 16 | not want to go through the invoices and add everything up. |
| 04:17:13 | 17 | And as far as we know, it still has not done that.  It has |
| 04:17:16 | 18 | not done the tabulations. |
| 04:17:18 | 19 | Coming back to the information from the accounting |
| 04:17:22 | 20 | system, we are producing that today.  It may already be |
| 04:17:26 | 21 | produced within the past hour to two hours, and that |
| 04:17:29 | 22 | information, Your Honor, also had been provided months ago |
| 04:17:33 | 23 | in our interrogatory responses. |
| 04:17:35 | 24 | THE COURT:  What is the basis for redacting what |
| 04:17:40 | 25 | you consider as irrelevant sales from the invoices? |

| | | |
|---|---|---|
| 04:17:44 | 1 | MR. YANG:  I think there are two bases, Your |
| 04:17:48 | 2 | Honor. |
| 04:17:48 | 3 | One, this sales information, again, for products |
| 04:17:51 | 4 | that have nothing to do with this case on the patents, they |
| 04:17:55 | 5 | do also belong to the third parties, Yealink's customers. |
| 04:18:00 | 6 | Second, Your Honor, there is the risk -- and, |
| 04:18:04 | 7 | again, it's -- it is a remote risk, but there is a risk of |
| 04:18:08 | 8 | inadvertent disclosure, and that is sensitive |
| 04:18:11 | 9 | information -- sensitive information, competitive |
| 04:18:14 | 10 | information for Yealink. |
| 04:18:16 | 11 | We're happy to provide copies for in camera |
| 04:18:21 | 12 | review, Your Honor, to verify that the redactions were |
| 04:18:23 | 13 | proper.  But, Your Honor, because they are wholly |
| 04:18:26 | 14 | irrelevant and because there has not been any showing that |
| 04:18:30 | 15 | Yealink is somehow redacting relevant information, that is |
| 04:18:34 | 16 | an accusation, Your Honor, I -- it's, quite frankly, |
| 04:18:38 | 17 | offensive. |
| 04:18:39 | 18 | On this record, Your Honor, it is our position |
| 04:18:42 | 19 | that the production of the redacted information is not |
| 04:18:47 | 20 | necessary, especially when Barco has informed Yealink that |
| 04:18:50 | 21 | it prefers to have the accounting information so that it |
| 04:18:54 | 22 | can use it as a document, as a piece of evidence, |
| 04:18:58 | 23 | especially when Barco has not done the tabulation analysis |
| 04:18:58 | 24 | it needs to do, has not done the verification analysis it |
| 04:19:05 | 25 | needs to do with the unredacted invoices. |

04:19:10  1       THE COURT:  Well, explain the confidentiality of

04:19:17  2  sales invoices.  I don't understand why -- even though the

04:19:25  3  products are sold to third parties, why there would be

04:19:29  4  confidential information there that can't be adequately

04:19:34  5  protected by the protective order.

04:19:36  6       MR. YANG:  Your Honor, these are not public

04:19:38  7  documents.  These have to do with the sales, the volume,

04:19:43  8  the number of orders for not only Yealink but also its

04:19:48  9  customers.

04:19:48  10       Barco is a competitor to Yealink in many aspects.

04:19:56  11  Your Honor, we understand --

04:19:56  12       THE COURT:  Are you competitors on these other

04:19:59  13  products that you're worried about?

04:20:01  14       MR. YANG:  As far as I know, not at this point,

04:20:03  15  but it is possible.  Again, our understanding is Barco,

04:20:09  16  while primarily focuses on videoconferencing equipment, it

04:20:14  17  may be also developing other products that Yealink

04:20:17  18  currently manufactures.

04:20:20  19       THE COURT:  Well, one way to resolve that, I am

04:20:27  20  not going to compare the redactions to the 1,700 pages of

04:20:33  21  invoices, but I don't mind saying that if you want to

04:20:39  22  protect them, you can allow a representative of the

04:20:45  23  Plaintiff to compare the unredacted to the redacted,

04:20:51  24  satisfy themselves that the redactions are proper, and not

04:20:56  25  keep the unredacted copies.

