

# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

BARCO, INC. AND BARCO NV,

    PLAINTIFFS,                     CASE NO.:

  vs.                                 2:23-CV-0521-JRG-RSP

YEALINK (USA) NETWORK TECHNOLOGY

CO., LTD., AND YEALINK NETWORK

TECHNOLOGY CO., LTD.,

    DEFENDANTS.

_____/

VIDEOTAPED DEPOSITION OF KEVIN C. ALMEROTH, Ph.D.

*VIA REMOTE COUNSEL VIDEOCONFERENCE*

FRIDAY, MAY 23, 2025

VOLUME I

STENOGRAPHICALLY REPORTED BY:

MEGAN F. ALVAREZ, RPR, CSR No. 12470

JOB NO. 7381305

Page 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

BARCO, INC. AND BARCO NV,

    PLAINTIFFS,                CASE NO.:

  vs.                         2:23-CV-0521-JRG-RSP

YEALINK (USA) NETWORK TECHNOLOGY

CO., LTD., AND YEALINK NETWORK

TECHNOLOGY CO., LTD.,

    DEFENDANTS.

_____/

     Videotaped Videoconference Deposition of KEVIN C. ALMEROTH, Ph.D., Volume I, taken on behalf of Plaintiffs, VIA REMOTE COUNSEL.  Deponent testifying from Goleta, California, beginning at 9:01 a.m. and ending at 10:25 a.m. on Friday, May 23, 2025, before Megan F. Alvarez, RPR, Certified Shorthand Reporter No. 12470.

Page 33

1  technical aspects of the patented features.
2              Do you see that?
3       A.   I see paragraph 51.
4       Q.   You see where you say:  "For the purposes
5  of my report and regarding the technical aspects of
6  the patented features."
7              Do you see that?
8       A.   I do.
9       Q.   What are the patented features of Barco's
10 patents?
11      A.   I don't know that I've got a definitive
12 list for you.  I think ultimately when you look
13 at -- at the claims, I've got a whole section of the
14 report that says there aren't really valid
15 patentable features within the claims.
16             I think you're getting into a point of the
17 report where there's an assumption that the claims
18 are valid and infringed to talk about the technical
19 importance of the patents and those features.
20             Ultimately, I think --
21      Q.   So for -- sorry.
22      A.   Ultimately, later in the report, it gets
23 to the point that there is not significant or any
24 patented features that didn't already exist in the
25 prior art or the state of the art.

```
                                                      Page 34
 1        Q.   And so are you offering an invalidity
 2   opinion in this report?
 3        A.   No, not specifically.  It's more about
 4   looking at technical issues that I would expect
 5   would ultimately feed into an apportionment opinion.
 6             But there is a recognition in the report
 7   about IPRs that have been filed that I've offered
 8   declarations on, and I think I've offered the
 9   opinion that, through those efforts, claims will
10   likely be found to infringe.  And I think there's
11   some specific language that says what would remain
12   at most is some dependent claims that would have
13   incrementally minimal technical importance.
14             So I think it goes to an opinion about
15   technical importance.
16        Q.   Do you have an opinion about the -- are
17   you familiar with the Crestron license?  Excuse me.
18        A.   Yes, I have -- I am aware that there is a
19   license, and I have seen the license.
20        Q.   Do you have an opinion about what type of
21   technology is covered by the patents in the Crestron
22   license that are not the patents that are asserted
23   in this case?
24        A.   If you mean what's referenced in -- in the
25   sentence that crosses between page 16 and 17, what
```

Page 35

```
 1   essentially is listed there is the '972, the '346,
 2   and the '347 patents.  I -- I don't have some
 3   particular synopsis in mind to describe what the
 4   technology is.  I don't think there's anything in
 5   the report, but if I'm misremembering, I would defer
 6   to what it says in the report.
 7        Q.   If you flip a couple pages to paragraph 55
 8   for me.
 9        A.   Okay.
10        Q.   Do a handful of software applications.
11        A.   Sure.
12        Q.   55, you're describing a product called
13   Skype; is that right?
14        A.   Yes.
15        Q.   And Skype is a software program that was
16   offered by Microsoft at some point in time, correct?
17        A.   I think it's primarily software.  I don't
18   know if they ever made hardware.  And I think they
19   were eventually acquired by Microsoft.
20        Q.   Do you know whether or not Skype has a
21   plug-in dongle with a button?
22        A.   Not that I recall.
23        Q.   And then -- so paragraphs 55, 56, and 57
24   are all describing Skype; is that right?
25        A.   They are.
```

