IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| BARCO, INC., et al., | ( | CAUSE NO. 2:23-CV-521-JRG |
| | ) | |
| Plaintiffs, | ( | |
| | ) | |
| vs. | ( | |
| | ) | |
| YEALINK (USA) NETWORK | ( | |
| TECHNOLOGY CO., LTD., et al., | ) | |
| et al., | ( | MARSHALL, TEXAS |
| | ) | AUGUST 28, 2025 |
| Defendants. | ( | 9:00 A.M. |

PRETRIAL CONFERENCE

BEFORE THE HONORABLE ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS 75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFFS:

K&L GATES, LLP
4 EMBARCADERO CENTER
SUITE 1200
SAN FRANCISCO, CA 94111
(415) 882-8238
BY: MR. ERIK HALVERSON

K&L GATES, LLP
1 CONGRESS STREET, SUITE 2900
BOSTON, MASSACHUSETTS 02114
(315) 391-0417
BY: MR. CHRIS CENTURELLI
MR. JOSH ANDREWS

GILLAM & SMITH, LLP
303 SOUTH WASHINGTON AVENUE
MARSHALL, TEXAS 75670
(903) 934-8450
BY: MS. MELISSA SMITH

FOR THE DEFENDANTS:

DENTONS US, LLP
100 CRESCENT COURT, SUITE 900
DALLAS, TEXAS 75201-1858
(214) 259-1887
BY: MR. FORREST GOTHIA
MS. HALEY EASTHAM

DENTONS US, LLP
1221 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10020
(212) 398-4890
BY: MR. STEPHEN YANG

OFFICIAL REPORTER:

SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS 75670
(903) 923-8546

01:32 01:32 THE COURT: Good afternoon. Please be seated. For the record, we are here for the completion of the pretrial conference in Barco versus Yealink Network, which is our Case No. 2:23-521.

Would counsel state their appearances for the record?

MS. SMITH: Good afternoon, Your Honor. Melissa Smith on behalf of the Plaintiff this afternoon. I'm joined by Mr. Erik Halverson, Mr. Chris Centurelli, and Mr. Josh Andrews. And Barco's ready to proceed, Your Honor.

01:33 THE COURT: All right. Thank you, Ms. Smith.

MR. GOTHIA: Good afternoon, Your Honor. Forrest Gothia for the Defendants. With me today is my colleague Stephen Yang and Haley Eastham. We are ready to proceed, Your Honor.

THE COURT: All right. Thank you, Mr. Gothia.

01:33 The primary item we have on the agenda today is the pre-admission of exhibits. I also have an issue about what was I guess referred to as a proposed stipulation as to the effect of the Defendants' stipulation or admission on the issues that the jury is going to have to decide.

01:34 Does either side have other issues besides those two that they want to have on the agenda for this afternoon?

MR. HALVERSON: Not from us, Your Honor.

THE COURT: All right. Thank you, Mr. Halverson.

MR. YANG: Your Honor, the one potential issue

01:34 Yealink would like to raise, and we can discuss this at the end, back in November we asked Your Honor about the possibility of staying the case in light of IPRs Yealink filed. At the time the Court filed because they were not instituted, the IPRs, the Court was not going to stay the case.

And Your Honor, I just wanted to ask again, because now the four IPRs Yealink filed have all been instituted in full on all claims that were challenged. We are expecting a decision -- a final written decision from the PTAB in April. And the effect, Your Honor, is if any claim challenged in those IPRs does become invalidated or being held unpatentable, 01:35 I think there will be a directive fact on any verdict that comes out of trial in this case. Yealink just wanted to raise that again to see if that is something the Court would entertain.

THE COURT: Just so I can understand what you are saying, are you representing that IPRs have been instituted as to all claims asserted in this case?

MR. YANG: Not all asserted, but a majority. So six patents are asserted in this case. Yealink filed IPRs on four 01:36 of them, and in those IPRs the challenged claims constitute I think about 80 to 90 percent of the asserted claims from those four patents, including the independent claims that are currently asserted, all independent claims.

01:36 01:37 01:37 01:37 01:38

THE COURT: I don't think that is a basis to reconsider the denial of the stay. I do think that that is a basis to carefully structure the verdict form so that if there are events in the PTAB that that effect the outcome, that they can be -- under their effect can be understood by examining the verdict form.

MR. YANG: Okay. Well, thank you, Your Honor. We just wanted to ask the Court, but I understand. Thank you.

THE COURT: All right. Thank you, Mr. Yang.

The filing, I guess it was now the day before yesterday, that's entitled "Proposed Joint Stipulation," which doesn't appear to have anything joint about it, is concerning to the Court. What I had expected to see is counsel addressing the effect of the answers along the lines of telling the jury that the Defendant has admitted that the accused products directly infringed the asserted patents as of, and I don't recall the date off the top of my head, but it was a date that the Defendant says they withdrew those products from the U.S. market.

But in any event, the Court has found already that the admission of direct infringement went through that date and, therefore, the questions for the jury would be whether the Defendant has directly infringed since that date, whether the Defendant has indirectly infringed since that date, which would include the inducement issue we've all talked about,

01:38 whether any such infringement was willful, and what the damages would be. And instead what we got are basically position papers.

01:39 There is no way that the Court is going to instruct the jury about Barco offering a license on certain terms that the Defendant rejected and all of the back and forth about that. There's also no way the Court is going to instruct the jury that Yealink made certain stipulations to reduce the burden of this trial on the jury.

01:39 And I'm surprised that -- you know, I had the general presumption, because the signature blocks indicate respected firms, that also the lawyers are going to also be good, and I am stunned that counsel could not come up with a simple way to tell the jury what the effect of the pleadings has been so far.

01:40 And if counsel don't want to be heard on that issue, then the Court will figure out something to do, but what you offered the day before yesterday does not indicate to me that any work has been done on this since the last time we got together in this courtroom.

Mr. Halverson, did counsel meet and confer about this issue?

MR. HALVERSON: Yes, Your Honor; albeit briefly, but -- sorry, Your Honor.

Yes, Your Honor, there was a conference. It was a brief

conference.

THE COURT: Tell me what 'brief' means to you.

MR. HALVERSON: Less than five minutes.

THE COURT: All right. And is there a particular reason that counsel couldn't afford more than five minutes to try and resolve this issue?

MR. HALVERSON: I think the timing on the submission was part of the reason why that there was a brief conference. We received the order and worked diligently with our client over the weekend to craft what we thought was language that was consistent with both the stipulations that were already filed in the pretrial order and the Court's order in Docket 178 as it related to the only remaining issue in the trial was going to be ongoing or continued induced infringement after April of 2024.

THE COURT: Why would the proposed license terms be relevant to any of that?

MR. HALVERSON: So part of our understanding of the order or the direction from Your Honor, and perhaps this was a misunderstanding on our part, was to preview the issues that did exist to the jury and the issues that did not exist before the presentation of evidence were to begin. And one of the issues that we're dealing with here today is the 408 issue as it relates to Barco's offer to license the patents to Yealink. And given that there was some concern by the Court previously

about whether or not that document would be admissible, we believe that by putting the terms in a statement from the Court, that we could avoid the need to pursue that 408 discussion today and instead have the fact that that offer was made, which is not deniable, come in without the need to characterize that offer through the presentation of evidence.

THE COURT: So you were seeking to accomplish things unrelated to what the Court asked for.

MR. HALVERSON: Correct, Your Honor.

THE COURT: Had -- did you attempt to address just the issue that the Court put to counsel, which was what is the effect of the admission in the answer?

01:43 MR. HALVERSON: We did, Your Honor.

And so paragraph 12, and I think there are some precursor paragraphs to that that lead up to paragraph 12, but what paragraph 12 does is outlines the admission, the timing of that admission which is relevant for other issues in this case, and then 13 and 14 go through and explain what our understanding of the order in Docket 178 was in that all infringement that was alleged prior to April of 2024 was admitted and no infringement after April of 2024 was admitted.

And so paragraph 13 in red explains all of the direct infringement allegations pre-April 25th of 2024 are admitted to.

Paragraph 14 in red explains that all of the indirect

01:44

infringement allegations prior to April of 2024 are admitted.

And then paragraph 15 outlines the remaining questions which I think closely track what Your Honor outlined just a second ago, with the exception of any ongoing direct infringement. And we do not have any intention to pursue ongoing direct infringement. We don't have any evidence that that is at issue in this case.

So of the four questions that Your Honor outlined, those three bullet points I think hit the remaining three.

01:44

THE COURT: And did you communicate to Yealink that what you were after was really what is set forth in those three paragraphs?

MR. HALVERSON: What do you mean by what we are after? I'm sorry.

THE COURT: All right. You're right. I made the mistake of thinking that what you're after was what I'm after, but what I'm after is those three paragraphs.

01:45

MR. HALVERSON: We're fine pulling the preceding paragraphs. If Your Honor wanted to strike through the paragraphs before paragraph 12, the language of 12, 13, 14, and 15 I think accurately captures the order. There is some question about how we would treat the second amended answer, the first amended answer, and the original answer, but we can certainly address those separately if you'd like, Your Honor.

01:45

THE COURT: Why would we need to address those to

the jury?

MR. HALVERSON: So the timing of the admission and the way that the admission changed over time is instructive as to the ongoing state of mind of Yealink, which is relevant to the post-April 2024 inducement claims that we are continuing to pursue as well as the decision to go from denying infringement to admitting infringement, which is relevant to the willful claims and the state of mind of Yealink both before and after April 2024.

Now, if the Court is not interested in pursuing or reading those statements, I think there are other ways that we can present evidence to the jury on that. And so we, again, would be fine with the striking of paragraphs 1 through 11 and the adoption of 12 through 15.

THE COURT: All right. I will emphasize, Mr. Halverson, that it is unfortunate that the first time counsel for the Defendant is hearing this is during this hearing, and I -- but we'll see if that's a helpful step. So thank you, Mr. Halverson.

Mr. Yang?

MR. YANG: Good afternoon, Your Honor. And we also want to apologize to the Court for failing to effectively meet and confer on this issue.

THE COURT: Do you agree that your conference was less than five minutes?

MR. YANG: I do, Your Honor. We were not able to come to agreements. At the time I think the parties were just too far apart with the proposal.

THE COURT: How would you know if you only tried for three minutes?

MR. YANG: We do apologize, Your Honor.

THE COURT: All right. Well, talk to me about your reaction to what the Plaintiffs have in paragraphs 12 to 15. And if you have what you consider a version of that in what you have offered, point that out to me.

MR. YANG: Yes, Your Honor.

And I think paragraphs 13, 14, and 15 in Barco's proposal are not completely accurate of the nature of the -- of Yealink's admissions.

THE COURT: Talk to me about your position, then. I do think that 12 may be unnecessary, in my view, but some version of what is set out in 13, 14, and 15 is what I'm trying to find a way to say.

MR. YANG: Well, I think -- and by the way, I do agree with Your Honor that paragraph 12 is unnecessary.

Regarding 13, 14, and 15, I think there are two main issues. One, in this case Barco has agreed that that infringement period and damages period began in May of 2023. There was a motion for partial summary judgment on this and Barco did not contest. So I think the language by saying "all

of the WPP20 and 30 products and all of the connected base units sold in the United States prior to April 25, 2024," is not accurate and there needs to be a reference to the actual damages period. Again, Barco is not seeking damages for any infringement that may have happened before May of 2023. That's when the notice period began.

