IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| BARCO, INC. et al., | § |
| Plaintiffs, | § § § |
| v. | §  CIVIL ACTION NO. 2:23-cv-00521-JRG-RSP |
| YEALINK (USA) NETWORK TECHNOLOGY CO., LTD. et al., | § § § § |
| Defendants. | § |

## MEMORANDUM ORDER

Before the Court is the Daubert Motion and Motion to Exclude Expert Opinion of William B. Scally, filed by Yealink (USA) Network Technology Co., Ltd. and Yealink Network Technology Co., Ltd. ("Defendants"). **Dkt. No. 113**. For the reasons discussed below, the Motion is **DENIED**.

### I.   BACKGROUND

On November 14, 2023, Plaintiffs Barco, Inc. and Barco NV ("Plaintiff") sued Defendants alleging they infringe several of Plaintiff's Patents. *See generally* Dkt. No. 1. Eventually, Defendants admitted to infringement, the extent of which the Court later resolved after a dispute arose as to this. Dkt. No. 85, Dkt. No. 189.

### II.   APPLICABLE LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme

Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

### III.   ANALYSIS

In the Motion, Defendants argue that Mr. Scally's opinion should be excluded in its entirety for various reasons. *See generally* Dkt. No. 113. The Court will address each purported basis in turn.

**A. Apportionment Regarding Non-Accused Features in the Dongles**

First, Defendants assert that Mr. Scally fails to apportion the amount of the reasonable royalty attributable to the patented features found in the accused dongles (as opposed to other, non-patented features). *Id.* at 3-5.

In response, Plaintiff argues that the instant case presents the rare situation in which apportionment has already been done through a comparable license. Specifically, Plaintiff asserts that prior to the instant litigation, a third party—Creston—approached Plaintiff to acquire a license to produce products which Plaintiff contends "operate in substantially the same manner, including essentially the same patented (and unpatented) features." Dkt. No. 122 at 1 (citing Dkt. No. 122-2 ("Ludke Depo")[1] at 58:10-23). Plaintiff argues that in such situations, there need not be any further apportionment because "[w]hen negotiating the actual license agreement that underscores Mr. Scally's opinions, Barco and Crestron already conducted the exercise of separating the value of Barco's patents from any non-patented aspects of Crestron's products (which, as reflected in Dr. Brogioli's report operate in substantially the same way as Yealink's)." *Id.* at 1, 3 (citing *Vectura*

---

[1] Andrew Ludke is a representative from Creston.

*Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020) ("when a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required…. because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have 'built-in apportionment.'"); *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015)).

Plaintiff goes on to argue that "Yealink identifies no feature in the accused product or the Crestron product that provides value that should be excluded from Mr. Scally's analysis," which renders it reliable under the instant facts and circumstances. *See id.* at 3-4.

The Court finds that Mr. Scally's opinions here are sufficiently reliable. Mr. Scally has apportioned by way of his reliance on the Creston license which had already done this. *Vectura Ltd.*, 981 F.3d at 1040. Defendants' remaining concerns are not sufficient to merit exclusion and may instead be addressed through cross examination.

### B. Apportionment Regarding Base Units

Second, Defendants argue that "Mr. Scally's reasonable royalty analysis concerning Yealink's base units is also legally insufficient because it fails to apportion between the base units' infringing and noninfringing uses." Dkt. No. 213 at 5. Specifically, Defendants assert that despite accepting that "Yealink's base units do not infringe any claims without a dongle, Mr. Scally nevertheless opines that a reasonable royalty applies to *all, 100%*, of Yealink's base units sold in the U.S." (*Id.* at 6 (emphasis in original) (citing e.g. Dkt. No. 113-2 ("Scally Report") at 46)), but that he has no evidence to support this (*Id.* (citing Dkt. No. 113-3 ("Scally Depo") at 226:21-227:7)). In other words, Defendants contend that there is no evidence to support the notion that

4

100% of the base units sold in the U.S. are used in conjunction with a dongle and, therefore, that there is infringement for 100% of the base units. *See id.*

In response, Plaintiff acknowledges that some of the asserted patents require a dongle to be used in conjunction with a base unit for infringement to occur. Dkt. No. 122 at 4. However, Plaintiff asserts that Defendants failed to provide the requisite discovery necessary for them to be able to do a more granular analysis, having 'short-circuited' discovery by admitting infringement. *See id.* As a result, "Mr. Scally was forced to 'draw a reasonable inference' regarding the percentage of base units in the United States that were used with dongles." *Id.* They claim that, here, this was indeed 100% and that this inference is supported by the fact that Yealink sold approximately 28,534 WPP20 and WPP30 dongles in the United States, but only 21,676 base units. *Id.* at 5 (citing Scally Report at ECF page 112, ECF page 113). Thus, it was reasonable to assume that, given the higher number of dongles than base units, all of the latter were used in conjunction with the former. *Id.*

The Court agrees with Plaintiff that the reasonableness of the expert's factual inferences, in this case, is something properly left to the trier of fact. Defendants, in response to Plaintiff's Motion to Compel discovery (Dkt. No. 75), filed their Third Amended Answer admitting infringement (Dkt. No. 85). *See also* Dkt. No. 88. They claimed that this mooted the need to provide the requested information in Plaintiff's Motion to Compel (Dkt. No. 98 at 1-2), and the Court agreed (Dkt. No. 99). Defendants may not preclude relevant discovery by admitting infringement and then complain that Plaintiff's expert failed to provide a sufficiently detailed opinion; the reason why Mr. Scally cannot supply a more detailed opinion is because he never had access to the relevant documents. Defendants cannot have their cake and eat it too.

Regardless of the above, and as Plaintiff correctly points out, Mr. Scally, devoid of other information data, interpolated a reasonable approximation of how many base units are used with dongles based on the WPP20, WPP30, and base unit sales in the U.S.. The Court finds that, given the higher number of dongles than base stations, it is reasonable for Mr. Scally to assume that all of the latter were used in conjunction with the former. To the extent that Defendants take issue with this approach, it is a matter for cross examination.

### C. General Reliability Concerns

Third, Defendants make a number of more generalized arguments concerning the reliability of Mr. Scally's analysis. Dkt. No. 113 at 8-14.

#### 1. Lower Boundary

Defendants attack Mr. Scally's report for setting the lower boundary for damages equal to the Creston license. *Id.* at 8. They claim this is problematic because of a lack of analysis showing why Plaintiff would be less favorably disposed towards Defendants than versus Creston, especially given that the date of the hypothetical negotiation with Yealink would be before the Creston license was actually negotiated. *Id.* at 8-10.

In response, Plaintiff argues that "Yealink purports to treat the requirement that the hypothetical negotiation involve 'willing parties' as if Barco must have provided the same licensing terms that it accepted from Crestron. Yealink, however, ignores the business realities between Crestron and Yealink vis-à-vis Barco. As Mr. Scally testified, Barco and Crestron do not compete for customers. Conversely, Yealink and Barco are direct competitors, as Mr. Scally addresses in his [*Georgia-Pacific*] Factor 5 analysis. Yealink simply disagrees with Mr. Scally's conclusions and would prefer he perform a different analysis. But as Mr. Scally's report properly articulates a conclusion of the hypothetical negotiation and offers an opinion about what the two

6

willing parties would have agreed to, this is a matter for cross examination, not exclusion. Dkt. No. 122 at 6 (citing Scally Report at ¶¶ 54, 76-77).

The Court agrees with Plaintiff. Mr. Scally has taken stock of the different positions that Yealink and Creston occupy vis-à-vis competition with Barco: namely, that Creston does not compete for customers with Barco, while Yealink does. This is a sufficient basis to justify Mr. Scally's use of the Creston license as the lower boundary, and he even explicitly says that Plaintiff's loss of customers due to Yealink's infringing products "would have an upward influence on the Reasonable Royalty." Scally Report at ¶ 77. Further, this is reflected in his analysis of *Georgia-Pacific* factor 5, which takes into account "[t]he commercial relationship between the licensor and licensee, such as, *whether they are competitors* in the same territory in the same line of business . . . ." *Id.*; *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1118 (S.D.N.Y. 1970) (emphasis added), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971).

### 2. Factors Ostensibly Not Relevant to Asserted Patents

Defendants' next general reliability concern with Mr. Scally's report is that "[i]n arriving at his reasonable royalty, Mr. Scally also considers other factors not related to the asserted patents and their features, such as brand awareness and reputation, before he concludes that Yealink should pay a higher royalty than Crestron." Dkt. No. 113 at 10.

Plaintiff responds as follows: "Yealink attempts to paint Mr. Scally as if his entire opinion was based solely on 'brand awareness,' which is not the case . . . . Rather than address anything in Mr. Scally's actual report, Yealink elicited testimony during Mr. Scally's deposition in an effort to manufacture a challenge based on an entirely unrelated case. Indeed, nowhere in Mr. Scally's report does he actually say 'brand awareness' had any impact on his opinion. There are only two

7

instances of the word 'brand' in the entire report, one in paragraph 59 ('Crestron began selling Crestron-branded Dongles') and one in paragraph 117 ('Mr. Six explained how Barco continues to suffer from loss of its customer base that have committed to other branded systems'). Neither of these suggest that 'brand awareness' had any influence on Mr. Scally's opinions." Dkt. No. 122 at 6-7 (citing generally Scally Report; *id.* at ¶¶ 59, 117).

The Court finds that striking is inappropriate here. It is well established that an expert is confined to the four corners of their report. Here, Mr. Scally's report indeed contains no arguments regarding 'brand awareness.' *See generally* Scally Report. Thus, while Mr. Scally's deposition testimony may be a grounds for impeachment, it is not a valid basis for the striking of his entire report as Defendants desire. Further, the Court questions why an increase in brand awareness for Yealink from licensing Plaintiff's patents is not something that can be considered at the hypothetical negotiation.

The hypothetical negotiation is a thought experiment designed to help arrive at a proper valuation of the damages in a patent infringement case, which takes into account a wide variety of considerations between two negotiating parties—the plaintiff and defendant to the suit—and assumes that they would willingly enter into a license agreement. *See generally Georgia-Pac.*, 318 F. Supp. 1116. Amongst these considerations, are (1) "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales"; and (2) "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a

8

particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." *Id.* at 1120. It is permissible for the hypothetically negotiating parties to take into account peripheral effects from licensure such as an increase in brand awareness for the licensee, especially given that this is something that parties in a real-world negotiation would (presumably) consider. Regardless, because no such brand-awareness opinions appear in Mr. Scally's report, this is a moot point.

### 3. 80/20 Royalty Allocation

Defendants' third general reliability concern with Mr. Scally's report is that he arrives at a royalty figure of $120, which is allocated as $96 per dongle and $24 per base unit (or, an 80/20 split between the two components), but that this 80/20 split comes from Plaintiff's proposed (but unconsummated) global settlement[2] to Defendants from before suit was filed, and not independently from Mr. Scally's own analysis. *See* Dkt. No. 113 at 12. Defendants claim this is improper because "it is not the type of independent and objective expert opinion required by Rule 702 and *Daubert*." *Id.* at 12-13. Defendants further criticize Mr. Scally's approach because they assert that he should have also considered Yealink's counterproposals. *Id.* at 13.

In response, Plaintiff argues that, while Mr. Scally's 80/20 split was indeed taken from the Global License Offer, he merely used this as one data point in arriving at his own conclusions. Dkt. No. 122 at 7. With respect to Defendants' argument concerning Mr. Scally not considering Yealink's counteroffers, Plaintiff contends that "Yealink's offers are plainly unavailable under Federal Rule of Evidence 408," and that, "[while] Mr. Scally weighed evidence differently than [Defendants] would prefer . . . this is not a basis to exclude . . . ." *Id.*

---

[2] The Court will occasionally refer to this as the "Global License Offer."

Having reviewed the relevant portions of Mr. Scally's report, the Parties' arguments, and the other relevant documents, the Court is satisfied that Mr. Scally's approach here is sufficiently methodologically sound. First of all, there is no dispute that the '80/20 split' is, as discussed above, merely an allocation of damages attributable to the two relevant components: the dongles and the base units. In other words, it is not an 80/20 split on the royalty base, which would potentially implicate the rule-of-thumb issue that the Federal Circuit has repeatedly warned against. *See e.g. Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)).

Second, we agree with Plaintiff that Mr. Scally is merely using the 80/20 split found in Plaintiff's pre-suit Global License Offer as a starting point. The Global License Offer allocated $120 to the dongles and $30 to the base units (or, again, an 80/20 split between the two components). *See* Scally Report at page 11. While Mr. Scally maintains this 80/20 ratio for his reasonable royalty opinion in the instant litigation, he adjusts the actual dollar amounts allocated to the dongle and base unit in accordance with his analysis related to the relevant *Georgia-Pacific* factors impacting damages. Thus, the $96 per dongle and $24 per base unit found in his final allocation is both sufficiently reliable and independent.

As to Defendants' further complaint regarding Mr. Scally not taking into account Yealink's counteroffers, Defendants will be free to explore this with him on cross examination.[3]

---

[3] With respect to Defendants' MIL No. 3 (*See* Dkt. No. 160), the Court hereby **DENIES** the Motion *in limine* as unnecessary in view of the fact that the proposed Global License Offer antedates the instant suit (*See* Scally Report at ¶ 33 ("On June 4, 2023, in response to Barco's . . . cease and desist letter[,] . . . Yealink requested that Barco 'provide [them] with [the] content or framework of the agreement,' regarding the 'patent issues.' Barco provided Yealink with the 'Proposed License Term Sheet' (i.e., the [Global License Offer]).")); *compare* Dkt. No. 1 (The Complaint initiating suit, which was filed on November 14, 2023)) and, therefore, does not go towards a "disputed claim," as contemplated by Rule 408 of the Federal Rules of Evidence. FED. R. EVID 408. The Court further notes that, because it is Plaintiff who is using its own license offer here (rather than attempting to use Defendants' own statements made during the licensure discussions against Defendants), this does not implicate the 'chilling effect' with which Rule 408 is concerned.

### 4. Reliance on Allegedly False Information

Defendants' penultimate general reliability concern with Mr. Scally's report is that "[i]n analyzing the Crestron license agreement, Mr. Scally makes the claim that the 'royalty rates provisioned in the Crestron License Agreement are inclusive of a royalty on both Dongles and Base Units,'" but that that is not correct. Dkt. No. 113 at 13-14. Defendants point to various pieces of evidence to show that royalties under the Creston license are tied to dongle sales, not base-unit sales.

In response, Plaintiff argues as follows: "Mr. Scally states that the royalty rate in the Crestron Agreement . . . is inclusive of a royalty on dongles and base units . . . because it is [inclusive of this]." Dkt. No. 122 at 7. In support of this bold declaration, Plaintiff cites to the testimony of Barco's Mr. Six, who said that there is no royalty based on the number of base units sold by Crestron "in the *final* agreement." *Id.* at 8 (emphasis in original) (citing Dkt. No. 113-5 at 137:20-23). "However," continues Plaintiff, "that's because the parties agreed to the use of a dongle only royalty as a proxy for the sale and use of base unit in an otherwise infringing manner." *Id.* (citing e.g. Ludke Depo at 89:14-19).

Having reviewed the relevant documents, the Court is satisfied that there is sufficient evidence in the record to support Mr. Scally's position that the license in the Crestron agreement is inclusive of dongles and base units, but that a royalty was only charged for sales of dongles. *See* Ludke Depo at 89:14-19 ("Q: Why is it that the per unit royalties is not based on the number of receivers sold? A: From a business standpoint, it was cleaner this way, and it was a goal of ours to keep it simple.").

### 5. Conclusory Opinions

Defendants' final general reliability concern with Mr. Scally's report is that "[h]aving made all the mistakes outlined above, Mr. Scally concludes, without explanation, calculation, or even approximation, that the reasonable royalty in this case is $96 per dongle and $24 per base unit." Dkt. No. 113 at 14. Thus, conclude Defendants, all that is left is *ipse dixit* argumentation from Mr. Scally, which is insufficient. *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Having already resolved the issues discussed above, the Court finds that Mr. Scally's opinions are not conclusory. Contrary to Defendants' contention, Mr. Scally's report is not merely *ipse dixit* argumentation; he offers sufficient analysis for his final opinion of $96 per dongle and $24 per base unit.

### D. Basis for Projections

Fourth, Defendants argue that "[f]or his damages calculations, Mr. Scally makes a series of projections for Yealink's dongle and base units sales in 2024 through 2025 in the U.S.," but that, "Yealink . . . stopped selling its dongles in the U.S. as of April 2024." Dkt. No. 113 at 15 (citing Scally Report at ¶ 133; Dkt. No. 85 ("Third Amended Answer") at ¶ 2). "Mr. Scally's inclusion of Yealink's 'projected' dongle sales in his damages calculations therefore is improper as it assumes infringement when there was none." *Id.* (citing *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015)). Defendants further complain that Mr. Scally's Report supposedly does not show the calculations behind these projections, which are only found in his work papers and these were not produced. *Id.* (citing Scally Depo at 237:3-6; 238:7-17).

In response, Plaintiff argues that Mr. Scally's projections are entirely explained in his report. Dkt. No. 122 at 9 (citing Scally Report at ECF page 111 – ECF page 113). With respect to Defendants' argument concerning dongle sales after April 2024, Plaintiff contends that, regardless

of the cessation of dongle sales, Defendants continued to sell their base units, that infringement continued to occur (by customers using a dongle with a base unit), and that Mr. Scally proposes a manner to compensate Barco for Yealink's infringement during this time based on the best approach that he could muster based on the available information. Plaintiff contends that, because Yealink elected to use its admission of infringement as a mechanism to limit discovery, certain estimations were necessary as a result. *Id.* (citing *Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 2:07-CV-468, 2009 WL 4723733, at *6 (E.D. Tex. Sept. 8, 2009)).

The Court finds that, while Mr. Scally does not include his line-by-line calculations for his CAGR[4] analysis in service to his projected sales opinion, we are satisfied that the use of this type of model is sufficiently reliable. Mr. Scally will be held to the four corners of his report when testifying, and Defendants will be free to ask him about his calculations on cross examination.

Regarding Defendants' argument concerning post-April 2024 sales, we agree with Plaintiff. As both we and the Federal Circuit have said previously, "if actual damages cannot be ascertained with precision because the evidence available from the infringer is inadequate, damages may be estimated on the best available evidence, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer." *Advanced Tech. Incubator.*, No. 2:07-CV-468, 2009 WL 4723733, at *6 (quoting *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996)).

Here, as Plaintiff asserts and as discussed above, Defendants 'short circuited' discovery by admitting infringement. Plaintiff was left to create a reasonable royalty analysis for post-April 2024 infringement based on the data it was provided by Defendant. Having reviewed Mr. Scally's report, the Court finds that his approach is sufficiently reliable.

---

[4] Compound Annual Growth Rate.

### E. Reliance on Barco Internal Data

Fifth and finally, Defendants argue that "[f]or the reasons discussed in more detail in Yealink's motion to strike Dr. Brogioli's expert testimony, Mr. Scally cannot properly rely on Barco's internal Clickshare user data[5] that was disclosed too late." Dkt. No. 113 at 15 (cross referencing Dkt. No. 112 at 8-10).

In response, Plaintiff argues that "Mr. Scally relied on data that was timely produced, and on the corresponding testimony of Mr. Erwin Six. For the reasons set forth in Barco's opposition to Yealink's motion to strike, Mr. Scally's reliance on these variety of sources is proper." Dkt. No. 122 at 11 (cross referencing Dkt. No. 120 at 7-9).

Up front, the Court looks askance at arguments made by way of cross-references to other motions, which is a circumvention of the page limits set out by the local rules. *See* Local Rule CV-7(2) ("Non-dispositive motions shall not exceed fifteen pages, excluding attachments, unless leave of court is first obtained. Likewise, responses to such motions shall not exceed fifteen pages, excluding attachments, unless leave of court is first obtained.").

Turning to the dispute proper, Defendants' arguments are unpersuasive. Whether to admit or exclude expert testimony pursuant to Rule 37 is a matter left to the discretion of the trial court. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004). We apply a four-factor test to determine whether the late disclosure is permissible: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Id.* at 563-64.

---

[5] This refers to Dkt. No. 112-5, which the Court will occasionally refer to as the "Clickshare User Data." *See generally* Dkt. No. 112-5.

With respect to the first and second factors, Defendants themselves concede that the Clickshare User Data evidence at issue is not of great importance (Dkt. No. 112 at 9), but by that same token, the prejudice they suffer from it is minimal. To wit, the principal relevance of Mr. Scally's opinions utilizing the Clickshare User Data is to rebut Defendants' non-infringing alternative opinions. *See* Scally Report at ¶¶ 101-102; *compare id.* at ¶ 100 ("I understand there are a number of *non-infringing alternatives* to Barco ClickShare technology . . . ." (emphasis added)). However, as discussed in the Court's Order on Defendants' Motion to Strike the Report of Dr. Brogioli, Defendants' non-infringing alternative opinions have been stricken. *See* Order resolving Dkt. No. 112; *see also* Order resolving Dkt. No. 109. Thus, the implicated opinions of Mr. Scally are rebutting something that is (for all intents and purposes) no longer found in Defendants' expert's report.

As to the third factor, neither side desires a continuance (*See* Dkt. No. 112 at 10; *compare* Dkt. No. 120 at 9), and the Court finds that one would be inappropriate at this stage of the proceedings because of the proximity to trial (*See* Dkt. No. 213).

Finally, as to the fourth factor, the Court finds that, contrary to Plaintiff's assertions, the information is indeed untimely. The operative Docket Control Order makes clear that the fact-discovery cutoff was April 18, 2025 (Dkt. No. 91 at 4), and there is no dispute here that the first time Plaintiff produced the Clickshare User Data was during the deposition of Barco's 30(b)(6) witness, Mr. Six (*See* Dkt. No. 112 at 8; *compare* Dkt. No. 120 at 7-8). However, this deposition itself occurred outside of fact discovery by agreement of the Parties. *See* Dkt. No. 112 at 8. Further, Defendants had a full opportunity to discuss this document with Mr. Six during his deposition.

Taking into account each factor and its associated weight, the Court finds that striking here would be inappropriate.

Accordingly, the motion to strike is **DENIED**.

**SIGNED this 13th day of October, 2025.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE