# EXHIBIT B

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | is an automotive company.  Aflac is an insurance company, and            |
| 08:41 | 2  | certainly Gillette is a shaving and razor company.                       |
|       | 3  |         MS. SMITH:  Your Honor, at this time I tender Mr.                |
|       | 4  | William Scally as an expert in economic damages.                         |
|       | 5  |         THE COURT:  Is there objection?                                  |
|       | 6  |         MR. YANG:  No objections, Your Honor.                            |
|       | 7  |         THE COURT:  Without objection, the Court will                    |
|       | 8  | recognize this witness as an expert in the designated fields.            |
|       | 9  |     Please continue, counsel.                                            |
|       | 10 |         MS. SMITH:  Thank you, Your Honor.                               |

Q. (BY MS. SMITH) Mr. Scally, do you have an understanding that Yealink has stipulated to directly infringing in this case?

A. Yes.

Q. Okay. And how did that influence your work?

A. Typically independent experts need to assume that liability will be established in a matter in a litigation like this. This is a little bit different in the sense that the Defendant in the case has admitted to infringement of the asserted patents. However, the damages analysis is the same.

Q. And have you done damages analysis and formed an opinion as to the damages that the Defendant Yealink should pay Barco?

A. Yes, I have.

Q. And what are we seeing up on the screen here?

A. This is my opinion on economic damages, the amount that I

|       |    |                                                                               |
|-------|----|-------------------------------------------------------------------------------|
|       | 1  | believe that Yealink should pay as compensation to Barco for                  |
|       | 2  | their infringement of the asserted patents.                                   |
|       | 3  | Q.   And for the record, that number is $3,172,704.  Correct,                 |
|       | 4  | sir?                                                                          |
|       | 5  | A.   Yes, $3,172,704.                                                         |
| 08:42 | 6  | Q.   Okay.                                                                    |
|       | 7  |         MS. SMITH:  If we could see our next slide.                           |
|       | 8  | Q.   (BY MS. SMITH)  Mr. Scally, what framework did you use to                |
|       | 9  | reach that $3 million number?                                                 |
|       | 10 | A.   I used a framework known as the hypothetical negotiation.                |
|       | 11 | Q.   And explain to the jurors what a hypothetical negotiation                |
|       | 12 | is.                                                                           |
|       | 13 | A.   Yes, of course.  In a case that doesn't involve                          |
|       | 14 | infringement but parties are looking to understand what a                     |
|       | 15 | licensing arrangement might be, they would enter into an                      |
| 08:43 | 16 | arrangement and negotiate in good faith to get to a desired                   |
|       | 17 | outcome that was mutually beneficial.                                         |
|       | 18 |     In this case we don't have the benefit of that.  We have                  |
|       | 19 | an admitted infringer, and Barco didn't have the ability to                   |
|       | 20 | negotiate on its own behalf.  However, the Court has provided                 |
|       | 21 | guidance on how one might look at what a hypothetical                         |
|       | 22 | negotiation might look like between the parties in order to                   |
| 08:43 | 23 | get to a reasonably informed opinion on what the royalty rate                 |
|       | 24 | would be in this case.                                                        |
|       | 25 |         MS. SMITH:  And if we could see slide 6.                              |

| | | |
|---|---|---|
| | 1 | Q. (BY MS. SMITH) Mr. Scally, you said the Court has |
| | 2 | provided guidance. This isn't something you came up with, is |
| | 3 | it? |
| | 4 | A. No. I have not. This process is -- these 15 factors |
| | 5 | that are quantitative and qualitative in their perspective |
| | 6 | come from a seminal case known as the *Georgia-Pacific* case |
| 08:43 | 7 | which was, you know, back in 1970. So these -- this guidance |
| | 8 | is 55 years old, and it provides practitioners practical |
| | 9 | guidance on what are the elements that you may consider |
| | 10 | depending on the facts and circumstances of each specific case |
| | 11 | that would help inform a reliable opinion on what the |
| | 12 | reasonable royalty might be. |
| | 13 | Q. In analyzing the *Georgia-Pacific* factors, what materials |
| 08:44 | 14 | did you review to do your analysis and reach your opinion? |
| | 15 | A. I analyzed the same types of information that I would do |
| | 16 | on any large case like this. I looked at the pleadings, I |
| | 17 | certainly read through the patent documents, there was a |
| | 18 | license agreement that I thought was a reliable benchmark to |
| | 19 | consider, the Crestron/Barco license. |
| | 20 | I also looked at other confidential information regarding |
| 08:44 | 21 | information of the other licensee in that particular license, |
| | 22 | Crestron. I certainly reviewed relevant deposition testimony. |
| | 23 | And then I spent a lot of time reviewing financial |
| | 24 | records of both Barco and also Yealink. There was a |
| | 25 | significant amount of sales data specifically with regard to |

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
| 09:16 | 1  | THE COURT: All right. Well, notwithstanding the |
|       | 2  | communication we've just had, I don't find that there is a |
|       | 3  | failure to put Defendants on notice and I don't find anything |
|       | 4  | substantively erroneous about the demonstrative. I'll permit |
|       | 5  | the use of the demonstrative as it stands. |
|       | 6  | MS. SMITH: Thank you, Your Honor. |
|       | 7  | THE COURT: Let's proceed, counsel. |
|       | 8  | Q. (BY MS. SMITH) Mr. Scally, is -- on the screen I have a |
|       | 9  | comparison between the Crestron license agreement and your |
|       | 10 | hypothetical royalty rate. Can you tell us a little bit about |
| 09:16 | 11 | that comparison that you undertook? |
|       | 12 | A. Yes, I can. |
|       | 13 | Q. Please do so. |
|       | 14 | A. So my conclusion that $3,172,704 is my independent |
|       | 15 | analysis that used the hypothetical negotiation and the |
|       | 16 | *Georgia-Pacific* factors and all of my analysis and data to |
|       | 17 | arrive at that opinion. |
|       | 18 | The secondary line on this is the Crestron license |
|       | 19 | agreement, and this is an analysis of just applying the |
| 09:17 | 20 | existing established license in the marketplace using the |
|       | 21 | terms of the Crestron license between Crestron and Barco and |
|       | 22 | applying it to the unit sales of Yealink's infringing |
|       | 23 | products. |
|       | 24 | Q. Thank you so much for your time this morning, Mr. |
|       | 25 | Scally. |

|  |  |  |
|---|---|---|
|  | 1 | A. I just don't have the same conclusion that the dongle is |
|  | 2 | just simply an invaluable accessory. |
| 09:26 | 3 | Q. Do you understand that Yealink's base units operate |
|  | 4 | without dongles or can operate without dongles? |
|  | 5 | A. Yes, I do. |
|  | 6 | Q. And if people use the base units without dongles, is it |
|  | 7 | your understanding that infringes any of the six |
|  | 8 | patents-in-suit? |
|  | 9 | A. In that particular use case where one might not be using |
|  | 10 | a dongle with a base unit, yes, I believe that's not an |
| 09:26 | 11 | infringing activity. |
|  | 12 | Q. It's not. Right? So the use of the base units |
|  | 13 | themselves do not infringe. |
|  | 14 | A. That's my understanding. |
|  | 15 | Q. Thank you, sir. |
|  | 16 | Mr. Six [sic], you mentioned earlier that you -- in |
|  | 17 | forming your opinion in this case, you have conducted what's |
|  | 18 | called a hypothetical negotiation. Do you remember that? |
| 09:27 | 19 | A. It's Mr. Scally, but, yes, I do. |
|  | 20 | Q. I'm sorry. I think I called you Mr. Six. Mr. Scally, |
|  | 21 | I'm sorry about that. Do you need the question, again? |
|  | 22 | A. Yes, please. |
|  | 23 | Q. Remember earlier when you testified, you mentioned this |
|  | 24 | analysis called the hypothetical negotiation? |
|  | 25 | A. Yes. |

Case 2:23-cv-00521-JRG-RSP    Document 248-2    Filed 01/20/26    Page 7 of 14 PageID #: 12181

02:51   1  couple of reasons.  It's the first three here.  When we look
02:51   2  at the actual number of units based on the data that we have
        3  from Yealink that were sold, 96 of those Yealink base units --
        4  and you haven't heard this yet, but 96 percent of those were
        5  sold without a dongle.  So the base units themselves have an
        6  independent ability to operate.  They can be used with Teams,
02:51   7  they can be used with Zoom, they can be used with Miracast,
        8  they can be used with AirPlay, they can be used with wired
        9  solutions.
        10      The other thing that's really important is to look at
        11 what's actually been done in the real world.  And we have a
        12 license agreement here, and that's the Crestron license
        13 agreement that you've heard an awful lot about.  It's the
        14 benchmark.  People have referred to it -- Mr. Scally referred
02:52   15 to it as the benchmark.
        16
        17 Q.    Thank you.
        18 A.    And then ultimately with that royalty base, one thing
        19 that you haven't heard a lot about, I don't believe, is that
        20 there were                         that Yealink sold into the
02:52   21 United States during this period after they were informed in
        22 that cease and desist letter on May 17, 2023, until they
        23 stopped selling the dongles into the U.S. in April of 2024.
        24 Q.    So I see April 2024 there again.  And, again, why is it
        25 that you did not count any dongle sales after April 2024?

```
1          I HEREBY CERTIFY THAT THE FOREGOING IS A
2     CORRECT TRANSCRIPT FROM THE RECORD OF
3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES
5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE
6     COURT AND THE JUDICIAL CONFERENCE OF THE
7     UNITED STATES.
8
9     S/Shawn McRoberts            11/18/2025
10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER
12  .
```