# EXHIBIT C

09:52

1    implementing a non-infringing alternative.  By the same

2    reasoning, if avoiding the patent would be difficult,

3    expensive, or time consuming, the amount the party would be

4    willing to pay for a license may be greater.

5         You may compare the patented invention to non-infringing

6    alternatives to determine the value of the patented invention,

7    including the utility and advantages of the patent over the

8    old modes or devices, if any, that had been used to achieve

9    similar results.

09:53    10        Comparable license agreements are another factor that may

11   inform your decision as to the proper amount and form of the

12   reasonable royalty award, similar to the way in which the

13   value of a house is determined relative to comparable houses

14   sold in the same neighborhood.  If a license agreement is not

15   sufficiently comparable, you may not rely on it for

16   determining damages.

17        Whether a license agreement is comparable to the license

09:53    18   under the hypothetical license scenario depends on many

19   factors, such as whether they involve comparable technologies,

20   comparable economic circumstances, comparable structure, and

21   comparable scope.  If there are differences between the

22   license agreement and the hypothetical license, you must take

23   those into account when you make your reasonable royalty

24   determination.

25        In determining the amount of damages, you must award

626

1    You have 20 minutes remaining, Mr. Centurelli.  Do you

2  want any final warning on your time?

3          MR. CENTURELLI:  Yes, Your Honor; five minutes

4  please.

5          THE COURT:  I'll warn you with five minutes

6  remaining.  You may present Plaintiffs' final closing

7  argument.

8          MR. CENTURELLI:  Thank you, Your Honor.

9      Almost done.

10      What have we heard from Yealink?  They've admitted

10:52  11  infringement.  They've admitted infringement of six patents,

12  75 claims.  Think about that--six patents, 75 claims.  And

13  then a bunch of excuses for why we're still here.

14      Mr. Six came in and testified, testified -- landed on

10:53  15  Friday from Belgium, went to Amazon, ordered Yealink WPP,

16  bought it to deliver it to here in Marshall.  And they want

17  you -- where are the receipts?  Where are the receipts?

18  That's what their excuse is.

19      You have the ability to believe Mr. Six's testimony.

20      We had Mr. Brogioli?  What did he testify?  Yep, did the

21  same thing.  You have a right to believe Mr. Brogioli.  You

10:53  22  don't need the receipts to believe Mr. Six.  You don't need

23  the receipts to believe Mr. Brogioli.

24      What do we also know?  What do we also know?  Yealink

25  sold 29,000 dongles into the United States from 2018 through

10:54

10:54

10:55

10:55

1    whenever they stopped selling, at least 29,000.  What did we

2    just show?  Just showed a website.  How much do they sell

3    their dongles for?  $339.  So do the math.  How much did they

4    make on that?  $9,831,000.  How much have they paid Barco for

5    those sales?  Zero.  Zero.  And they think $600,000 is the

6    right number?  They think $600,000 is the right number?

7         If you take the 11,000 numbers that they claim is what's

8    at issue, times $339, guess what you get?  $3.838 million,

9    less -- that's more than just what we're asking for just in

10   that one year.  Just in that one year.

11        They suggest that our request that they disable the

12   products in the U.S. is an overreach.  They'd have to go to

13   Microsoft and say, Microsoft, we have to change our software.

14   That's -- we have six patents.  The patents are our right to

15   exclude.  We have a right to say, hey, stop infringing our

16   patents.  They need to do the steps necessary to stop

17   infringing.  That's why we're here.  We're here because they

18   won't do the steps, and we need your help.  We need your help

19   to get them to stop.

20        The Alliance Program.  They want to use this Alliance

21   Program to say, oh, hey, we're good actors.  I tell you a good

22   actor is not someone who you have to send a letter to in May,

23   please stop; a letter to in August, please stop; sue them

24   please stop; go through two years of litigation, please stop,

25   go through two days of trial, please stop.  That's not a good

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
1              I HEREBY CERTIFY THAT THE FOREGOING IS A

2         CORRECT TRANSCRIPT FROM THE RECORD OF

3         PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4         I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5         FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6         COURT AND THE JUDICIAL CONFERENCE OF THE

7         UNITED STATES.

8

9         S/Shawn McRoberts             11/19/2025

10        _____DATE_____
          SHAWN McROBERTS, RMR, CRR
11        FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```