04:21:03  1          I'm not going to undertake that, but if the

04:21:07  2   Plaintiffs care enough about the potential for improper

04:21:13  3   redaction, I'll order that they be given access.  And if

04:21:19  4   you want to have somebody present when they make that

04:21:23  5   comparison, I'll allow that, but...

04:21:28  6          MR. YANG:  Thank you, Your Honor.  And, no, it was

04:21:30  7   never our intention to add any burden for the Court, of

04:21:34  8   course.

04:21:34  9          I think, Your Honor, that is probably okay with us

04:21:40  10  if Barco is really concerned that Yealink is doing improper

04:21:43  11  redactions, that Yealink is somehow hiding information.

04:21:47  12  Yes, Your Honor, we're okay with that approach to have

04:21:50  13  somebody -- as long as it is outside counsel, of course, to

04:21:55  14  just review the documents and verify them.

04:21:59  15          THE COURT:  All right.

04:22:05  16          MR. YANG:  Coming back to, again, the technical

04:22:09  17  documents and Yealink's proposal to admit to the

04:22:14  18  infringement of all asserted claims, back in November, Your

04:22:20  19  Honor, when we first discussed this issue, this Court also

04:22:23  20  made the notes that if you really want to take technical

04:22:27  21  discovery off the board, then admit infringement of all

04:22:31  22  asserted claims.

04:22:31  23          And I agree with you that -- that that greatly

04:22:36  24  reduces technical discovery that they're entitled to.

04:22:40  25          THE COURT:  Did I say that?

04:22:41　　1　　　　　MR. YANG:  Your Honor, yes.  I am reading from the

04:22:46　　2　　transcript.

04:22:46　　3　　　　　THE COURT:  Well, I -- there are times when I

04:22:49　　4　　shouldn't interject, but --

04:22:56　　5　　　　　MR. YANG:  But, Your Honor, my point is this idea

04:23:00　　6　　that Yealink is hiding something, Yealink is trying to

04:23:04　　7　　streamline the case.  It has already withdrawn the key

04:23:09　　8　　products, its dongle, from the U.S. market.  The damages in

04:23:13　　9　　this case, Your Honor, are very limited.  The infringement

04:23:16　　10　　period is very small.

04:23:18　　11　　　　　Yealink is not trying to hide something.  If that

04:23:21　　12　　is the case, Yealink would deny infringement and hide its

04:23:25　　13　　documents.  Yealink is trying to move on.  Yealink is

04:23:27　　14　　trying to save the expenses, save some time for the Court,

04:23:32　　15　　for the parties, move on to damages.

04:23:35　　16　　　　　There's nothing new to Yealink's proposal.

04:23:38　　17　　Counsel has been talking about this.  Yealink and Barco

04:23:41　　18　　have explored this for a long time.  And, again, this is

04:23:44　　19　　something we mentioned in our response to the motion to

04:23:48　　20　　compel.  Yealink had agreed to the terms that Barco had

04:23:54　　21　　proposed.  Yealink had agreed to stipulate to the

04:23:58　　22　　infringement of -- of the dependent claims that Barco had

04:24:01　　23　　proposed.

04:24:03　　24　　　　　We understand now that is a moving target.

04:24:07　　25　　Nevertheless, Yealink's intention to streamline this case

04:24:11   1   has been consistent.

04:24:13   2           THE COURT:  Do you have a copy, Mr. Yang, of the

04:24:17   3   third amended answer that you referred to?

04:24:19   4           MR. YANG:  Yes, Your Honor.  We have a redline

04:24:22   5   copy showing changes over the previously filed second

04:24:26   6   amended answer, if that's okay with the Court, so the Court

04:24:29   7   can see all the changes.

04:24:30   8           THE COURT:  And have you -- do you have a copy for

04:24:32   9   the Plaintiff, as well?

04:24:33  10           MR. YANG:  We sent a copy to Plaintiffs already.

04:24:35  11           THE COURT:  All right.

04:24:36  12           MR. YANG:  But we also do have a copy today if the

04:24:40  13   Court wishes to review it.

04:24:43  14           THE COURT:  I would like that review that, and

04:24:45  15   take a -- about a 10-minute recess to do that.  And then

04:24:48  16   we'll come back and finish this up.

04:24:50  17           MR. YANG:  Okay.  Your Honor, may we approach?

04:24:53  18           THE COURT:  Would you?

04:24:54  19           MR. YANG:  Thank you.

04:24:55  20           THE COURT:  Thank you.

04:25:00  21           All right.  We will take a 10-minute recess.

04:25:02  22   Thank you.

04:25:02  23           MR. YANG:  Thank you, Your Honor.

04:25:03  24           COURT SECURITY OFFICER:  All rise.

04:25:04  25           (Recess.)

| | | |
|---|---|---|
| 04:25:04 | 1 | COURT SECURITY OFFICER:  All rise. |
| 04:25:05 | 2 | THE COURT:  Thank you.  Please be seated. |
| 04:37:26 | 3 | Mr. Halverson, I have had a chance to look over |
| 04:37:31 | 4 | the proposed third amended answer, and it does appear to |
| 04:37:40 | 5 | admit infringement of the listed products. |
| 04:37:48 | 6 | Do you have a position that there are other |
| 04:37:53 | 7 | products of significance in the case that are not addressed |
| 04:37:58 | 8 | in the admissions in this answer? |
| 04:38:00 | 9 | MR. HALVERSON:  No, Your Honor. |
| 04:38:06 | 10 | THE COURT:  The only relevance that I can see of |
| 04:38:13 | 11 | further technical production, if this third amended answer |
| 04:38:21 | 12 | is filed, has to do with the possible effect of copying on |
| 04:38:29 | 13 | a willfulness claim, and even that is somewhat limited in |
| 04:38:44 | 14 | its effect. |
| 04:38:45 | 15 | But I do think that the Defendant makes a good |
| 04:38:51 | 16 | argument about the burden of that technical production and |
| 04:38:58 | 17 | the -- especially what resonates with me is to the extent |
| 04:39:01 | 18 | that the Plaintiff and Defendant are competitors, |
| 04:39:06 | 19 | disclosure of source code is always a touchy issue. |
| 04:39:16 | 20 | And so I'm inclined to say that I think that the |
| 04:39:22 | 21 | burden is not justified by the relevance. |
| 04:39:31 | 22 | If you have more evidence about the -- about the |
| 04:39:46 | 23 | support for the copying argument, you can tell me, but I |
| 04:39:55 | 24 | understand the smoke, but I don't know that I can really |
| 04:40:03 | 25 | rely on that to justify expensive production. |

04:40:07     1          MR. HALVERSON:  Understood, Your Honor.  I think

04:40:11     2     the only response that exists is we don't know what we

04:40:14     3     don't know.  And the only reason we don't know that is

04:40:18     4     because they haven't given us the routine technical

04:40:20     5     discovery.

04:40:22     6          And each of these amendments keep coming in

04:40:25     7     response to motions to compel.  And so it's only when their

04:40:29     8     back is up against the wall do they try to get out of fact

04:40:33     9     discovery in a way that is court-facing.

04:40:38    10          So back in the fall of last year, we reached out.

04:40:41    11     We were looking for the same kind of technical documents.

04:40:43    12     We got an amended answer saying:  We admit we infringe

04:40:46    13     Claim 1.  Now we don't have to produce anything.

04:40:48    14          Came down here.  We had this discussion.  There

04:40:51    15     was an order.  We spent another few months looking for

04:40:55    16     additional documents, waiting for compliance with the

04:40:58    17     Court's order.  It didn't come.  We reach out about our

04:41:04    18     dispute.  We send our letter.  And, again, as soon as it

04:41:08    19     gets down to the Court, we get another amendment.

04:41:12    20          And I don't know how to prove that they copied

04:41:15    21     without access to what it is that they did.  And I don't

04:41:19    22     have any evidence because I've not been able to get any

04:41:24    23     evidence, Your Honor.

04:41:31    24          THE COURT:  All right.  Thank you, Mr. Halverson.

04:41:36    25          MR. YANG:  Your Honor, may I respond?

04:41:39    1          THE COURT:  Go ahead.

04:41:40    2          MR. YANG:  Your Honor, I think what Mr. Halverson

04:41:44    3    just described is a fishing expedition.  Also, this idea

04:41:51    4    that Yealink is somehow admitting because it's had its back

04:41:55    5    to the wall, ignores months of Yealink's attempt to come to

04:42:02    6    agreement, including Yealink agreeing to the very terms

04:42:07    7    Barco has offered.  We reached an agreement before this

04:42:12    8    motion.

04:42:12    9          This second motion to compel, Your Honor, was

04:42:13    10   completely unnecessary, nor did the parties have the chance

04:42:19    11   to meet and confer.

04:42:20    12         This idea that Barco is entitled to see the -- to

04:42:28    13   verify that Yealink did not copy its products, there is no

04:42:33    14   evidence.

04:42:33    15         Earlier, by the way, we've heard this technical --

04:42:36    16   technical alliance, and I've heard that for the first time

04:42:39    17   this morning when Barco served some interrogatories on

04:42:43    18   that.  As far as I know, there has been no document

04:42:47    19   production from Barco about this alliance.  There's been

04:42:50    20   nothing.

04:42:51    21         And, Your Honor, I'm worried that Barco's using

04:42:55    22   motions as a way to apply pressure on Yealink, as a way to

04:43:02    23   maybe -- to portray that Yealink is a bad actor, that

04:43:06    24   Yealink violates the Court's orders before the jury.

04:43:09    25         None of this -- none of this evidence should be

| | | |
|---|---|---|
| 04:43:13 | 1 | admissible, but that is my concern, Your Honor, that there |
| 04:43:15 | 2 | could be some misuse of the discovery process. |
| 04:43:17 | 3 | THE COURT:  Well, I am certainly not ascribing any |
| 04:43:22 | 4 | ill motive to the Plaintiff. |
| 04:43:24 | 5 | MR. YANG:  That's not my intention either, Your |
| 04:43:26 | 6 | Honor, but there is concern coming from my clients. |
| 04:43:30 | 7 | THE COURT:  All right.  And do I understand now |
| 04:43:36 | 8 | that you will be filing the third amended answer this week? |
| 04:43:42 | 9 | MR. YANG:  With the Court's leave, yes, Your |
| 04:43:46 | 10 | Honor. |
| 04:43:46 | 11 | THE COURT:  All right.  I hereby grant you leave |
| 04:43:51 | 12 | to do so.  And I will withhold a ruling on the motion to |
| 04:43:58 | 13 | compel until that has been filed. |
| 04:44:00 | 14 | MR. YANG:  Thank you, Your Honor. |
| 04:44:01 | 15 | THE COURT:  I will say that -- I will order that |
| 04:44:06 | 16 | the unredacted sales invoices be made available for the |
| 04:44:11 | 17 | Plaintiff to review and return as discussed before, but |
| 04:44:19 | 18 | I'll withhold a ruling on the other aspects of the motion |
| 04:44:23 | 19 | to compel until after that answer is filed. |
| 04:44:26 | 20 | MR. YANG:  Understood, Your Honor.  Thank you. |
| 04:44:29 | 21 | THE COURT:  Mr. Halverson? |
| 04:44:30 | 22 | MR. HALVERSON:  May I? |
| 04:44:31 | 23 | So on the sales invoices, Your Honor -- |
| 04:44:35 | 24 | THE COURT:  Yes. |
| 04:44:35 | 25 | MR. HALVERSON:  -- this is what's redacted.  This |

04:44:41  1  is not sensitive information.  Nobody is able to copy a

04:44:46  2  product or develop a competing product from a line item on

04:44:50  3  an invoice.

04:44:51  4      And so while I agree it's within the Court's

04:44:54  5  discretion to order the production of this on a standalone

04:44:57  6  non-network computer under the protective order, it seems

04:45:01  7  like a little bit of an extreme remedy for something that

04:45:11  8  is at best seven words and a couple numbers.

04:45:13  9      THE COURT:  Well, I'm giving you a chance to

04:45:15  10  verify the good faith of the Defendant in the way they've

04:45:19  11  redacted these.  And if you find anything that you think is

04:45:28  12  not consistent with what has been portrayed as a good-faith

04:45:33  13  redaction of totally unrelated products, then I expect I'll

04:45:38  14  hear about it.

04:45:39  15      MR. HALVERSON:  Yes, Your Honor.

04:45:41  16      THE COURT:  All right.

04:45:42  17      MR. YANG:  Your Honor, I just have a logistical

04:45:44  18  concern.  This is the second time that counsel has shown

04:45:47  19  Yealink's confidential information on the screen.  I don't

04:45:51  20  think that is making its way into the transcript, but I

04:45:53  21  just want to note that for the record.  These documents,

04:45:57  22  including the document Mr. Halverson showed earlier, has

04:45:59  23  been marked as highly confidential.

04:46:03  24      THE COURT:  All right.  I do understand that,

04:46:05  25  although I think he was just doing it for a demonstrative

04:46:10    1    purpose that did not disclose any information.

04:46:12    2            MR. YANG:  Okay.

04:46:13    3            THE COURT:  But I note your objection to that.

04:46:16    4            MR. YANG:  Thank you, Your Honor.

04:46:17    5            THE COURT:  All right.  Anything that we need to

04:46:21    6    put on the record further for the Plaintiff, Mr. Halverson?

04:46:25    7            MR. HALVERSON:  No, Your Honor.

04:46:26    8            THE COURT:  Mr. Yang?

04:46:27    9            MR. YANG:  Your Honor, just -- I understand the

04:46:30    10   Court will issue its ruling on the second motion to compel.

04:46:33    11   I think there may be some other discovery issues, but the

04:46:38    12   parties are trying to work that out.

04:46:40    13           The one potential concern -- I just wanted to

04:46:42    14   raise this for the Court so the Court is aware -- fact

04:46:44    15   discovery closes on April 18th.  Barco has noticed 26 -- or

04:46:50    16   demanded to take 26 depositions and has taken the position

04:46:54    17   that it will not provide the availability of its own

04:46:56    18   witnesses until Yealink has provided availability for the

04:47:00    19   26 witnesses.

04:47:01    20           We're trying to work that out, but there may be an

04:47:04    21   issue, given the timing, that we may need the Court's

04:47:08    22   assistance.

04:47:08    23           THE COURT:  Well, I'm certainly amenable to

04:47:10    24   addressing things like timing by telephone.  You can

04:47:15    25   coordinate a time with Ms. Andrews by calling chambers.

| | | |
|---|---|---|
| 04:47:23 | 1 | And if it's something that can be taken up that way, I |
| 04:47:26 | 2 | will.  If we have to reconvene, we'll do that. |
| 04:47:30 | 3 | MR. YANG:  Thank you, Your Honor. |
| 04:47:31 | 4 | THE COURT:  All right. |
| 04:47:32 | 5 | MR. HALVERSON:  Thank you, Your Honor. |
| 04:47:32 | 6 | THE COURT:  Thank you. |
| 04:47:33 | 7 | We're adjourned. |
| 04:47:35 | 8 | COURT SECURITY OFFICER:  All rise. |
| 04:47:36 | 9 | (Hearing concluded at 4:47 p.m.) |

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes                      3/20/2025
    SHELLY HOLMES, CSR, TCRR                Date
10  CERTIFIED SHORTHAND REPORTER
    State of Texas No.: 7804
11  Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25