Page 36

1  Q. What is that description of Skype based
2  on?
3  A. The documents that are cited here, there's
4  at least one from the web page. And also based
5  on -- on my knowledge of and use of Skype.
6  Q. So the document -- there's a single URL in
7  paragraph 55; is that right?
8  A. There is.
9  Q. There's no URL in 56 and no footnote in
10 56; is that right?
11 A. That's correct.
12 Q. And there's no URL and no footnote in 57;
13 is that right?
14 A. That is correct.
15 Q. And so are 56 and 57 based on your
16 knowledge and use of Skype?
17 A. I would have to check the document. Maybe
18 there's a missing ID or an ID that could be included
19 based on what's in that document for 56 and 57.
20     I think these paragraphs, as you
21 indicated, generally support a description of Skype.
22 And to the extent the document or other documents
23 about Skype that are part of the case support those
24 opinions, then that would be something that I would
25 rely on or have relied on. In addition, there's

Page 37

1  also my knowledge and experience in use of Skype.
2     Q.  And when you say you'd have to check the
3  document, what document are you referring to that
4  you would have to check?
5     A.  That Skype web page that's listed there.
6     Q.  And then you said there might be a missing
7  ID.
8         What do you -- what does that mean?
9     A.  The "See above" reference to the same
10 document.  It's not my understanding you have to put
11 a cite for every single sentence; you can generally
12 refer to a document.
13    Q.  If you flip a couple page -- or one page,
14 excuse me -- a couple paragraphs, I meant,
15 paragraph 58 on the next page is talking about Zoom;
16 is that right?
17    A.  Yes.
18    Q.  And here you have a URL in 58 to zoom.com;
19 is that right?
20    A.  Yes.
21    Q.  No other footnotes in 58?
22    A.  No.
23    Q.  And Zoom is a software program, right?
24    A.  Generally it is a software program.  I
25 don't recall if they didn't also at some point make

Page 38

```
 1   hardware solutions.
 2        Q.   And are you aware of Zoom offering any
 3   dongle-based solution that includes a button?
 4        A.   Not that comes to mind as I sit here right
 5   now.  I don't -- I don't know if there's other
 6   evidence in the record that would suggest that they
 7   had such a product at some point.
 8        Q.   Paragraph 59, you're talking about Slack;
 9   is that right?
10        A.   Yes.
11        Q.   No footnotes in 59, right?
12        A.   Correct.
13        Q.   One URL to a Encyclopedia Britannica page;
14   is that correct?
15        A.   That's correct.
16        Q.   And Slack is a software program, right?
17        A.   It's gonna be a similar kind of answer,
18   that what comes to mind is that it was a software
19   program.  I don't know if at some point they also
20   sold hardware programs.
21        Q.   And are you aware of Slack offering any
22   dongle-based presentation solution that includes a
23   button?
24        A.   Not that specifically comes to mind.  I
25   don't know if there's something in the record that
```

```
                                                         Page 39
 1   would suggest that something like that did exist.
 2        Q.   Paragraph 60, you talk about HDMI and VGA
 3   cables.
 4             No URL or footnotes in 60, right?
 5        A.   Correct.
 6        Q.   So for those -- that paragraph, are you
 7   just relying on your own knowledge of those cables
 8   and Miracast and AirPlay?
 9        A.   No.  So for Miracast and AirPlay, the
10   subsequent paragraphs talk about Miracast and
11   AirPlay and provide references to web pages.  So
12   this is -- 60 is probably more of an introductory
13   paragraph to what -- what comes in the subsequent
14   paragraphs.
15        Q.   So paragraph 61 is talking about Miracast,
16   right?
17        A.   It is.
18        Q.   62 is AirPlay?
19        A.   It is.
20        Q.   63 is Surfly?
21        A.   Correct.
22        Q.   And I'm happy to do them individually, but
23   if we can lump them together and save questions,
24   we'll try together.
25             For those additional product offerings,
```

```
                                              Page 40
 1   are those all software product offerings?
 2        A.   Generally, they are.  Obviously they run
 3   on -- on hardware products, and I don't know if at
 4   least some of those companies don't also offer
 5   companion hardware to go with the software.
 6        Q.   Do you know whether or not any of those --
 7   Miracast, AirPlay, or Surfly -- offer dongle-based
 8   solutions with a button?
 9        A.   I don't recall as I sit here right now.
10        Q.   Go to paragraph 75 for me.
11        A.   Okay.
12        Q.   You offer an opinion -- and let me start
13   over.
14             So paragraph 75 is a conclusion paragraph
15   for a section that begins a couple of pages earlier,
16   paragraph 66 entitled "Crestron Products," right?
17        A.   That's correct.
18        Q.   And so you're offering an opinion in your
19   report that Crestron offers a non-infringing
20   alternative; is that right?
21        A.   That is one of the opinions.
22        Q.   And as part of that opinion, you're
23   pointing to Crestron's software-only based sharing
24   system, correct?
25        A.   I'm not sure I would call it a system
```

```
                                                    Page 41
 1    per se.  Certainly it's the functionality of being
 2    able to not use a peripheral device as required by
 3    the claims and accomplish the same screen sharing or
 4    presentation sharing functionality.
 5         Q.   And Crestron is a licensee to the patents
 6    in this case, correct?
 7         A.   For some of its products and some of its
 8    functionality.
 9         Q.   Is it your understanding that Crestron
10    license is limited to certain products and
11    functionality?
12         A.   It's not my understanding that there were
13    allegations of infringement against the Crestron
14    AirMedia 2.0 app.
15         Q.   Do you know whether or not there were ever
16    any allegations of infringement against Crestron?
17         A.   At all?  I think generally there were.  I
18    don't recall --
19         Q.   If there were not, would that change -- I
20    apologize.  I'm doing a bad job with my rules.  I
21    apologize.
22              Let me ask that again so you can get your
23    full answer out.
24              Do you know whether or not there were ever
25    any allegations of infringement against Crestron?
```

Page 42

1  A. I don't recall the details. If the basis
2  of the license was because of an allegation of
3  infringement or not, that would, I assume, be part
4  of the history of the relationship between Barco and
5  Crestron. I don't have those details in mind as I
6  sit here right now.
7  Q. And if Crestron approached Barco without a
8  litigation having been filed already, would that
9  change any of your opinions?
10 A. I don't believe so. I don't have the full
11 set of opinions in mind. It certainly wouldn't
12 change this opinion in 74 and 75.
13 Q. Can you go up to page 41 for me,
14 paragraph 112?
15 A. Okay.
16 Q. Paragraph 112 you have a quote from a
17 Frost & Sullivan presentation.
18    Do you see that?
19 A. Yes.
20 Q. So the first sentence is the quote, and
21 then you go on to talk about an aspect of that quote
22 as click-to-join meetings; is that right?
23 A. I do have a sentence that follows the
24 quote.
25 Q. So in that sentence -- in those sentences

Page 43

1  that follow the quote, one of the things that you're
2  talking about is how Teams offers a software-based
3  solution that a user can click to join a meeting,
4  right?
5       A.   That's identified as one example.  It's a
6  fairly prevalent functionality in the state of the
7  art.
8       Q.   Is Teams a plug-and-play device?
9       A.   Not sure how to answer that question
10 exactly.  Generally, Teams is the software, but its
11 ability to integrate a plug-and-play device is
12 something that would have existed.
13           So, for example, for sharing audio and
14 video, I could share video from -- or audio from
15 headphones just like what I'm doing here.  So it's a
16 wireless plug-and-play device that can be integrated
17 into Teams.
18      Q.   So it's your opinion that the Teams
19 software offering is a plug-and-play device?
20      A.   The Teams software by itself is not the
21 plug-and-play device.  It has the ability to provide
22 simplicity and ease of use for plug-and-play devices
23 that are used in and plugged into a system or on a
24 PC, for example.
25      Q.   Is --

Page 44

1       A.    Just like we're doing here for Zoom.
2       Q.    Is Zoom a plug-and-play device?
3       A.    It would be a similar answer.  It's both
4  the software that enables a meeting like this to
5  happen, being able to do things like screen sharing.
6  The audio is through my headphones.  That's a
7  plug-and-play device.  That's all things that are
8  being provided as seamless and easy to use via the
9  software.
10      Q.    What is Zoom doing for your headphones?
11      A.    So Zoom for my headphones is being -- is
12 being able to take advantage of devices that are
13 connected logically to my laptop.  So my headphones
14 are presented to Zoom as a source of audio via the
15 headphone microphone or as an output for audio via
16 headphone speakers.  And essentially any types of
17 devices that you can connect to your computer for
18 things like audio and video are things that can be
19 integrated into a Zoom meeting.
20      Q.    Can you modify the audio output of this
21 meeting via Zoom from your headphones to your laptop
22 speakers or do you have to use your computer audio
23 output settings in order to change that?
24      A.    I can do it through Zoom.
25      Q.    How?

1    A.   Let's see.  In the lower left, you click
2 on audio, and just as an example, I can switch this
3 to microphone.  And so the tenor of the audio should
4 have changed based on fact that I'm using the
5 microphone on my laptop now.
6    Q.   So as part of the computer audio settings
7 within Zoom, you're able to adjust the input and
8 output, this microphone and speaker to and from your
9 Bose headset and your computer, right?
10    A.   I -- there's an audio menu that you can
11 select.  There's a video menu you can select.  They
12 have a variety of different functionality for
13 setting inputs and outputs for devices that are
14 connected to my computer.
15    Q.   Paragraph 120 -- I'm sorry.  Go ahead.
16    A.   I was gonna say, and this is functionality
17 that's existed in software like this for decades.
18    Q.   Can you go to paragraph 121 for me on
19 page 44?
20    A.   Okay.
21    Q.   You're talking about a wireless
22 conferencing market in the first sentence of
23 paragraph 121.
24         Do you see that?
25    A.   Yes.

1    Q.   What is the wireless conferencing market?
2    A.   Generally it's the market for -- for
3 wireless conferencing.  As an example, like what
4 we're doing today.
5    Q.   So what we're doing today is a
6 videoconference over the Internet with a number of
7 disparately located individuals, right?
8    A.   I think that's one characterization for
9 what we're doing.
10   Q.   We're not in one room together?
11   A.   We are not in one room together.
12   Q.   There's not a screen up at the front of a
13 room that we're all looking at together, right?
14   A.   No, not in this particular application
15 scenario.
16   Q.   Here your opinion in 121 is that the
17 security claimed by the asserted patents has zero
18 value in the wireless conferencing market.
19        Goes on to say:  "The security benefit's
20 minimal value resides entirely with wireless
21 presentation within an individual meeting room
22 which, as discussed above, is provided by the
23 protocols and platforms above without the claimed
24 dongle."
25        Do you see that?

Page 47

```
 1        A.    I do.
 2        Q.    Are you saying that people are not looking
 3   for secure connection for their wireless
 4   conferences?
 5        A.    No.  It's -- it's what it just -- the
 6   sentence that you read:  "The security benefit's
 7   value, minimal value, resides entirely within the
 8   wireless presentation within the individual meeting
 9   rooms, that's provided by protocols and platforms
10   above without the claimed dongle."
11             So all of technology for providing
12   security comes from aspects that are not part of the
13   claim or novel to the patent or to the dongle either
14   accused of infringement or what -- you know, Barco's
15   alleged practicing products.
16             All of the security mechanisms that exist
17   for protecting privacy, integrity of the data are
18   all provided by standard Internet protocols for
19   either wireless communication, wired communication
20   at the data link layer, network layer, application
21   layer, et cetera.
22        Q.    I see.
23             So you're saying that because
24   Internet-based communications can be encrypted or
25   can be secured, that that technology is standardized
```

```
                                                     Page 48
 1    and isn't something that is provided by the patents
 2    themselves?
 3         A.   I think I'm saying much more than that.
 4    It's not only Internet communication; it's
 5    communication in a wireless context whether you're
 6    connected or not.
 7              The ability to secure, say, USB-based
 8    communication at the USB layer, at the network
 9    layer, at the application layer are all technologies
10    that have been standardized and used in exactly this
11    field for this functionality for these kinds of
12    devices as part of the state of the art and the
13    prior art in exactly this context, meaning to
14    support all of the different kinds of uses of the
15    technology for things like videoconferencing,
16    meetings and presentations either remote or in a
17    single location.
18         Q.   Are you familiar with concept of induced
19    infringement?
20         A.   Generally, I am.
21         Q.   Have you ever offered opinions in other
22    cases about induced infringement?
23         A.   I have.
24         Q.   What is induced infringement?
25         A.   I -- it's not an opinion I've offered in
```

Page 56

```
 1                    CERTIFICATE OF REPORTER
 2            I, the undersigned, a Certified Shorthand
 3    Reporter of the State of California, do hereby
 4    certify:
 5            That the foregoing proceedings were taken
 6    before me at the time and place herein set forth;
 7    that any witnesses in the foregoing proceedings,
 8    prior to testifying, were administered an oath; that
 9    a verbatim record of the proceedings was made by me
10    using machine shorthand, which was thereafter
11    transcribed under my direction; and that the
12    foregoing is an accurate transcription thereof.
13            Further, that if the foregoing pertains to
14    the original transcript of a deposition in a federal
15    case, before completion of the proceedings, review
16    of the transcript [X] was [ ] was not requested.
17            I further certify that I am neither
18    financially interested in the action, nor a relative
19    or employee of any attorney of any party to this
20    action.
21            IN WITNESS WHEREOF, I have this date
22    subscribed my name.
23    DATED: May 29, 2025
24
                                    MEGAN F. ALVAREZ
25                                  CSR No. 12470, RPR
```