01:49

01:50 And two, Your Honor, I think, as the Court said at the very beginning of this conference, Yealink had admitted to the direct infringement. The technical aspects of its products when they were used together infringed in that when these products, the base units, plus a WPP20 or 30 dongle were used together, all limitations of the asserted claims are met. But there is the issue of indirect infringement, particularly as it relates to damages.

01:50

I think what Barco is trying to do here is saying that Yealink has admitted to all indirect infringement; therefore, all base units that were sold between May of 2023 and April 25th of 2024 must be counted in the damages analysis when there is no evidence of any such use.

01:51

A lot of the claims here are method claims. While Yealink admitted to if -- admitted to the direct infringement if the products are used together, there is no evidence at all that such products were used together in the infringement period in the United States. At the last pretrial conference Mr. Halverson has made that representation that Barco lacks

01:51

such underlying evidence.

THE COURT: So what is the language that you think would capture what you feel was admitted? Are you saying it would be instead of including connected base units, it would -- it should be when used with base units? Or what are you seeking?

MR. YANG: I think we have to break it down a little bit, Your Honor, just by the nature of the products that we

01:52 have here, and that's what we tried to do in Yealink's proposal. There are multiple products, two dongle units, and there are at least three base units, different base units, and there are six patents. So I think, Your Honor, we would agree that that the dongle units, the WPP20 and 30, directly infringed the two patents that are directed to the dongles. I don't think there's any dispute there.

01:52 But I do think we need to clarify that only when the dongle and the base unit is used together there is direct infringement. But Barco still has to prove that Yealink induced that specific -- that specifically induced the users to infringe on these claims, and there has to be evidence that there are users -- there were users in the United States who

01:53 used the infringing products in this manner.

THE COURT: You know, we're not going to set out in this all the different things that the evidence may show; we're going to tell the jury what your client has admitted,

01:53

and that is what I'm seeking to do.

So if you want to be heard on some change to what's in at this point paragraph 13, tell me about that.

MR. YANG: Thank you, Your Honor.

I think for paragraph 13, removing "including connected base units" will be proper. I think there needs to be a reference to the May 2023 date, which is the beginning of the damages period.

THE COURT: And anything else?

01:54

MR. YANG: I don't think it's all asserted claims of the Barco asserted patents. Again, I want to be accurate because it's not the case -- direct infringement of the dongles, the WPP20 and 30, only implicate two patents. I'm happy for it to say Yealink admitted direct infringement of some of the Barco patents, but I do not think it's proper to say it's all of the asserted claims because that is not accurate.

01:54

THE COURT: So the two that you are saying you have admitted are the '832 and the '103.

MR. YANG: Yes, Your Honor.

THE COURT: All right. And I understand what you've said about the dates.

01:55

MR. YANG: Thank you, Your Honor.

THE COURT: And tell me about paragraph 14.

MR. YANG: Well, I think editing paragraph 14 as it

01:55 01:56 01:56 01:57 01:57

is written is a little bit more difficult, but I think the idea there, Your Honor, I think we can tell the jury that Yealink has admitted to the direct infringement of the four other patents if and when its base unit products are used with the dongles.

I do not think this admission that Barco refers to of indirect infringement, again, of all asserted claims of all Barco asserted patents, is accurate. We tried to explain that, Your Honor, in our proposal on page 4 in the second half of the page when we broke out on numbers 1, 2, and 3 the situations of the products used together, which tracks the language of Yealink's admissions in its third-amended answer.

But the idea there is, again, to be accurate, what Yealink admitted to is the technical aspect that when the products are, in fact, used, there is direct infringement of the other four patents, but Barco still has to meet its burden for indirect infringement.

THE COURT: So what you are saying would be right would be to say that Yealink has admitted to direct infringement of the other four patents when the dongle products, which I assume we are referring to the WPP20 and 30 products as, when those are used together with Defendants' base units?

MR. YANG: Yes, Your Honor.

And that is a much better way of what I tried to do just

01:58
01:59
02:00
02:00

now to put it. I would also ask to have the same temporal limitations in that paragraph of May 2023 and also April 2024 when infringement actually occurred.

THE COURT: And the other four patents are the '002, the '237, the '676, and the '951?

MR. YANG: That is correct, Your Honor.

THE COURT: All right. So tell me how you would describe in paragraph 15 what it is the jury is going to be asked to decide.

MR. YANG: Your Honor, I think paragraph 15 is close to what we believe the jury needs to decide. I'm fine with the first question whether Yealink continued to induce its customers to infringe Barco's patents after April 25, 2024, but I do think there needs to be a separate question, Your Honor, of whether Yealink induced its customers to infringe Barco's four patents that we just discussed between May of 2023 and April 25, 2024.

THE COURT: So you're saying what you have admitted was just direct infringement --

MR. YANG: Yes, Your Honor.

THE COURT: -- of those four patents?

MR. YANG: Yes, Your Honor.

THE COURT: All right.

MR. YANG: If the products are used in the manner to which Yealink's admission described.

02:00 02:01 02:01 02:02 02:03

THE COURT: So you're saying the jury should be asked to decide whether indirect infringement occurred at any time from May of '23 forward.

MR. YANG: You know, Your Honor, I think that is accurate. This issue of indirect infringement at any time is still a live issue.

THE COURT: So you're saying that you admitted direct infringement before April of 2024 but not indirect infringement?

MR. YANG: Your Honor, that's correct, because Yealink's admission is about the technical aspects of its products and the patents, and the admissions are for when the dongle and the base units were used together, then the claims, the limitations of the asserted claims are met. But there are other parts to indirect infringement to which Yealink has not admitted, and that is something that Barco has to prove, including intentional inducement and whether such direct infringement actually occurred. What Yealink had admitted to is simply if they were used together, yes, then infringement would happen, the technical aspects or the limitations of the claims are met.

THE COURT: So you're saying that there is an issue about whether Yealink instructed its customers to use the dongle products with the base units?

MR. YANG: I do think that is an issue, Your Honor.

That's -- well, let me put it this way. That is not something Yealink's admissions included.

THE COURT: All right. It sounds like it's going to be pretty hard to make an issue about that.

MR. YANG: That very well might be the case, Your Honor, and, you know, Barco may prove that at trial, but I do 02:03 think that is something Barco needs to prove and not rely on Yealink's admissions when the admissions are not so broad.

THE COURT: Okay.

MR. YANG: But I do think this issue of whether and how many times direct infringement of the four patents actually occurred, that is something Barco absolutely needs to prove.

THE COURT: And that's subsumed within the issue of damages.

MR. YANG: Correct, Your Honor.

02:03 THE COURT: So if we get the first bullet point right, the second bullet point in paragraph 15 would be just damages.

MR. YANG: Right. I do not have an issue with the second paragraph because, again, that's what Yealink infringed, it owes damages, and that's what the jury has to decide.

Also I do not really have an issue with the third bullet point because I understand Barco wants to prove willfulness

and that is something the jury also needs to decide.

THE COURT: All right.

All right. Thank you, Mr. Yang.

MR. YANG: Thank you, Your Honor.

THE COURT: Mr. Halverson, I think I -- as I understand it, I think there should be room for the parties to reach some agreement along the lines that we just went through on your paragraphs 13, 14, and 15, taking into account the suggestions that Mr. Yang just made. So what I'm going to do is take a few minutes. I'm going to try and gather my notes as accurately as I can. I'd ask you to do the same thing, to see if you can agree upon some language, or at least narrow the gap, and we'll start back up in 10 minutes or so.

MR. HALVERSON: Just one quick question, Your Honor.

THE COURT: All right.

MR. HALVERSON: I think the fundamental disagreement here is whether or not when Yealink said it was putting the issue of infringement behind it, it's going to be held to that, and what we just heard from Mr. Yang is Yealink is putting the issue of infringement back on the table. And so if the Court is inclined to stick with what it said in Docket 178 where it said the only issue remaining for the jury is the ongoing or continued inducement, I think some clarity about whether or not that is the issue or whether or not there is also an open question as to past indirect infringement from

02:06

before April of 2024.

THE COURT: That is something that if that is disputed I will resolve by looking at the pleadings themselves -- and -- because I agree that particular nuance was not on my mind before, and if you look at the answer and come up with something you think is definitive on that, that would be very helpful. I'm going to try and clean up something that will identify for me where the real issues are and see if we can take a pass at that, and then we'll move onto the exhibits.

02:06

MR. HALVERSON: Yes, Your Honor.

THE COURT: Thank you.

(Brief recess.)

02:41

THE COURT: Thank you. Please be seated.

Mr. Halverson, tell me about the progress.

MR. HALVERSON: Not a lot, Your Honor; still a fundamental dispute about whether or not the representations that were made in open court are valid and need to be adhered to. And we talked a little bit about paragraph 13, which is the direct infringement paragraph, toyed with some proposed languages, but no agreement was reached.

02:41

Paragraph 14, the inducement issue, we didn't touch based on kind of the outstanding question raised just before we went on recess.

And I think we're on essentially the same page about the

bullet points, but we did not have additional conversations about those bullet points, Your Honor.

02:42

THE COURT: All right. Well, I will set this issue aside, take it back up tomorrow afternoon at 1:00, and we can move onto the exhibits now.

02:42

I have Docket No. 181, which is the joint notice regarding remaining exhibit list objections that was filed the day before yesterday, and we can approach that in the order listed. And the -- so group 1 on that is called DX Third-Party Product.

02:43

Let me call on Plaintiff to tell me about the nature of the objections.

MR. HALVERSON: So we have a binder with all of the exhibits. Would that be helpful for Your Honor, or would you like me to just use the elmo?

THE COURT: The binder's fine.

MR. HALVERSON: May I approach?

THE COURT: Sure.

02:44

MR. HALVERSON: So, Your Honor, I'm not sure what you call it, but the plastic sleeve on the first page of the binder gives an outline for all of the tabs. And so group 1 was third-party products, the representative exhibit identified as a Skype webpage, DX 32. And it appears in Your Honor's binder behind tab No. 10.

02:44

And so this is a third-party website from a party that

02:45 has had no discovery taken of it during this proceeding, so there is no witness who can lay foundation or authenticate this third-party website. Moreover, this third-party website is being used for the truth of the matter asserted to indicate that Skype indeed was a product and did do what the words on this website printout say.

02:45 And then, finally, this applies to most of the exhibits in this bucket but not all of them. This particular one, though, DX 32, was produced after the close of fact discovery. And consistent with Your Honor's representation at the end of the last pretrial conference, documents that belong to the party or are third-party documents that were produced after the close of fact discovery will be not allowed into evidence going forward.

THE COURT: Which of the exhibits in this category were produced after the close of discovery?

02:45 MR. HALVERSON: It's my understanding that it's 15, 32, 38, 41, 42, 45, and 47, which means DX 1 and DX 4 are the two exhibits that remain that were produced during fact discovery. And we can talk briefly about those two if you would -- or a representative one of those two, if you would like.

THE COURT: All right. Tell me about Exhibits 1

02:46 and 4.

MR. HALVERSON: In group 1 or in group 2?

02:46 THE COURT: We're just in group 1. Right?

MR. HALVERSON: So there are two issues tied to DX 1 and DX 4. One is in the first part that it is a third-party piece of evidence, and then in the second part it also relates to the standing MIL 13 in that these reference other litigations that are not at issue in this litigation.

THE COURT: Well, I don't want to consider one exhibit more than once.

MR. HALVERSON: Then we can scratch group 2, Your Honor.

THE COURT: All right.

02:47 MR. HALVERSON: And so DX 1 and DX 4 relate to other litigations in that that first is an email exchange between counsel for Barco and third-party Sahara. And DX 4 is a letter from third-party Sahara. There's been no discovery taken about third-party Sahara, and there is nobody who can authenticate these pieces of evidence that are consistent with DX 32.

02:47 THE COURT: All right. Thank you, Mr. Halverson.

Mr. Yang, start, if you would, with the response to the late production of all of the exhibits in group 1, other than 1 and 4.

02:48 MR. YANG: Your Honor, those exhibits were produced along with the expert report of Defendants' technical expert Dr. Almeroth who, contrary to what Mr. Halverson has

02:48

represented, does talk about these exhibits, does rely on these exhibits in his opinion. They were produced on the same day. And these are, again, printouts of publicly available webpages. So there is someone to lay the foundation and it's part of his opinion. They were timely produced with the reports.

THE COURT: How is that timely production?

MR. YANG: It was a -- it's not evidence by either -- by Yealink, it's not evidence from any party; it's a public document that Dr. Almeroth relied on in forming his opinion.

THE COURT: That you're wanting to admit into evidence.

02:49

MR. YANG: Yes, Your Honor, because Dr. Almeroth, we expect that he will be referring to these documents during his testimony.

THE COURT: Why couldn't the experts just come up with all the evidence that way and we wouldn't bother to have discovery?

MR. YANG: Your Honor, I think if it's a party evidence, there is an issue because the other party does need to take discovery on the evidence, but these are not Yealink

02:49

evidence that Yealink withheld; these are documents about well-known products like Skype, like Zoom, like Teams. Dr. Almeroth does talk about that these -- does explain these products has been available, that they do not infringe. These

are also the same products that Barco's witnesses discussed and acknowledged are not infringing. These products are also discussed in Barco's expert report, particularly the expert report of Dr. Brogioli. So these are well-known products, and again --

02:50

THE COURT: Are you saying these are prior art?

MR. YANG: They're not prior art, Your Honor; they're non-infringing alternatives and they are relevant to the reasonable royalty analysis.

THE COURT: Are they something that was identified during discovery as a non-infringing alternative?

02:51

MR. YANG: Yes, Your Honor.

THE COURT: So how was it they weren't produced if they were identified?

MR. YANG: Again, these are publicly available webpages. They were -- it was -- they were readily accessible to everybody. These are not evidence that Yealink withheld that's unique to Yealink, or any other third party, for that matter.

02:51

THE COURT: Your belief is that anything that's publicly available does not need to be produced during discovery?

MR. YANG: I think they can be, Your Honor, but I think there's a difference between publicly available documents and documents that belong to a party, say in this

02:51 case Yealink, documents that Barco otherwise would not have access to.

THE COURT: I guess it's not a question of whether they have access to them; it's a question of whether they know you're going to rely on them.

MR. YANG: Dr. Almeroth relied on them, and he was deposed in this case regarding his opinion, so I -- so I -- 02:52 and they do know -- Barco does know that Yealink relies on these products as non-infringing alternatives.

THE COURT: I'm sorry. I was not sufficiently clear. I meant how did they know during the discovery period that you were going to rely on these documents?

MR. YANG: Maybe, Your Honor, not these very specific webpages, but Barco is aware that Skype and -- well, products like Zoom and Teams are non-infringing alternatives. 02:52 Barco itself deposed Yealink's witnesses regarding these non-infringing alternatives, and Barco's expert -- certain expert reports before Dr. Almeroth served his rebuttal report addressed these very non-infringing alternatives.

THE COURT: Well, maybe I'll understand better if you show me how you identified these products as non-infringing alternatives during discovery.

MR. YANG: Yes. I may need one minute, Your Honor, if that's okay.

THE COURT: Yes.

02:53 (Pause in proceedings.)

02:55 MR. YANG: Your Honor, we're pulling up one of the interrogatory responses, but it is identified -- well, the non-infringing alternatives are identified in Defendants' 02:55 first supplemental response to Barco's set of interrogatories, so specifically Interrogatory No. 13. In their response, Yealink has identified products and protocols such as Apple AirPlay, Miracast, Smart Share, Screen Mirroring, and SmartView as non-infringing alternatives. Yealink also identified meeting platforms such as Microsoft Teams, Zoom, 02:56 Cisco Webex, and Google Meet as non-infringing alternatives. This issue, by the way, was also further briefed in the parties' briefing regarding Barco's motion to strike Dr. Almeroth's testimony.

THE COURT: All right. So are you representing that 02:56 that Interrogatory No. 3, or your response to it, set out all of the instrumentalities that are these exhibits?

MR. YANG: I believe if not all, a -- I want to be accurate. I probably need to double check, but I believe most of them, if not all of them. I'm happy to check and further confer with Barco.

02:56 Your Honor, by the way, it's Interrogatory No. 13, not No. 3.

THE COURT: All right.

MR. YANG: I also want to add that during discovery

02:57 Barco also deposed Yealink's witnesses regarding some of the same products on April 13th, so before the close of fact discovery. Barco's counsel asked Yealink's witnesses questions regarding Teams, Zoom, Miracast, AirPlay, so essentially the same platforms and the same products.

In other words, parties do know these are non-infringing alternatives, and really I don't think there's any dispute that they are non-infringing. Barco clearly knew even before Yealink served its supplemental response to Interrogatory

02:57 No. 13 that these are non-infringing alternative products.

THE COURT: All right.

MR. YANG: Your Honor, would you like me to address the other two exhibits?

THE COURT: Yes.

MR. YANG: So the other two exhibits, DX No. 1 and 4, they were emails and -- it was one email chain and a letter produced by Barco during discovery -- fact discovery in this

02:59 case. And these exhibits, while they do reference a prior litigation, they are referring to a non-infringing alternative product. And again, Yealink relies on those exhibits--not to bring up prior litigations; we understand there is Standing

02:59 MIL No. 13--but to show that there are products that had existed during the relevant period that are non-infringing.

THE COURT: So you're relying on letters from counsel to show that third-party products were in existence?

MR. YANG: That also do not infringe, yes, Your Honor. And again, these are documents produced by Barco.

02:59 THE COURT: Well, I understand that, but emails from counsel about prior litigation don't sound like a necessary way to show what the prior art was that existed at any given point in time.

MR. YANG: Well, Your Honor, I think they do show --

THE COURT: Why would you need that? Your expert does not have evidence about when these products existed?

03:00 MR. YANG: I think our experts do not have -- well, with these two exhibits, they show that they do not infringe and they show the reason why.

THE COURT: How does a letter or an email from counsel show that something does not infringe?

MR. YANG: Because in these emails and letter, counsel discusses the non-infringing products. It's a product called Clevershare. The reason they do not infringe is 03:00 because it lacks a transmitter. That was discussed by counsel for both parties, and that's a representation from the third party made to Barco which Barco accepted and acknowledged that without this transmitter the product no longer infringes.

THE COURT: The representations made to and from counsel in the prior litigation are insufficiently probative 03:01 and excessively prejudicial. I'll sustain the objection to DX 1 and 4.

And I'd like to hear the Plaintiffs' response to the argument that the other exhibits in this bucket have already been revealed to Plaintiff through the interrogatory answer to No. 13 about non-infringing alternatives.

MR. YANG: Thank you, Your Honor.

THE COURT: Thank you.

MR. HALVERSON: No, Your Honor, none of those DX exhibits were identified in the interrogatory response. What Mr. Yang represented was the products were, and so they said Skype is a non-infringing alternative. DX 32 is a specific printout of Skype that counsel could have identified and produced, did not do that, did not do that before Barco's opening reports went in; only did it on the day Yealink submitted their rebuttal reports, which is the only report that Dr. Almeroth submitted. And so while the concept of Skype was disclosed, the exhibits that Yealink is intending to rely upon were not.

THE COURT: And was there any discovery that either side did regarding Skype and the other providers of these alleged non-infringing alternatives?

MR. HALVERSON: Questions were asked of party witnesses about Skype and the other non-infringing alternatives, but discovery was not taken into any of the entities that provide those alleged non-infringing alternatives, Your Honor.

03:03

THE COURT: Do you dispute that the expert is going to be able to discuss these with the jury in connection with his opinions on non-infringing alternatives?

MR. HALVERSON: This was briefed in our motion to strike, but Dr. Almeroth, by not submitting these opinions in his opening report because he did not submit an opening report, should not be allowed to testify or provide evidence of non-infringing alternatives because we did not have the opportunity to respond to that in any sort of rebuttal report, given the timing of that exchange. And maybe I didn't answer your question. I apologize if I didn't. I didn't mean to add confusion to that, Your Honor.

03:04

THE COURT: All right. Well -- all right. Thank you, Mr. Halverson.

Mr. Yang?

MR. YANG: Yes, Your Honor.

THE COURT: I don't see what would excuse the Defendants' failure to provide or disclose this evidence during discovery. This is evidence about non-infringing alternatives, and I'm not aware of what it is that would excuse you from the requirements of Rule 26 to disclose this.

03:05

MR. YANG: Your Honor, if I may, it was referenced -- it's a product that had been discussed during fact discovery. Barco knows this is a non-infringing alternative. And Your Honor, our belief was that it was timely disclosed

03:06
03:06
03:07
03:08

with the expert report of Dr. Almeroth.

Yes, Your Honor, this particular exhibit was not disclosed during fact discovery, but again, this is something that is readily available and it is used solely in conjunction with Dr. Almeroth's opinion that Skype, for example, was a non-infringing alternative that had existed. So it is to support the contention -- Yealink's contention, which was disclosed during fact discovery, that this, again, is a non-infringing alternative.

But Your Honor, I do not -- standing up here today, I do not dispute that this particular exhibit was not produced during fact discovery, which was before -- well, which is -- which closed on April 18th.

THE COURT: Were any of the other exhibits in this bucket or category disclosed during discovery?

MR. YANG: The specific exhibits, Your Honor, you're referring to?

THE COURT: I'm referring to category or group 1 on Document 181. That's the joint notice that was filed the day before yesterday about objections to exhibits.

MR. YANG: Yes, Your Honor.

I -- if the Court may indulge me for just 30 seconds, I just want to double check.

THE COURT: All right.

(Pause in proceedings.)

03:08

MR. YANG: Bucket No. 1, group 1, except Exhibits 1 and 4, the other exhibits were produced for the first time with Dr. Almeroth's report which is after the close of fact discovery.

THE COURT: All right. Well, I'm not saying that you can't attempt to use those as demonstratives or otherwise discuss them if they were properly included in Dr. Almeroth's report, but I do find that they were disclosed too late to be used as evidence, and I'll sustain the objection to DX 15, 32, 38, 41, 42, 45, and 47.

03:08

MR. YANG: I understand. Thank you, Your Honor, for that clarification.

THE COURT: All right. Thank you, Mr. Yang.

That takes us to group 3, which is DX 7 through 12.

MR. HALVERSON: We withdraw our objections to that group.

THE COURT: All right.

03:09

MR. HALVERSON: And for housekeeping, group 7 and group 8.

THE COURT: All right. That takes us to group 4.

MR. HALVERSON: So group 4, Your Honor, is a proposed term sheet between Barco and Crestron, a third party. The license between Barco and Crestron is on the JX list. The term sheet which led to that license is irrelevant. It does nothing beyond what the license itself does, and only

03:10

serves -- or can only serve to further confuse the jury about the difference between the actually executed license and the term sheet that the parties agreed to.

THE COURT: What do you think is in the term sheet that causes the Defendants to want to use it?

03:10 MR. HALVERSON: I don't know, Your Honor.

THE COURT: All right. Well, let me find out. Thank you.

MR. YANG: Your Honor, I agree with Mr. Halverson that the Crestron license, which is a JX, that is probably

03:10 [redacted]

03:11 [redacted]

03:11 [redacted]

[redacted].

03:12

THE COURT: All right. Thank you, Mr. Yang. I think I know how to approach this.

Mr. Halverson, I believe that there has been a showing of relevance. If there's some portion of this that you can articulate as being unfairly prejudicial, tell me about it and we'll address that portion.

MR. HALVERSON: No, Your Honor.

03:12

THE COURT: All right. Then I'll overrule the objection to DX 130. It will be pre-admitted.

MR. HALVERSON: Sorry. Your Honor, I missed the very last part. You said pre-admitted?

THE COURT: Yes.

MR. HALVERSON: Thank you.

THE COURT: So the next group is DX 81 and 82 in group 5.

03:13

MR. ANDREWS: Good afternoon, Your Honor.

So regarding DX 81 and DX 82, these are patent-based references which were not disclosed during fact discovery.

03:13

And additionally, these references would fall foul of the Court's standing motions in limine regarding Motion in Limine No. 4, a prior art reference not disclosed with respect to a

specific combination, Motion in Limine No. 6, a prior art that is used in an IPR proceeding, and Motion in Limine No. -- apologies --

03:14 THE COURT: I don't think that MIL 6 excludes everything used in an IPR; it just excludes references to IPRs.

MR. ANDREWS: Yes, Your Honor. But there is -- as noted on the elmo, this includes a reference to exhibit -- a Yealink exhibit which is an exhibit from an IPR proceeding.

THE COURT: I don't think there's any way anybody

03:14 would -- on the jury would connect that number to an IPR proceeding, but -- so your position is that this was -- has not been elected as prior art by the Defendant?

MR. ANDREWS: Yes, Your Honor.

And further, it was produced after we were -- after Barco submitted on behalf of their expert the expert's opening

03:15 report, and the technical expert had no opportunity to review and respond to this exhibit in response to its submissions.

THE COURT: All right. Thank you, Mr. Andrews.

MR. YANG: Your Honor, Yealink has no intention to violate Standing Motion in Limine No. 6. Yealink also does

03:15 not intend to argue in this case that the patents are invalid, and will not use these references to argue invalidity. These references were used, again, by Dr. Almeroth to show the incremental value of the patents that are asserted, and that

relates, Your Honor, directly to the reasonable royalty analysis.

03:16 Barco has had these documents. These are, again, patent documents. And Mr. Andrews just argued that Barco had no opportunity to respond. Well, this relates to the reasonable royalty, the incremental value, and apportionment. Those are issues on which Barco carries the burden.

03:16 Now, Barco failed to do that. That was briefed in Yealink's *Daubert* motion on Mr. Scally. But Yealink's witness -- Yealink's experts did conduct this apportionment analysis, and these two exhibits, the two patent documents were used as part of that analysis which is, again, required for the reasonable royalty determination.

03:17 THE COURT: So your answer to the question of whether this was timely produced is that it doesn't need to be produced until the expert report.

MR. YANG: I don't think these need to be produced, Your Honor. And again, Barco has been a aware of these documents since almost the very -- well, I want to be accurate. Since at least September of last year.

THE COURT: And what do you base that on?

03:17 MR. YANG: Well, Mr. Andrews pointed to this other exhibit number that our -- from the IPRs. So as part of the IPR Yealink filed, these exhibits were served to the same counsel at Barco. And again the IPRs are, of course, publicly

available documents.

THE COURT: And this document is being relied upon by Dr. Almeroth for what purpose?

MR. YANG: To show the incremental value of the asserted patent claims over what is already in the prior art, or what is already existing before the priority date of the asserted patents. And that, in turn, is relied on by Yealink's damages expert Mr. Bero to -- well, as part of his reasonable royalty determination analysis.

THE COURT: Well, I certainly am less concerned about it in view of the fact there is no invalidity case here.

Mr. Andrews, do you dispute that this document has been known to the Plaintiff since last year?

MR. ANDREWS: We do not dispute that, Your Honor. But the fact of the matter is, is that there were many documents submitted to -- submitted in these IPRs, probably roughly 50 exhibits, but opposing counsel would have a better understanding than -- we would have a better idea of the exact number. And at the same time we had no notice that these exhibits would be relied upon. And to the extent that they are to be relied upon as non-infringing alternatives, that's something that we would have liked to have included in -- had our expert opine on in his opening report, which we were not given the opportunity to ask our expert to opine on as they were not submitted at the time.

03:20 THE COURT: I do not understand that this is being offered as a non-infringing alternative but, rather, that it's being offered as part of the state of the art to show what has been contributed by the Plaintiffs' invention. Is your understanding different?

MR. ANDREWS: We understand, Your Honor. Thank you.

03:20 THE COURT: All right. Well, I'll overrule the objection on the grounds that it's been presented.

03:21 That takes us to group 6.

MR. ANDREWS: Thank you, Your Honor.

So with respect to the documents produced in group 6, 03:21 these are a series of searches of products, and they have -- they constitute hearsay that is being offered for the truth of the matter asserted, and by -- they're website webpages of parties that have not been deposed, and there's no discussion or no way to authenticate these documents.

THE COURT: All right.

MR. ANDREWS: I'd further add that these documents were also produced, again, at the close of fact discovery or 03:22 after the close of fact discovery.

THE COURT: Thank you, Mr. Andrews.

MR. YANG: Your Honor, we do not dispute that these were produced, just like the exhibits in group 1, after the close of fact discovery. They are relied on by Dr. Almeroth.

THE COURT: I'll make the same ruling about them

03:22 that while you can seek to use them as demonstratives, their late production disqualifies them from use as exhibits, so I'll sustain the objection.

MR. YANG: Thank you, Your Honor.

THE COURT: Thank you.

03:23 That takes us to group 9.

MR. HALVERSON: So group 9, Your Honor, is pre-suit emails between Yealink's former lawyers and Barco's current 03:23 lawyers discussing requests for additional information about licensing offers that Barco was making before the case was filed. The prejudice of putting forth attorney-to-attorney communications significantly outweighs any probative value 03:24 that may exist, in particular when -- I guess we can just leave it like that.

And as a secondary point on this, the reason at least why we understand this is being presented is the NDA that was discussed, which is a second -- or that is an attachment to this email thread. And I believe that is the other DX exhibit 03:25 that's part of this. That NDA will only seek to confuse the jury about what it is that the parties were doing, what they were allowed to talk about or not allowed to talk about, including the trial presentation.

THE COURT: All right. Thank you.

03:25 MR. YANG: Your Honor, these emails, DX 160 and 162 -- by the way, Yealink does not seek to introduce the

03:25

non-discloser agreement as an exhibit. But these emails in 160 and 162 relate to the discussions between Yealink and Barco, both before this litigation or right before this litigation and during this litigation regarding the parties' efforts to reach agreement.

THE COURT: And that is something that would -- it's hard for me to imagine admitting negotiations between the parties, especially ones that didn't succeed.

03:26

MR. YANG: Well, Your Honor, I would say this. Barco is trying to admit the very same thing in its PX 37. We can get to that later, Your Honor. But if -- and Barco is also trying to admit a Rule 408 settlement proposal that it made to Yealink. Now, if Barco's allowed to introduce that as evidence, then Yealink needs to be able to respond to that.

03:26

THE COURT: If they can get me to make inconsistent rulings in the same afternoon, they'll be doing well, but we'll see.

But what is the relevance of the lawyers' positions on these negotiations?

MR. YANG: I think, Your Honor, I would agree that settlement discussions should not be admitted. Now, if Barco,

03:27

again, is trying to -- is successful in admitting that for its own settlement proposal in PX 37, then, Your Honor, the relevance of these emails is to show that Yealink had also been very diligent in -- and very reasonable, for that matter,

to respond to Barco's demands and eager to reach agreement in good faith.

THE COURT: What I'm going to do is sustain the objection to DX 160 and 162, but I'll allow you to argue that or refer back to that when we get to PX 37, if I see the connection there.

03:27

MR. YANG: Your Honor, I think that makes sense. Thank you.

THE COURT: All right. Thank you.

MR. YANG: Sorry, Your Honor. I also want to make a note that PX 37 is also part of Defendants' Motion in Limine No. 3, I believe, that has to do with a Rule 408 settlement proposal from Barco, and also has to do with -- it also relates to Yealink's *Daubert* motion on Mr. Scally, who also relies on that Rule 408 settlement proposal. I just wanted to make the record clear.

03:28

THE COURT: All right. I'm sure I'll hear more about that.

That takes us to group 10, which is the last of the Defense exhibit objections.

03:28

MR. HALVERSON: And so 10, unfortunately, Your Honor, is kind of a -- we couldn't find another bucket, so these are 'other'. I think there are probably a 10A and a 10B.

So 10A is an email thread that has not been produced even

03:29 today in this case. It is a document that there is no testimony on as far as who -- where it came from, what it is. It was marked with a witness from Barco who had no personal knowledge about it. He's not a recipient on any of these email threads. There's no discovery that's been taken about anybody on these email threads. And so it is inadmissible as
03:29 an unproduced document, as a document that has no authenticity, and as a document that itself is not evidence because it's not part of this case.

THE COURT: All right. Thank you, Mr. Halverson.

MR. HALVERSON: Should I do 10B or should I sit down?

THE COURT: We might as well take them up separately.

03:30 MR. YANG: Your Honor, this Exhibit 210 is an email chain that had Barco on it, so this is an email chain that Barco already has. It was marked during the deposition of Mr. Six. As Your Honor can see, as the Court can see, it was Exhibit No. 13 in that deposition.

Further, Mr. Six was able to testify to this document,
03:30 and in his testimony he said -- he testified that this document is consistent with his understanding of this so-called Alliance Program and how Barco reached out to Yealink to join this Alliance Program. So it is authenticated. It has been marked during deposition, timely

marked, and Barco has had this document because this is an email that Barco should have.

03:31 THE COURT: Who is the Barco witness that you say authenticated this?

MR. YANG: Mr. Erwin Six--S-I-X--Your Honor.

THE COURT: And he is one of the correspondents in this chain?

MR. YANG: I do not believe he's one of the correspondents, but I was able to identify the Barco correspondents, he knows the Barco correspondents, and he testified in this deposition that this chain is consistent 03:31 with his understanding of the Alliance Program. And by the way, Mr. Six was testifying in a corporate capacity when he was asked about this document.

THE COURT: And maybe this won't come up, but tell me what the relevance of the Alliance Program is.

MR. YANG: The Alliance Program, Your Honor, as the Court may remember, is something that Barco put at issue I think for the first time in March, and Barco is making the 03:32 allegation that because Yealink -- well, Barco is alleging that Yealink asked to join the Alliance Program and that Yealink received Barco confidential information as part of this program. None of that is true. Mr. Six testified to the opposite.

But that is irrelevant, Your Honor. We believe that

03:32 Barco is trying to -- well, through this Alliance Program allege that Yealink somehow received its confidential information and that Yealink is willfully infringing because Yealink is copying Barco's products.

THE COURT: And your position is that there is some discussion in this email chain in Exhibit 210 that relates to the issue you just discussed?

MR. YANG: Yes, Your Honor.

THE COURT: All right. Thank you, Mr. Yang.

03:33 MR. YANG: Thank you, Your Honor.

THE COURT: Mr. Halverson, it looks like there are Barco correspondents in this email chain. Do you dispute that your corporate representative Mr. Six identified this as an authentic email?

MR. HALVERSON: Yes, Your Honor. Mr. Six said he was familiar with some of the individuals in the email and 03:33 then he was talking about what he understood the Alliance Program to be. That's all proper testimony. That does not lay foundation for this exhibit. That may lay foundation for the concept of the Alliance Program, and to the extent it assuages anybody's concern, we have no intention of bringing up the Alliance Program. That's not part of how we are going to pursue any aspect of this case.

But this -- part of the issue with this document not being produced is we have no way of knowing whether or not

03:34 this is a true and accurate reflection of what the chain -- the email chain is; it's just an alleged thread that was put in front of your witness who then testified that he'd not seen it before.

THE COURT: Why don't you have a way, if there are a number of barco.com correspondents on this, to verify?

MR. HALVERSON: We've looked, Your Honor. We don't have records from that. It was something that we investigated 03:34 and were not able to identify email traffic from that time frame. I don't have further explanation for why we don't have these emails, but --

THE COURT: You know, authentication is a pretty low bar; it just requires that there be a reasonable basis to believe something is what it purports to be. Certainly this looks to me like an ordinary email chain. Is there something 03:35 that you can point to that would undermine the confidence in that?

MR. HALVERSON: The one thing that I do have, Your Honor, is at the very top of this, and it's not particularly strong, but at the very top of this there is a collection of information that seems to suggest that this email thread was sent again in 2025. And so this is not a thread that was 03:35 archived and pulled from the records of Yealink; this is something that was a live and editable document in April of 2025 when it was sent from CDX to whomever is in the 'to'

03:36
03:36
03:37
03:37

line. And so I just don't know. I don't have a way of being able to ascertain one way or the other.

THE COURT: All right. So my next question is can you identify anything in it that is unfairly prejudicial?

MR. HALVERSON: I don't believe so, Your Honor.

THE COURT: All right. Well, I'm going to overrule the authenticity and relevance objections and pre-admit DX 210.

MR. HALVERSON: Yes, Your Honor.

THE COURT: And that takes us to DX 234, and then we'll take the afternoon recess.

MR. HALVERSON: No. 234 is an excerpt of a textbook that was also produced after the close of fact discovery. It has a chapter in it which is authored by Defendants' damages expert Mr. Richard Bero, and it's a book that is edited by Mr. Scally. I don't think we have any additional objections on that. I think we can withdraw that and move on.

THE COURT: So it looks like, at best, a learned treatise?

MR. HALVERSON: Correct, Your Honor.

THE COURT: All right. Mr. Yang, if you're offering this as a learned treatise, it would not be allowed to be on the exhibit list, but it's something that under 803(17) I believe you'd be able to show to your expert, and if he establishes that it's a learned treatise, he could read parts

of it into the record to the jury.

03:38 Do you have a different basis to get around a hearsay objection?

MR. YANG: I do not think so, Your Honor.

The additional context, the only additional context that I want to add about this particular document's book chapter, Your Honor, which Mr. Halverson did not address is that this

03:38 is a book chapter relied on by Barco's own expert for the first time in his expert report. He used this book chapter to criticize Mr. Bero, Yealink's damages expert, Mr. Bero's analysis. Now it seems that that Barco wants to run away from this document. Barco did not produce this document, Yealink produced it, but I don't think there's any dispute it is the same book chapter used by Mr. Scally.

03:39 So in addition to having this be a learned treatise that can be explained by Mr. Bero, Your Honor, I just -- I think Yealink should also be allowed to use this to address this with Mr. Scally because it is part of his opinion as well.

THE COURT: Well, certainly if the Plaintiffs'

03:39 expert on cross admits that this is a learned treatise, then you'd be able to have him read certain parts of it that you think are inconsistent with his testimony. But again, I will sustain the objection so that it won't be on the exhibit list, but you can use it with a witness as allowed by 803(17).

MR. YANG: Thank you, Your Honor. I think we're

fine with that.

THE COURT: All right. Then we will take the afternoon recess and then come back and take up the objections to Plaintiffs's exhibits.

(Brief recess.)

THE COURT: Thank you. Please be seated.

And we're ready to turn to the Defendants' objections to the Plaintiffs' exhibits, starting with group 11.

MR. YANG: Thank you, Your Honor.

Before I proceed, we do have the copies of the representative exhibits prepared for the Court.

May we approach?

THE COURT: Yes.

MR. YANG: Your Honor, starting with group 11, and I will put into this bucket PX 17 as well that was previously in the last bucket, the other bucket, but I think PX 17 also belongs to this bucket, and the exhibits here all relate to prior litigations that Barco was involved in. Also, they relate to settlement discussions having to do with these prior litigations.

So I think, Your Honor, there is an issue with the Court's standing MIL. There's also an issue with Rule 408. Those are the main objections that Yealink has.

THE COURT: Is this PX -- I see. What I'm looking at in your folder for PX 24 is labeled DX 128. Is that the

03:55

same thing?

MR. YANG: I believe it is. It is PX 24.

THE COURT: The folder has JX 24, PX 24, and DX 128, all three, so they're all three the same?

MR. YANG: I believe that are, Your Honor.

And this was one of the issues Yealink raised in a letter I believe we filed last week. It was inadvertently included in -- on the JX list. Yealink made clear to Barco that this exhibit should not be on the JX list, but Barco nevertheless insisted that it must be part of the JX.

03:56

THE COURT: All right. And so, as best you know -- well, I guess I'll just hear from the Plaintiff as to what they say the relevance is.

MR. YANG: Thank you, Your Honor.

THE COURT: Thank you, Mr. Yang.

03:57

MR. HALVERSON: So we do not have a PX 24 on our exhibit list, Your Honor. I'm not entirely sure what the issue is on PX 24.

THE COURT: Do you have a settlement agreement between Barco and Vivitek under any number?

MR. HALVERSON: On our JX list, yes, Your Honor.

03:57

THE COURT: But not on your PX list.

MR. HALVERSON: Correct. We have a consent judgment from a case that involved Barco and a company called Vivitek that is PX 25, which is also in this box, but that's a consent

03:57
03:58
03:58

judgment, not a settlement agreement. And I'm happy to share that on the elmo if that would be helpful.

THE COURT: Well, is this the document or the one you're talking about on the joint exhibit list?

MR. HALVERSON: There we go. Yes, Your Honor, it is. I apologize for that. So it was -- it is JX 24.

THE COURT: And as far as you know -- okay.

MR. HALVERSON: There we go. I apologize, Your Honor.

THE COURT: So your position is that this is a joint exhibit and the Defendants are objecting to that?

MR. HALVERSON: I mean, it was a joint exhibit. It was filed with our pretrial order after being negotiated and reviewed all of those documents multiple times by all of the lawyers in the case.

THE COURT: All right. Well, I do see now that this is a joint exhibit, so let me hear from Defendant if they disagree, and then I'll give you a chance to respond if necessary.

MR. HALVERSON: Yes, Your Honor.

MR. YANG: Your Honor, we do disagree, and this was explained in our letter dated August the 19th; Document No. 174, so Mr. Halverson is well aware of Defendants' position.

THE COURT: And what is the Defendants' position?

MR. YANG: This exhibit was inadvertently included in the first JX list. Yealink has told Barco numerous times to remove it. Yealink has also objected -- timely objected to this exhibit when it appeared on the PX list, which objections Barco dropped in one of the subsequent drafts it sent around.

Now, when we were here before Your Honor on August 5th, the parties submitted an exhibit list that contained way too many exhibits, and we were ordered to further meet and confer and come to an agreed set. But even before then, Yealink has made clear to Barco in multiple emails that JX 24, and the same issue exists with JX 9, that they should not be a part of the JX list.

THE COURT: What is your objection to it as a Plaintiffs' Exhibit?

MR. YANG: I do not have any -- well, that's the same objections we're talking about. I think Barco can and should move this exhibit to the PX list. As a matter of fact, the joint trial disclosure agreement that we submitted, there is a provision that says, a party, if it removes an exhibit from its own list, must give the other party the opportunity to add it to that party's exhibit list, and we told Barco they should do that but it should not be a joint exhibit.

THE COURT: Well, the notice that was filed day before yesterday has you making an objection to PX 24. Are you withdrawing your objection to PX 24?

MR. YANG: No, Your Honor. It's the other way around. We maintain those objections. We object to Barco's attempt to include PX 24 on the joint exhibit list.

THE COURT: All right. Well, the objection that I'm looking at is not about the joint list. But in any event, as long as it can be on the Plaintiffs' list, you're not objecting to it in that capacity?

MR. YANG: I'm not objecting to Barco's inclusion on its exhibit list, no, but we do have objections to the exhibit itself as far as admissibility goes. Does that --

THE COURT: That's what I'm trying to get at, Mr. Yang. Do you object to PX 24?

MR. YANG: We do, Your Honor. And I apologize for confusing the Court. It's not a joint exhibit, it's a PX, it's a Plaintiffs' exhibit, and we do object to it as noted in the notice filed.

THE COURT: And what is the objection?

MR. YANG: The objection again, these are prior litigations that Barco was involved in, they relate to patents that are not even at issue in this case, it is confusing, it is highly prejudicial, and it runs afoul of the Court's Standing MIL No. 3, I believe, about prior litigation--13; excuse me.

THE COURT: So you don't consider that this is a license.

MR. YANG: I do not, Your Honor, because it is not a license; it's a settlement agreement in which the third party -- the prior party agreed to withdraw its products from the U.S. And PX 25, the consent agreement, really is directed to the same effect. There is no license, Your Honor, in those agreements; it's an agreement for that party to withdraw its products.

THE COURT: All right. Thank you.

MR. YANG: And apologize if I confused the Court on the other issue.

04:03 THE COURT: All right.

MR. HALVERSON: So the consent judgment and the settlement agreement between Barco and Vivitek that resulted in the conclusion of that dispute are part of the damages analysis in this case as it relates to the *Georgia-Pacific* factors and whether or not Barco licenses its patents and the terms under which it will license the patents. And so consistent with what happened here, Barco has an established practice of enforcing its patents and insisting on removal from the marketplace of infringing products. So these documents are not prejudicial; rather, they are highly probative into the *Georgia-Pacific* analysis that must be done.

04:04 THE COURT: And does the Defendant dispute that Barco seeks exclusion of products that practice its patents?

MR. HALVERSON: Would you like me to give my

understanding of the Defendants' position or sit down?

THE COURT: Yes. In other words, why is this necessary?

MR. HALVERSON: This document is necessary because at the end of this whole process what Yealink is going to do is ask the Court for a running royalty. They're going -- they have pulled their product from the market, and as part of -- what they would like to do is reintroduce their product. And so part of what Mr. Scally, Barco's damages expert, is going to do is provide his analysis of how Barco has enforced the patents in the past, and what kind of reasonable royalty Barco would have insisted on in this case in order to resolve the issues of past infringement. But a live issue for post-trial briefing will be what happens next.

THE COURT: So why wouldn't this be something, then, to use in connection with post-trial briefing as opposed to in front of the jury?

MR. HALVERSON: Because it's also relevant to Mr. Scally's opinion about what the proper measure of damages in this case is.

THE COURT: And how does this relate to the proper measure of damages?

MR. HALVERSON: This puts upward pressure on what the reasonable royalty rate would have been and supports

[redacted]

indicated by his ultimate opinions in those reports, taking into account the other factors that he does. But the fact that Barco enforces its patents and the fact that it has sought and obtained consent judgments in courts throughout the country is an important factor in how we arrive at the ultimate royalty that should be owed.

04:06 Separately, or perhaps in addition, whatever we want to call the settlement agreement document may stand separately from the actual order signed by Judge Tigar, which is PX 25, that is the consent judgment by itself.

THE COURT: Can you show me a copy of that?

MR. HALVERSON: I sure can.

May I approach? I've got a binder of all of the PX exhibits, Your Honor.

04:07 THE COURT: All right.

MR. HALVERSON: So tab 2 in this, Your Honor, is PX 25, and that's the consent judgment from the case that the settlement agreement that was the document that we were talking about a second ago attaches as an exhibit at the back in an unsigned form.

THE COURT: And are there other similar documents that you intend to offer?

MR. HALVERSON: In addition to PX 25?

THE COURT: Yes.

MR. HALVERSON: There is a press release that is

04:08 PX 17 from Barco that appears in tab 1 of Your Honor's binder, and that is a summary document describing two litigations that were resolved in similar manners.

THE COURT: And is it your understanding that there is an objection to this document as well? I do see that.
04:08 It's in group 17.

MR. HALVERSON: I think it was in the 'other' bucket at the very end, Your Honor. We can do it in either spot.

04:09 THE COURT: All right. Thank you, Mr. Halverson.

MR. YANG: Your Honor, may I?

THE COURT: Yes.

MR. YANG: Thank you.

THE COURT: I can tell you that I find less problematic the consent judgment than the settlement agreement, so talk to me about the consent judgment and what
04:09 problems you think it would introduce into the case.

MR. YANG: Your Honor, I agree that -- well, I think both are problematic, but I agree the consent judgment, PX 25, is probably a little less problematic. The issue there, though, again, it relates to a prior litigation involving different patents. The litigation happened more than five years ago before this -- well, more than five years -- more than four years ago before this litigation.

04:10 Not only that, PX 25, the consent judgment, says "consent judgment, permanent injunction, and dismissal with prejudice."

It does not have to do with the *Georgia-Pacific* factors about prior licensing practices because it is not a license.

On top of that, Your Honor, I think there is a separate issue with the Court's Standing MIL No. 5 which relates to equitable claims and claims that are not proper before a jury. I understand that Barco may seek a permanent injunction, to which we disagree, but that is an issue before the Court. The same goes for any ongoing royalties. That is also an issue for the Court, not the jury.

To introduce -- sorry.

THE COURT: Do you dispute that the patents-in-suit in the Vivitek case are either related to or similar technologically to the patents in dispute here?

MR. YANG: Your Honor, I think I do dispute that. They're not the same, and I do believe at least some of them come from different patent families. Again, I may need to double check, but it's our understanding that these patents are not wholly related to the patents at issue.

THE COURT: All right. Thank you, Mr. Yang.

MR. YANG: Thank you, Your Honor.

THE COURT: Mr. Halverson, tell me about the comparability of the patents asserted in the Vivitek case. Has your expert opined that they are comparable?

MR. HALVERSON: So, Your Honor, the first patent in PX 25 in paragraph 4, the '348 Patent, is this patent. It's

the patent to the '002 Patent. They are related. What happened is this is earlier in time. Judge Tigar entered this consent judgment in April of 2020, which is before the issuance of the '002 Patent. But this is all the same family. This is the ClickShare patent family, Your Honor.

THE COURT: Did your expert opine on the comparability of the technology at issue in the Vivitek case?

MR. HALVERSON: I believe so, Your Honor.

The other thing that I would flag is *Georgia-Pacific* factor 4 states, "The licensor's established policy and marketing program to maintain the patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly," that's exactly what this consent judgment is. It's exactly what the pattern of litigation that Barco has undertaken before this case is and that's why Mr. Scally relies on these for his analysis of that *Georgia-Pacific* factor.

THE COURT: All right. Thank you, Mr. Halverson.

Mr. Yang, I do think that this is something that experts can rely upon like they do comparable settlement licenses. I think this is evidence of the practice of Barco in that connection. I'm going to sustain the objection to PX 24, the settlement agreement, but overrule the objection to PX 25, the consent judgment.

MR. YANG: Your Honor, may I just have one word on

this?

THE COURT: You may.

MR. YANG: If Barco's experts have discussed the comparability between these patents and the patents at issue, I would like to see it because it is my understanding that they have not.

THE COURT: Well, frankly, since one of the patents in the consent judgment is the parent of one of the asserted patents, I am satisfied that there is enough evidence of comparability even without the experts' testimony.

MR. YANG: Thank you, Your Honor.

What about PX 17 which is a -- I believe a summary -- well, an email -- a press release of Barco released back in 2020?

THE COURT: Why don't we turn to that now.

MR. YANG: Does Your Honor have a copy?

THE COURT: I think that I do, but I just saw it.

MR. HALVERSON: It's tab 1.

THE COURT: Yes. I have one in front of me. It indicates that it's a Barco press release.

MR. YANG: Yes, Your Honor.

That press release refers not only to the litigation we had just discussed; it discusses litigation against Delta Electronics. Your Honor, it also discusses in that press release litigations in Europe. This press release, PX 17,

does not make any reference to that one patent that is related to the '002 Patent, the '348 Patent, Your Honor.

04:16 THE COURT: All right. I think the biggest problem with PX 17 is hearsay, and I'll give Mr. Halverson a chance to talk me out of that, but I have pretty much never let press releases in as business records. I think they are the opposite of something relied upon by the business that issues it, but feel free.

MR. HALVERSON: I can read the room--nope.

04:16 THE COURT: All right. I'll sustain the objection to PX 17, which is in group 17.

What's next, Mr. Yang?

MR. YANG: Thank you, Your Honor.

I believe next we have group 12 that has to do with Barco's financial documents, and my colleague Ms. Eastham will address that, if that's okay with the Court.

THE COURT: Yes.

MR. YANG: Thank you.

04:17 MS. EASTHAM: Group 1 is PX 45 and 46, and these summarize Barco financial data, and there's three reasons that these should not be admitted.

The first is that these aren't relevant because Barco dropped their lost profit theory and they only seek a reasonable royalty here. The only finances that are relevant here are Yealink's with respect to the calculation of

04:17 reasonable royalty. And showing two sets of financial data, one of which is irrelevant in the first instance, would be confusing to the jury.

There's also an authenticity issue because it looks like these two charts are summarized data and we haven't seen the underlying data, there's no way to verify it, and Barco hasn't produced a witness or affidavit from whom prepared these summaries.

04:18 THE COURT: When was this document or these two documents produced to you?

MS. EASTHAM: During fact discovery.

THE COURT: So why wouldn't that give you the opportunity to explore the underlying documents?

MS. EASTHAM: We requested it but they didn't

04:18 produce it.

THE COURT: All right. I will explore that further with them and then give you a chance to respond. Thank you, Ms. Eastham.

Why are these relevant to the jury's consideration?

MR. HALVERSON: *Georgia-Pacific* factor No. 8 states "the established profitability of the products made under the

04:19 patent, its commercial success and its current popularity." These evidence the sales that have been made by Barco of its ClickShare product, its patent-practicing product that we've seen and we might still have on the table. We have it in a

bag somewhere, but we've seen it a couple of times.

THE COURT: Does your expert -- your damages expert discuss this in terms of commercial success?

MR. HALVERSON: Not in terms of commercial success in the sense of secondary considerations of non-obviousness,
04:19 but in the sense of commercial success under his *Georgia-Pacific* analysis, yes.

THE COURT: All right. And tell me about whether you made available the underlying documents here to the Defendant.

MR. HALVERSON: The underlying documents, Your Honor? What we did was we prepared a printout from our accounting system and produced that along with a witness to testify as to the source of this information, the accuracy of
04:20 this information. Yealink took that deposition, spent a fair amount of time using these two documents with that witness.

So as far as the underlying invoices that actually went into the accounting system, no, we did not go pull whatever thousands of invoices that went into that, but our witness did testify as to the accuracy and veracity of the information that was spit out by the computer to arrive at this information.

THE COURT: And who was that witness?

04:20 MR. HALVERSON: That was a Mr. Wesley Lightcap.

THE COURT: All right.

MR. HALVERSON: Thank you, Mr. Andrews.

THE COURT: Thank you, Mr. Halverson.

Ms. Eastham, do you have some reason to doubt the representation that these are simply spreadsheets that were pulled from the Plaintiffs' accounting system?

MS. EASTHAM: I don't have a reason to rebut that, 04:21 but I am concerned that the summaries are not complete because the financial data in particular is not split between the products.

THE COURT: Tell me what you mean by that.

MS. EASTHAM: It's not broken down by product between base units and dongles. And this is PX 45 specifically.

THE COURT: Why wouldn't that be something that you would explore on cross?

04:21 MS. EASTHAM: We could explore it on cross, Your Honor.

THE COURT: I haven't heard anything convincing as far as these not being relevant to the case, and they look like they're drawn from the business records.

Do you dispute that Mr. Lightcap was offered as a witness 04:22 and was able to answer questions about these documents?

MS. EASTHAM: We do not dispute that, Your Honor.

THE COURT: All right. Then I'll overrule the objection to PX 45 and 46. Thank you.

04:22

Tell me about group 13.

MR. YANG: Your Honor, group 13 has to do with some exhibits of Yealink's webpages. And if it's okay with the Court, my colleague Mr. Gothia will be arguing that category.

THE COURT: All right.

MR. GOTHIA: Good afternoon, Your Honor.

So group 13 deals with purported Yealink webpages. These -- similar to Barco's arguments with group 1 and a few of the other groups, these webpages were -- purported webpages were produced two months after fact discovery and one month after the close of expert discovery. They were produced after the -- all depositions were taken. No witness has relied on these, no depositions have relied on these documents, they have not been briefed in any motions or any arguments before the Court.

04:23

THE COURT: These are your documents?

MR. GOTHIA: They are purported webpages from Yealink, Your Honor. They are taken from the archive. So Your Honor, we don't really know for sure whether these webpages are accurate. They are not from -- directly from Yealink's websites. Again, they're not relied on by any witness. These were disclosed after the fact -- of all discovery.

04:24

I would like to also draw the Court's question specifically to PX 68. In this particular document, it even

04:24

goes so far as to have no web address on it. Therefore, we do not know where this document came from, if it's an accurate representation. It's purported to be from Yealink's webpage, but again, there is no web address associated with this document.

So what we have here is documents that were produced well

04:24 after fact discovery and expert discovery now being attempting to be introduced by Barco, but Your Honor, we don't really know what they are.

THE COURT: So these documents were produced after expert discovery as well?

MR. GOTHIA: Yes, Your Honor.

If you look at PX 54 at the top left corner, the date is

04:25 June 18th, 2025. Fact discovery was two months prior, April 18th, 2025. And I believe--don't hold me to it--but expert discovery closed around May 17th, 2025.

THE COURT: All right.

MR. GOTHIA: So these were produced after both discovery periods.

THE COURT: Thank you, Mr. Gothia.

I'll hear from the Plaintiff on the late production.

MR. HALVERSON: So these are Yealink websites. They

04:25 are websites that existed within the possession, custody, and control of Yealink all throughout this case and they were never produced by Yealink. So what Barco did, after relying

on them in its opening expert report, these URLs are from Barco's opening expert report. Barco had to produce the evidence that Yealink did not produce during fact discovery.

THE COURT: Why is it dated June 18, then?

MR. HALVERSON: Because it took us a while to do it, Your Honor.

04:26 THE COURT: Well, you're saying your expert found it, but --

MR. HALVERSON: Yep.

THE COURT: -- did not have a copy of it?

MR. HALVERSON: The expert did have a copy of it; we just did not produce it. So when the report was served, the archive.org URL is in that report. It was part of what was available for deposition of our expert, and it was part of what was available for Yealink's expert to respond to during 04:26 expert discovery, but the actual document here was not. The content was; the pages were not. So not unlike -- sorry. Yes, Your Honor.

THE COURT: And all of these documents were produced 04:27 to the Defendant around the same time in June?

MR. HALVERSON: I believe that is the case. I'm looking to double check 83 real quick, but at least up to that point, yes; with the exception of PX 83, which I believe was produced later in time.

THE COURT: You know, your opening argument was that

04:27 they should have been produced by Defendant. Do you have evidence that these are in their possession? You got them from some web archive?

MR. HALVERSON: Correct, Your Honor.

So bear with me for a second. There is a software company that performs what are called web crawls, and they 04:28 take snapshots of websites that are oftentimes used by defendants to establish prior art of certain disclosures.

THE COURT: Like the Wayback Machine.

MR. HALVERSON: That's what this is, Your Honor. Yes.

THE COURT: Well, that captures a lot of things that the party that created it may no longer have.

MR. HALVERSON: These reflect the website as it stands today, Your Honor. This was simply a way of gathering 04:28 the -- a -- this was simply a way of locking in time the disclosure. Because what's relevant about these websites is what Yealink is instructing its customers to do on those websites when its customers access this website in the United States. And so what we've done is we've gathered a handful of snapshots from different points in time throughout the case.

THE COURT: Why didn't you do this during discovery?

MR. HALVERSON: I don't have an answer to that, Your 04:29 Honor. Ideally Yealink would have produced its websites because they're relevant to the issue that appears to now be

back on the table as far as induced infringement and how it communicates to its customers and the directions that it gives its customers. We were under the assumption that that was not a live issue for this case, and over the course of the last couple of weeks it has shifted. And so this was originally included to account for willful infringement, but now it may have to serve double duty to also be instructive of the directions as it relates to the induced infringement prong.

04:30

THE COURT: That kind of cuts against your argument that you generated it because of recent changes in position. These were drawn two months ago.

MR. HALVERSON: So I did not intend to make the argument that these were generated because of a recent change in position. These were printed in June of 2025 and were printed for the assumption that these documents would be used to help prove willful infringement; not for the purposes of continuing to do what we now may have to do. I'm simply saying that this is the type of evidence that if we do need to prove induced infringement, this is the kind of evidence that would be.

04:30

THE COURT: Well, I can tell you that you may be able to use this as impeachment. If the Defendants' witnesses deny the contents of this, then you can seek to use it that way, but I don't think there's an adequate excuse for not producing this during discovery, or at least confirming

04:30

04:31 through discovery that it was -- that these are accurate, because I'm hearing from the Defendant that they don't know whether this is accurate or not.

MR. HALVERSON: Had the Defendant produced static versions of its website, we wouldn't have to be in this position. But respectfully, out of a desire to avoid producing discovery in this case, we were acting under a different assumption, and so now we're kind of scrambling to

04:31 try to find a way to make some things work. But the fact that this was not produced by Yealink doesn't seem like it should be held against Barco, being that it's Yealink's own website.

THE COURT: That is the issue, though--is it Yealink's website, is it accurate, is it what it purports to be.

MR. HALVERSON: So Dr. Brogioli, our expert, will lay foundation as to that. He will explain what the Wayback

04:32 Machine is, how it identifies websites, and what the URL at the bottom means and how that is generated by the Wayback Machine itself. That's all part of what he describes in his expert report.

THE COURT: And if he had done it during discovery, we wouldn't be talking about this, but I'm going to sustain the objection that these were late-produced. And as I've

04:32 said, you can seek to use them as impeachment if the Defendants' witnesses dispute the contents of it.

MR. HALVERSON: And respectfully, Your Honor, are they still available for demonstrative purposes, like the rest of group 1?

THE COURT: They -- yes, although I will tell you, you know, there is a process for demonstratives, and objections to that would be argued before Judge Gilstrap, and I have no to idea what the arguments will be or what the ruling will be. But certainly there's nothing about the fact that they have been ruled out as exhibits that would prevent them from being offered as demonstratives.

So that is group 13, which is PX 54, 55, 56, 63, 68, and 83.

Which takes us to group 14.

MR. YANG: Thank you, Your Honor.

Group 14 relates to Yealink's pleadings in this case, including its first answer, first amended answer, second amended answer, and third amended answer. Barco's counsel, Mr. Halverson, addressed this very briefly this morning, and it seems that Barco wants to use Yealink's prior pleadings and the fact that Yealink changed or dropped its defenses to prove willfulness.

The issue -- the main issue we have with that, Your Honor, is the Court's standing motion in limine order No. 1 which bars Barco from doing just that. Barco is seeking to use Yealink's prior claim, prior defense that they dropped to

04:35
04:35
04:36
04:37

prove willfulness, and that, Your Honor, is improper. Pleadings, of course, are also not evidence.

THE COURT: All right. Thank you, Mr. Yang.

MR. YANG: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Halverson.

MR. HALVERSON: So the state of mind of Yealink is paramount now in this case as far as what they believe met the claims, what they disagreed met the claims, and what they chose to do vis-a-vis their customers with that mental state about infringement. And so to the extent at some point in time Yealink believed that it did not infringe and then later in time Yealink represented that it did infringe, its conduct towards its customers throughout that passage of time is relevant for the issue of ongoing induced infringement and potentially past induced infringement.

THE COURT: So why can't you lay evidence about its conduct toward its customers without the pleadings prepared by its lawyers?

MR. HALVERSON: The conduct towards the customers we can; the mental state of the company we cannot, or, respectfully, becomes harder. I don't want to say cannot.

THE COURT: Well, I am going to carry this one until tomorrow and see if we are able to work out a suitable stipulation for the jury, and I'll then consider further whether one or more of these answers is appropriate for the

jury.

04:37 So let's move to group 15.

MR. YANG: Your Honor, group 15 is a -- as Yealink understands it, a number of physical products, physical exhibits. Yealink wants to preserve its objections because Yealink has never seen these physical exhibits, nor has Yealink seen any evidence about how Barco received or obtained this physical evidence. This may be better addressed at 04:37 trial, Your Honor, but that's the issue here. Yealink wants to have the opportunity to understand where they come from, so that's the authenticity issue. So far we have not seen any evidence on these physical products. And two, Yealink just wants to have the opportunity to inspect them if they are going to be introduced as exhibits.

There is also the relevance issue here, but I think that's less of a concern. The bigger concern is Yealink just 04:38 wants to understand where these come from and what they are.

THE COURT: So are you including in your objection the Yealink products that they're identifying on the list here?

MR. YANG: I believe they are included. I believe these include Yealink's products, Barco's products, and products from third-party Crestron Electronics. And the issue 04:38 there is Yealink has never seen any of these physical exhibits, and so far there's no evidence of how these physical

exhibits, how they were obtained by anybody.

THE COURT: All right.

MR. YANG: Thank you.

THE COURT: Thank you.

MR. HALVERSON: We asked. We asked for samples.

04:39 In response we were told Yealink does not intend to produce samples of its products. So yes, the products that we have from Yealink, they're certainly welcome to inspect them, nobody has said they weren't able to inspect them, but probing into where these came from well after the close of fact discovery, when back in September of 2024 we were trying to get samples of Yealink's products so that we didn't have to deal with this exact issue, is a little bit incredulous, Your Honor.

04:39 THE COURT: Well, some of these purport to be Yealink products and some are from other manufacturers. Have you offered to make them available yet?

MR. HALVERSON: They are certainly available. They have not asked for an inspection, but we can make them available for inspection, yes.

THE COURT: Did -- and I guess my question was a little different. Have you offered to make them available for inspection? 04:40 In other words, did you communicate to them, We have these, you can get a look at them, or are you just waiting for them to show up?

MR. HALVERSON: No. So my recollection is when we were discussing the initial exhibit list back before the first pretrial conference, we had said, Yes, you are entitled to look at them; we'll make them available when you want to look at them. I don't have an email traffic of that, so I don't -- that was my recollection.

04:40 THE COURT: All right. And are you representing that all of these physical exhibits are currently in your possession? You're not still waiting to obtain them?

MR. HALVERSON: Yes, Your Honor, they're either sitting in our Dallas office or in the process of arriving at our Dallas office from our Boston office.

THE COURT: And it looks to me like three of the six

04:41 are the Defendants' products. Did you obtain them just through ordinary commercial channels?

MR. HALVERSON: Yes, Your Honor.

THE COURT: In other words, you bought them?

MR. HALVERSON: I bought them on the internet, yep.

THE COURT: All right. Let me see. There's also one that is -- looks like a Barco product, one that is a

04:41 Crestron product. Or two I guess are Crestron products.

MR. HALVERSON: Sounds correct.

THE COURT: All right. Thank you, Mr. Halverson.

Mr. Yang, do you dispute that the Plaintiff has offered these physical exhibits for inspection in the past?

04:42 MR. YANG: Your Honor, I do not have that recollection.

THE COURT: Have you -- when did you learn of their intention to offer physical exhibits?

MR. YANG: Your Honor, it was the first time that Barco sent its exhibit list, the party exhibit list. I think that would have been sometime in July. There were discussions -- Barco had requested samples. As Mr. Halverson has shown 04:42 the Court, Yealink refused because we do not believe samples are relevant in this case. But at no point, as far as I can remember, Your Honor, did we know that Barco intends to introduce physical exhibits from Barco and from Crestron.

THE COURT: All right. I guess I forgot to ask. The Defendants' physical products are, to me, obviously relevant in some fashion.

04:43 Mr. Halverson, what is the relevance of the Crestron and Barco products?

MR. HALVERSON: So both Mr. Scally and Dr. Brogioli rely on those products to help -- in support of Mr. Scally's damages opinions, the *Georgia-Pacific* analysis about the success of the products, the operation of the products, how 04:43 they are related to each other. That would be the relevance of Barco products. And then Crestron is a licensee of Barco and has similar relevance.

THE COURT: I'm going to overrule the objection to

04:44

the three Yealink physical exhibits, with the understanding that you are to make those available for inspection on reasonable notice.

With respect to the other three, the ones that came from Barco and Crestron, can you show me that you gave notice of those at some relevant point in the past before we got to exhibit lists?

04:44

MR. HALVERSON: So they're certainly in our expert report, our opening expert report. There is testing that was performed by Dr. Brogioli on both the Barco product and the Crestron product. There are images in there and he was questioned about those products during his deposition.

04:45

I'm trying to remember whether or not the products -- there were products at Mr. Six's deposition. I don't remember the origin of those products; did we bring them did they bring them. So we did bring physical products to Mr. Six's deposition as well, which would have been during fact discovery.

04:45

THE COURT: Well, I'll have to sustain the objection to those three exhibits, which are 77, 78, and 79. Late production of those is obviously prejudicial since the Defendants have never seen them, and their relevance is very slight, I would say. It doesn't mean the expert can't talk about them, but I don't think it's fair to the Defendant to allow them to be introduced as exhibits. I will overrule the

04:46 objection to the three Yealink exhibits, with the understanding I just made that they are to be made available on reasonable notice. And by that I mean short notice, but reasonable notice.

MR. HALVERSON: Understood, Your Honor.

THE COURT: All right.

MR. YANG: Your Honor, before I move on, may I just seek a very quick clarification on that order?

THE COURT: You may.

MR. YANG: On the three physical exhibits that are

04:46 the Yealink products, we will certainly make the request to inspect. In addition, Your Honor, I think Yealink probably needs some representation or documentation as to where they came from; if they were bought, when they were bought; just to establish -- just so we can understand how they came into Barco's possession.

THE COURT: And what is the relevance of how they came into Barco's possession?

MR. YANG: Well, Your Honor, there are multiple

04:47 generations of the same product out there. It's -- sometimes it's not readily apparent just by looking at a product. Again, we just want to be able to have some supporting document as to how they were obtained. For example, if they were obtained -- I understand Barco in this case, Barco's employees has apparently done some testing on Yealink's

04:47

products even before this case. Now, if they were the same products that Barco tested, if they were tampered with, then I think there is an issue.

So I think it could be as easy as a representation, but there should be some supporting documentation relating to the actual physical products.

THE COURT: All right. I'm going to deny that request at this time. If your inspection of these produces some indication that there's something abnormal about them, then I -- you may reurge that request.

04:48

MR. YANG: Thank you, Your Honor. I think that's just fine.

THE COURT: All right.

MR. YANG: Should I move on to group No. 16, Your Honor?

THE COURT: Yes.

MR. YANG: Okay. Group No. 16, PX 37, Your Honor, this is something we discussed before the afternoon recess. This is an email from Barco's counsel sent to Yealink. It is a confidential settlement offer made pursuant to FRE 408.

04:49

This exhibit also contains as an attachment to this email the actual settlement proposal that Barco made.

Your Honor, this email has also -- well, is also part of Yealink's motion in limine. It is a part of Yealink's *Daubert* motion, Mr. Scally's analysis. This is a 408 document. It

04:49 should not be relied upon by any party, and certainly should not be admitted into evidence.

THE COURT: Do you have a copy of it? Is it in your -- I do see it. It's in your folder.

MR. YANG: I think it may appear as a JX 37, but -- excuse me; JX 9.

THE COURT: All right. Thank you, Mr. Yang.

Let me hear the response.

04:49 MR. YANG: Thank you, Your Honor.

MR. HALVERSON: Your Honor, the email in question was sent on June 9th, 2023. This case was filed in November of 2023. It can't be a settlement offer. There was no case 04:50 to settle. It was a licensing offer. It was inartfully marked, it's inartfully referred to in the emails, but there simply isn't something at that point in time that could have been settled by an execution of the agreement or an --

THE COURT: Barco had not sent a demand letter?

MR. HALVERSON: A demand letter was sent, yes.

THE COURT: And did the demand letter threaten suit?

MR. HALVERSON: I'm sure it did, yes.

THE COURT: So why couldn't this be a settlement of the disputed claim?

04:50 MR. HALVERSON: Because at that point in time there wasn't a disputed claim. The case hadn't been filed. It was pre-litigation.

THE COURT: That's an interesting -- do you have any authority for the proposition that before litigation is pending there cannot be a Rule 408 issue?

MR. HALVERSON: So there's a case *Wireless Alliance vs. AT&T Mobility*, Your Honor. Respectfully, it's an opinion

04:51 that you authored up on the screen now. It says, "The Court addressed 408 at the pretrial conference and ruled that because no litigation or claim was pending at the time of the June 21st, 2021 letter proposing a license, 408 was not implicated."

THE COURT: You'll notice it says "litigation or claim." If you sent a letter making a claim of infringement and threatening suit, that to me is a claim.

04:51 MR. HALVERSON: And I respectfully disagree, but I understand that position. And there was nothing that could have been recovered at that point. A claim requires some sort of ability to receive something in response, and so had Yealink and Barco just went their separate ways pre-litigation, there was nothing there that would have resulted from that.

THE COURT: So you were not contending that there was infringement at that time?

04:52 MR. HALVERSON: There -- we had alleged infringement at that time, yes, but we had not filed a complaint that was recoverable on at that time.

THE COURT: Other than this language which I have kind of a sense of, do you have anything that draws a distinction between pre-suit and post-suit?

MR. HALVERSON: The only other thing I have, Your Honor, is this is our own offer. And I think I raised this last time but I'll reiterate this again. It is not the case that there would be any sort of chilling effect by Barco's ability to use its own offer. Barco has the ability -- should have the ability to do that. All of the cases that we have been able to find have been an application of 408 to prevent a party from using the other party's offer, which makes perfect sense.

It's entirely consistent with the purpose of 408, the meeting notes of 408, but here what we're using this for is to establish a data point within Mr. Scally's analysis. This -- there could not be better evidence of how Barco would have approached the hypothetical negotiation and how Barco approached an actual negotiation; again, pre-litigation.

THE COURT: And so what is there in this that you're seeking to rely upon? The rate that you offered; the -- what was it?

MR. HALVERSON: It is the structure of the [redacted]

[redacted]

04:55 And so to help provide context as to why these experts are proposing different structures, it's important to note how Barco actually approached this particular negotiation.

The numbers themselves are different than Mr. Scally's ultimate opinion. He does not take this proposal and say, Well, if that's what Barco offered at the very beginning before the case was filed, that must be what they would have 04:55 resulted in that hypothetical negotiation; he uses this as a ceiling and comes down from that.

THE COURT: You know, the value of the claim is one of the things that 408 prohibits using these kinds of 04:56 negotiations to establish. It's not just liability.

MR. HALVERSON: Correct, Your Honor.

And part of the reason why that is the case is the authors of the Federal Rules of Evidence didn't want to create a situation where parties were discouraged from making offers to try to resolve litigation. But that would be only an issue for the other party's use of that document or of that offer. 04:56 How could Barco have been harmed, injured, chilled, have any sort of other negative repercussions on itself for its use of

its own offer?

THE COURT: You know, the concern would be that the recipient of the offer would not trust that it is, in fact, confidential, and they would, therefore, have a disincentive to openly engage. And that's especially true when your offer comes with the label "Confidential Settlement Offer Made Pursuant to Federal Rule of Evidence 408." So I don't think you can have your cake and eat it, too. I'll sustain the objection to PX 37.

MR. YANG: Thank you, Your Honor.

Shall I move on to group 17, the final group.

THE COURT: Yes. And we've already addressed PX 17, so there's just 67 and 69.

MR. YANG: That is correct.

And before I start, does Your Honor have both exhibits in front of you, Your Honor?

THE COURT: I do.

MR. YANG: Thank you.

So if I may start with Exhibit 67, it is this one-page document that says -- that reads "ClickShare: The One-Click Wonder." It is dated from 2012, more than a decade before the current dispute. And that date, Your Honor, is on the left-hand side on the -- towards the bottom there is a copyright notice there.

This exhibit was not put before any witness and, quite

04:59 04:59 05:00 05:00

frankly, Your Honor, I'm not sure what this exhibit is supposed to be. Further, it's not really relevant to any issue that is still pending at trial.

The issues that are still alive really do not have anything to do with Barco's products, especially it's products that apparently was available eight years before the patents were issued and more than a decade before Barco sent its notice letter to Yealink starting the current dispute.

THE COURT: When was it produced to you?

MR. YANG: I want to say it was produced during fact discovery. Your Honor, I do not have the exact date, but I think it was produced during fact discovery, although this document was not put in front of anybody. And I do not believe any expert has addressed this document.

THE COURT: All right.

MR. YANG: Should I move on or should I talk about Exhibit 69, I believe?

THE COURT: Let's go ahead and address this one before we move to 69.

MR. YANG: Thank you, Your Honor.

THE COURT: First off, do you read that date as 2012?

MR. HALVERSON: I think that's right, Your Honor, yes.

THE COURT: Okay. What is your response to the

relevance objection?

MR. HALVERSON: The operation, ease, and success that Barco's customers have using Barco's device is relevant to the damages analysis, the *Georgia-Pacific* factor that I read tying to Barco's financial information; I don't remember if it was 4 or 6. But the operation of Barco's product and
05:01 the success of that product comes partially from the fact that it is a simple product to use. That's what this helps demonstrate.

THE COURT: And do you have evidence that the product depicted in PX 67 is practicing the asserted patents?

MR. HALVERSON: Both Barco's technical expert and Barco's witness will testify to that, yes.

05:01 THE COURT: All right. Well -- all right. Thank you, Mr. Halverson.

Mr. Yang, what is unfair about allowing this exhibit if
05:02 it is -- if there's a foundation established by Barco's witness?

MR. YANG: Well, I'm not sure if there's a foundation established so far, but I understand, of course, Barco may try to do that at trial with its expert. I do not believe this was ever cited in the expert report, but that's more appropriately I think an issue to deal with at trial if it becomes an issue.

THE COURT: Well, what I often do with something

05:02 like this, then, is to allow it to remain on the exhibit list, but with an asterisk, which will mean that it is not to be used in front of the jury until it has been admitted in connection with the testimony of a witness. And I ordinarily name that witness.

Mr. Halverson, who do you intend to have lay that 05:03 foundation for this PX 67?

MR. HALVERSON: Mr. Erwin Six.

THE COURT: All right. I've heard a lot about Mr. Six. There's also a Mr. Seven, isn't there?

MR. HALVERSON: There is not.

THE COURT: All right.

MR. HALVERSON: It's on the other side.

THE COURT: Anybody for five? No? All right.

05:03 Then what I'll do is allow PX 67 to remain on the exhibit list, with the understanding that it is not to be used before the jury until Mr. Six has caused it to be admitted.

MR. YANG: Thank you, Your Honor.

THE COURT: And that leaves us 69.

MR. YANG: Yes, Your Honor.

05:04 No. 69, Your Honor, purports to be -- well, I'm actually not sure exactly what this is. It purports to be either a website printout or some kind of --

THE COURT: This is your document.

MR. YANG: It is, Your Honor, so let me rephrase, if

I may.

I think the issue with 69, Your Honor, is mostly relevance. No. 69 is about -- excuse me.

05:04

THE COURT: This is one of the accused products, is it not?

MR. YANG: Yes, Your Honor.

I'm going to withdraw the objections to this exhibit.

THE COURT: All right. Then PX 69 will be pre-admitted.

MR. YANG: Thank you, Your Honor.

05:05

THE COURT: All right. And we will resume 1:00 tomorrow. I expect counsel to exchange some drafts and try to resolve the issue that's before us between now and then, and we'll find out where you are.

MR. YANG: Your Honor, if I may, we have a draft ready if the Court wishes to review it now.

05:05

THE COURT: Is that a joint draft?

MR. YANG: Not yet -- well, no I think is the better answer at this point.

THE COURT: If you come to an agreement before -- at any time before 1:00, even this evening, you can email it to my law clerk and we'll cancel the hearing if there's a joint agreement.

05:06

I am expecting to see you tomorrow, but I make that offer.

MR. HALVERSON: Yes, Your Honor.

MR. YANG: Thank you, Your Honor.

THE COURT: All right. Thank you. And we are adjourned.

(The proceedings were concluded at 5:06 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts 09/06/2025

__________________________DATE____________
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER